T.C. Memo. 2003-224


UNITED STATES TAX COURT


WALTER L. MEDLIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2615-98.                Filed July 29, 2003.


<u>David D. Fussell</u> and <u>Mark L. Horwitz</u>, for petitioner.

<u>James F. Kearney</u>, <u>Benjamin A. de Luna</u>, and <u>Robert W. Dillard</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CONTENTS

GENERAL FINDINGS OF FACT . . . . . . . . . . . . . . . . . . 6

General Legal Principles . . . . . . . . . . . . . . . . . 20

I.  Items of Income  . . . . . . . . . . . . . . . . . . . 21

    A.  Rents Received From Island Livings, Inc. in 1988 . 22

FINDINGS OF FACT . . . . . . . . . . . . . . . . . 22
OPINION . . . . . . . . . . . . . . . . . . . . . 22

B.  Schedule C Gains From Property Sales  . . . . . . 23

   1.  Florida Fruit Belt Subdivision (OS-06) . . . 23

       FINDINGS OF FACT . . . . . . . . . . . . . 23
       OPINION . . . . . . . . . . . . . . . . . . 24

   2.  Susan's Lakefront Estate (OS-03) . . . . . . 28

       FINDINGS OF FACT . . . . . . . . . . . . . 28
       OPINION . . . . . . . . . . . . . . . . . . 29

   3.  High Plains Property (OS-35) . . . . . . . . 30

       FINDINGS OF FACT . . . . . . . . . . . . . 30
       OPINION . . . . . . . . . . . . . . . . . . 31

   4.  Silver Lake (OS-1.4) . . . . . . . . . . . . 36

       FINDINGS OF FACT . . . . . . . . . . . . . 36
       OPINION . . . . . . . . . . . . . . . . . . 37

   5.  East Lake Vista (OS-47) . . . . . . . . . . 38

       FINDINGS OF FACT . . . . . . . . . . . . . 38
       OPINION . . . . . . . . . . . . . . . . . . 42

   6.  Grissom Parcels (OS-1.3) . . . . . . . . . . 52

       FINDINGS OF FACT . . . . . . . . . . . . . 52
       OPINION . . . . . . . . . . . . . . . . . . 53

   7.  Arrowhead Lakes Subdivision (OR-2),
        Angel-Royse Property (OS-39) . . . . . . . 58

       FINDINGS OF FACT . . . . . . . . . . . . . 58
       OPINION . . . . . . . . . . . . . . . . . . 60

   8.  Prather Ranch Property (OR-01) . . . . . . . 65

       FINDINGS OF FACT . . . . . . . . . . . . . 65
       OPINION . . . . . . . . . . . . . . . . . . 68

   9.  Citrus County Property . . . . . . . . . . . 75

FINDINGS OF FACT . . . . . . . . . . . . . . 75
OPINION . . . . . . . . . . . . . . . . . . 77

C.  Miscellaneous Items of Schedule C Income  . . . . 81

FINDINGS OF FACT . . . . . . . . . . . . . . 81
OPINION  . . . . . . . . . . . . . . . . . . 82

D.  Schedule E Income . . . . . . . . . . . . . . . 82

FINDINGS OF FACT . . . . . . . . . . . . . . 82
OPINION  . . . . . . . . . . . . . . . . . . 83

E.  Unidentified Deposits . . . . . . . . . . . . . 83

1.  Deposit on March 12, 1985, of $59,000  . . . 84

FINDINGS OF FACT  . . . . . . . . . . . . 84
OPINION  . . . . . . . . . . . . . . . . 85

2.  Deposit on September 16, 1986, of $84,521.63  88

FINDINGS OF FACT  . . . . . . . . . . . . 88
OPINION  . . . . . . . . . . . . . . . . 89

3.  Deposit on April 9, 1987, of $67,740 . . . . 93

FINDINGS OF FACT  . . . . . . . . . . . . 93
OPINION  . . . . . . . . . . . . . . . . 95

4.  Deposit on July 8, 1988, of $140,000 . . . . 96

FINDINGS OF FACT  . . . . . . . . . . . . 96
OPINION  . . . . . . . . . . . . . . . . 98

5.  Other Deposits . . . . . . . . . . . . . . 103

FINDINGS OF FACT  . . . . . . . . . . . . 103
OPINION  . . . . . . . . . . . . . . . . 103

F.  Deductions Claimed by Petitioner  . . . . . . . . 103

1.  Schedule C Real Estate Business Deductions . 103

FINDINGS OF FACT  . . . . . . . . . . . . 103
OPINION  . . . . . . . . . . . . . . . . 104

2.  Personal Residence Interest  . . . . . . . 105

FINDINGS OF FACT . . . . . . . . . . . . . . 105
OPINION . . . . . . . . . . . . . . . . . . 105

3.  Orange Grove, Cattle, and Ferrari
Activities . . . . . . . . . . . . . . . . 106

FINDINGS OF FACT . . . . . . . . . . . . . . 106
OPINION . . . . . . . . . . . . . . . . . . 108

G.  Self-employment Tax . . . . . . . . . . . . . . . 116

FINDINGS OF FACT . . . . . . . . . . . . . . 116
OPINION . . . . . . . . . . . . . . . . . . 116

II.  Additions to Tax for Fraud . . . . . . . . . . . . . 118

A.  Underpayment of Tax Required To Be Shown
on a Return . . . . . . . . . . . . . . . . . 121

1.  Underpayment for 1985 . . . . . . . . . . . . 122

2.  Underpayment for 1986 . . . . . . . . . . . . 128

3.  Underpayment for 1987 . . . . . . . . . . . . 131

4.  Underpayment for 1988 . . . . . . . . . . . . 132

5.  Conclusion . . . . . . . . . . . . . . . . . 135

B.  Fraudulent Intent . . . . . . . . . . . . . . . . 135

1.  Clear and Convincing Evidence of Fraud . . . 135

2.  Portion of Underpayment Not Attributable
to Fraud . . . . . . . . . . . . . . . . . 145

C.  Section 6653(b)(2) Addition to Tax for 1985 . . . 153

III.  Statute of Limitations for Assessment . . . . . . . 155

Appendix A . . . . . . . . . . . . . . . . . . . . . . . 157

Appendix B . . . . . . . . . . . . . . . . . . . . . . . 162

Appendix C . . . . . . . . . . . . . . . . . . . . . . . 164

Appendix D . . . . . . . . . . . . . . . . . . . . . . . 171

RUWE, Judge:  Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows:

| Year | Deficiency | Additions to Tax | | | |
|------|-----------|------------------|--|--|--|
| | | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) |
| 1985 | $86,533 | $43,736 | 50% of the Interest Due on $87,471 | --- | --- |
| 1986 | 165,732 | --- | --- | $124,340 | 50% of the Interest Due on $165,787 |
| 1987 | 309,456 | --- | --- | 232,092 | 50% of the Interest Due on $309,456 |
| 1988 | 64,910 | 51,021 | --- | --- | --- |

After concessions,[1] the issues for decision are:  (1) Whether petitioner had unreported income from various real estate transactions, from commissions, interest, rents, and unidentified deposits for the years in issue; (2) whether petitioner is liable for additions to tax for fraud under section 6653(b);[2] and (3) whether assessment of the alleged deficiencies is barred by the statute of limitations.  For convenience and clarity, general findings of fact are discussed first followed by a statement of general legal principles applicable to this opinion; separate

---

[1]The concessions of petitioner and respondent, as well as the amounts which remain in dispute, are detailed in app. C. Petitioner on brief adopts respondent's statement of the issues settled by the parties and the accompanying schedules thereto.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

findings of fact and opinion are then set forth for each item of unreported income. Finally, we discuss whether the additions to tax for fraud apply and whether assessment is barred by the statute of limitations.

GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time of filing the petition, petitioner resided in Kissimmee, Florida.

Since the 1960s through the present, petitioner has been engaged in the business of buying and selling real estate, as well as real estate development. Petitioner used Donna Allen (Ms. Allen), Michael Johnson,[3] and R. Stephen Miles, Jr. (Mr. Miles), as trustees for the buying and selling of real estate. Ms. Allen's and Mr. Johnson's only duties as trustees were to hold title to the various properties in trust.

Petitioner met Ms. Allen in 1971, and since 1974, she has worked for petitioner as a bookkeeper, secretary, and housekeeper. Petitioner and Ms. Allen had a child together in 1982. The child lived with Ms. Allen from 1982 through 1990. Petitioner agreed to pay child support of $50,000 per year to Ms. Allen. Since 1975, petitioner has given real property and two

---

[3]Michael Johnson was petitioner's cousin.

Ferrari automobiles to Ms. Allen. Petitioner owed Ms. Allen money for a number of different things, including child support.

Mr. Miles is an attorney in the State of Florida, and he has known petitioner since 1959. He has been petitioner's real estate attorney since 1975, and he started acting as a trustee for petitioner at that time. As trustee, Mr. Miles did whatever petitioner instructed him to do. Mr. Miles held the proceeds from petitioner's sales of real estate in his law firm's trust account. Alana Goodman was a bookkeeper for Mr. Miles's law firm, and she maintained ledger cards which reflected the identity of properties held in trust, the date that funds were deposited or disbursed, and the amounts that were deposited and disbursed from the law firm's trust account.

On several occasions, petitioner instructed Mr. Miles or Ms. Goodman to disburse his funds from the law firm's trust account for various payments: (1) On December 23, 1985, a house payment of $51,266.25 was paid to Walter E. and Maxine Melitshka from the trust account with respect to petitioner's personal residence; (2) on May 15, 1987, a house payment of $71,266.25 was paid to Mr. and Mrs. Melitshka with respect to petitioner's personal residence; (3) on May 21, 1987, petitioner's accountant, John F. Kelly, was paid $12,187.50; (4) on June 15, 1987, $32,500 was

paid for the purchase of a 1960 Ferrari;[4] (5) on July 2, 1987, Ms. Allen was paid $31,800; (6) on July 9, 1987, income taxes of $8,472 were paid to the Internal Revenue Service (IRS); (7) on July 28, 1987, $12,000 was paid to Mid America Exotic Auto Sales; (8) on July 30, 1987, income taxes of $1,482 were paid to the IRS; (9) on September 17, 1987, child support of $10,000 was paid to Ms. Allen; (10) on October 9, 1987, a house payment of $30,000 was paid to Mr. and Mrs. Melitshka with respect to petitioner's personal residence; (11) on November 2, 1988, political contributions of $2,800 were paid. None of those payments from the law firm's trust account were reported as income by petitioner.

Mr. Kelly prepared petitioner's Forms 1040, U.S. Individual Income Tax Returns, for 1983 through 1988.[5] Petitioner provided Mr. Kelly with spreadsheets which reflected deposits into, and expenditures from, petitioner's bank accounts for the years 1983 through 1988.[6] Those spreadsheets provided the basis for preparing petitioner's tax returns for those years: The income

---

[4]The bill of sale and the application for a temporary tag for the Ferrari were in the name of Mr. Miles's law firm; however, petitioner was its actual owner.

[5]Mr. Kelly is a certified public accountant who has known petitioner since 1975. Mr. Kelly and petitioner were members of the Ferrari Club of America.

[6]The spreadsheets were prepared by Ms. Allen at petitioner's request. Petitioner provided Ms. Allen guidance in preparing the spreadsheets.

reported on the returns reflected deposits into petitioner's bank accounts, less any deposits that were classified as loan proceeds. Any amounts not deposited into petitioner's bank accounts were not reported as income. Petitioner did not provide Mr. Kelly with checks, real estate contracts, real estate closing statements or any other books or records to prepare his income tax returns. Petitioner did not inform Mr. Kelly that the proceeds from his real estate sales were deposited in Mr. Miles's law firm's trust account, and those proceeds were not reflected on the spreadsheets. Petitioner did not inform Mr. Kelly of any additional income. Throughout the 1980s and 1990s, petitioner asked Mr. Kelly questions about the requirements for like-kind exchanges.

Petitioner requested extensions for the filing of his income tax returns for 1985, 1986, 1987, and 1988. Petitioner's Form 2688, Application for Extension of Time to File U.S. Individual Income Tax Return, for the 1985 tax year states as his need for an extension: "Client derived substantially all his income from a bulk land transaction, which was extremely complex. Additional time is needed to analyze the transaction." Petitioner did not provide any information to Mr. Kelly regarding any bulk land sale transaction. Petitioner requested an extension for tax years 1986, 1987, and 1988, because "Taxpayer has not received all needed K-1's for 1065 & 1120 tax returns that represent a

substantial portion of his income. Without these items a complete and accurate return cannot be prepared." Petitioner provided no Schedules K-1 to Mr. Kelly.[7]

On petitioner's Form 1040, Schedule C, Profit or (Loss) From Business or Profession, for 1985, petitioner listed his principal business or profession as "Real Estate Development". Petitioner reported no income from gross receipts or sales, but he did report $160,363 as "Other income Commissions, Fees & Interest" and claimed deductions of $152,481. See appendix A. Petitioner reported a net profit from his real estate development business of $7,882 on his Form 1040. This was the only amount petitioner reported as income for 1985. Petitioner reported taxable income of $5,802 and a tax of $426.

On petitioner's Form 1040, Schedule C, for 1986, petitioner listed his principal business or profession as "Real Estate Development". He likewise reported no income from gross receipts or sales, reported $119,772 as "Other income Commissions, Fees & Interest", and claimed deductions of $115,634. See appendix A. Petitioner reported a net profit from his real estate development business of $4,138 on his Form 1040. This was the only amount

_____

[7]Mr. Kelly discussed Schs. K-1 with Mr. Miles and Mr. Miles's accountant. However, the accountant informed him that Schs. K-1 would not be provided and that any information that would have been on those schedules should be put on petitioner's personal income tax returns.

petitioner reported as income for 1986.  Petitioner reported

taxable income of $2,058 and a tax of $0.

On petitioner's Form 1040, Schedule C, for 1987, petitioner

listed his principal business or profession as "Real Estate

Development".  He reported no income from gross receipts or

sales, reported $138,653 as "Other income * * * Fees, int, &

Sales", and claimed deductions of $94,434.  See appendix A.

Petitioner reported a net profit from his real estate development

business of $44,219 on his Form 1040.  This was the only amount

petitioner reported as income for 1987.  Petitioner reported

taxable income of $37,879 and a tax of $7,515.

On petitioner's Form 1040, Schedule C, for 1988, petitioner

listed his principal business or profession as "Developer/Real

Estate".  Petitioner reported $61,921 as income from gross

receipts or sales, reported no "Other income", and claimed

deductions of $43,713.  See appendix A.  Petitioner reported a

net profit from his real estate development business of $18,208

on his Form 1040.  This was the only amount petitioner reported

as income for 1988.[8]  Petitioner reported taxable income of

$5,206 and a tax of $784.

In 1985, petitioner purchased a ring, earrings, and two

necklaces for Ms. Allen as a gift.  Those items cost $14,540,

---

[8]Petitioner claimed an S corporation loss from Frank's
Corner, Inc., of $4,702 in 1988.

which petitioner deducted as commissions paid on Schedule C of his 1985 tax return. Petitioner deducted the costs of his subscriptions to Playboy and Penthouse magazines on his 1986 tax return as Schedule C business expenses.

The trusts that petitioner used did not file tax returns for any of the tax years at issue. During 1985-88, petitioner never informed Mr. Miles that petitioner believed that he had no obligations to report his earnings from the trust transactions, because they supposedly involved tax free exchanges.

Petitioner used the fictitious names "John Waltin"[9] and "William R. Wright" in some of his real estate transactions during the tax years at issue. Petitioner signed various real estate documents as "William R. Wright". Petitioner signed that name as a notary public on real estate documents and on articles of incorporation filed with the State of Florida. Petitioner used and signed the name "D.W. Davis" to purchase and sell real estate. He opened a bank account in that name without the knowledge of Mr. Davis. At one time, petitioner was a notary public in the State of Florida; however, his license expired. Petitioner continued to notarize documents after his license expired.

---

[9]At trial, petitioner claimed that the name John Waltin was not a fictitious name because "there's probably a John Waltin somewhere."

Mr. Miles held properties in land trusts, which we refer to as the Mefford Property (OS-22) and Susan's Lakefront Estate (OS-03). Mr. Miles, as trustee, applied for and received an employer identification number for those land trusts. Respondent requested tax returns from Mr. Miles for the land trust holding the Mefford Property for 1985, 1986, and 1987. Respondent also requested tax returns from Mr. Miles for the land trust holding Susan's Lakefront Estate for 1984, 1985, and 1986. Mr. Miles discussed with petitioner this latter request. Mr. Miles informed respondent that the trusts were not required to file returns because each of the beneficiaries had filed a return and reported his or her share of the income.[10]

In 1985-88, petitioner was a shareholder and officer in Frank's Corner, Inc., which operated a bar and lounge (Island Living, Inc.), a furniture import business, and Waltin Investments, Inc. Petitioner was also a shareholder in Medlin Investment Co., Michigan Avenue Car Wash, Majestic Oaks, and Cheyenne Social Club. During the tax years at issue, petitioner owned approximately 25 Ferrari automobiles. Petitioner did not sell any of those Ferraris during 1985-88.

On December 17, 1985, petitioner sold a piece of property to Fred Brunson for $5,000. The quitclaim deed that petitioner or

---

[10]Mr. Miles testified that he supposed that he got this information from petitioner.

his agent filed with the Osceola County Recorders Office paid documentary stamp taxes of only $.50, reflecting a reported sales price of less than $100.

Petitioner maintained the following bank accounts during the tax years at issue:

| Bank Name | Account Number | Account Name |
|---|---|---|
| Freedom Savings and Loan (formerly Com Bank) | 32-480-9 | Walter L. Medlin Trust Account 1 |
| Tucker State Bank | 1089234 | Walter L. Medlin |
| Tucker State Bank | 18066 | Walter L. Medlin Trust Account 1 |

The accounts titled "Trust Account 1" were actually petitioner's personal bank accounts. Petitioner was also the beneficiary of a Cayman Islands trust account at Washington International Bank and Trust, Ltd., which he had funded.

On a financial statement dated November 15, 1985, petitioner represented that he had a net worth of $10,822,260, and he valued his automobile collection at $2,717,000. On a financial statement dated June 1, 1988, petitioner represented that he had a net worth of $7,121,800. On a financial statement dated September 20, 1989, petitioner represented that he had a net worth of $8,837,000.[11]

Thomas Brooks, a certified public accountant, prepared petitioner's tax returns for the 1977-1982 tax years. Petitioner provided spreadsheets of his income and expenses to Mr. Brooks

_____

[11]The financial statements dated June 1, 1988, and Sept. 20, 1989, do not include a listing for petitioner's automobile collection.

for the preparation of his tax returns.  Mr. Kelly prepared those spreadsheets using as their basis the deposits and disbursements into, and from, petitioner's bank accounts.  Petitioner did not inform Mr. Brooks that the proceeds from his real estate transactions were deposited into Mr. Miles's law firm's trust account, that those proceeds were not accounted for on the spreadsheets, that petitioner used trustees in his transactions, or that petitioner had a Cayman Islands trust account. Petitioner did not give to Mr. Brooks any books, records, or closing statements from his real estate transactions.  Petitioner did not file timely his Federal income tax returns for 1977, 1978, 1979, 1980, and 1981.  Petitioner did not file his Forms 1040 for those years until June 15, 1983.

Respondent audited petitioner for the 1977-1982 tax years, and respondent issued a notice of deficiency for those years on June 13, 1986.[12]  On September 12, 1986, petitioner filed a petition with the Tax Court (docket No. 36958-86).  In January 1988, petitioner and his representative met with respondent's revenue agent for purposes of resolving that case.  Petitioner took an active role in those meetings.  Most of the real estate transactions which were at issue for the 1977-1982 tax years

---

[12]Petitioner's representative would not allow petitioner to meet with respondent's revenue agent assigned to examine his returns or to extend the period of limitations, unless respondent gave petitioner immunity from criminal prosecution.

involved the use of trustees, and petitioner agreed that those particular transactions were taxable. Petitioner did not inform the revenue agent that proceeds from his real estate transactions were deposited into Mr. Miles's law firm's trust account, nor did he inform him of his belief that those proceeds were not subject to taxation if not disbursed. On April 27, 1988, this Court entered a decision pursuant to a stipulation of the parties and found the following deficiencies and additions to tax:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Tax Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1977 | $1,082 | $2,240 | $54 | n/a | n/a | n/a |
| 1978 | 22,213 | 10,661 | 1,161 | n/a | n/a | n/a |
| 1979 | 63,533 | 15,883 | 3,177 | n/a | n/a | n/a |
| 1981 | 7,110 | 1,778 | n/a | $356 | 50% interest on $7,110 | n/a |
| 1982 | 37,921 | 3,792 | n/a | 1,896 | 50% interest on $37,921 | $9,480 |

Petitioner did not file timely his Forms 1040 for 1983 and 1984. Those tax returns were filed on January 30, 1986, and March 7, 1986, respectively. Respondent examined those tax returns. Petitioner told the revenue agent assigned to that examination that he was not involved in any corporations, partnerships, or trusts. Petitioner's income for 1983 and 1984 was determined on the basis of deposits and disbursements from his bank accounts. The revenue agent explained to petitioner that simply analyzing deposits into his bank account was not the proper way to report income and did not reflect the true financial picture of his real estate transactions. Petitioner

did not disclose all his installment sale activities to the revenue agent during this examination. Petitioner also informed the revenue agent that his Cayman Islands trust account had been closed in 1983. However, petitioner received five checks totaling $135,000 from the Cayman Islands trust in 1985. On October 21, 1988, petitioner agreed to income tax deficiencies of $10,550 and penalties of $3,584 for those tax years.

Respondent received Forms 1040 for petitioner's 1985 and 1986 tax years on November 29, 1988. Those forms were not timely filed.[13] Petitioner's Form 1040 for 1987 was received on October 17, 1988. Petitioner was given an extension until October 16, 1989, to file his 1988 Federal income tax return. Petitioner did not file his Form 1040 for 1988 until April 26, 1990. For each of his Forms 1040 for 1985, 1986, 1987, and 1988, petitioner listed his address as "P.O. Box 383, Lake Lure, NC 28746". However, petitioner actually resided in Kissimmee, Florida, at the time he filed his returns.

Respondent examined petitioner's 1985, 1986, 1987, and 1988, tax returns. As part of that examination, respondent's revenue agent spent several weeks researching courthouse records in seven counties in order to identify petitioner's real estate

---

[13]Petitioner claims to have previously filed timely returns for 1985 and 1986; however, respondent could not find those purported returns. Petitioner did not produce copies of any such returns, and he did not present any evidence or testimony on the subject of those purported returns.

transactions for 1985-88.  Petitioner never informed the revenue agent of his belief that funds from his real estate transactions, which were held in trust, were not subject to taxation. Respondent reconstructed petitioner's income and expenses for 1985, 1986, 1987, and 1988.

On September 5, 1990, respondent served a third-party recordkeeper summons on Mr. Miles, which requested information pertaining to petitioner's income tax liabilities for the 1985-88 tax years.  At the request of petitioner's representative, Mr. Miles did not provide the requested documents to the IRS.  On March 7, 1991, the Government filed a petition in the U.S. District Court for the Middle District of Florida, Orlando Division, to enforce the summons issued to Mr. Miles.  On March 26, 1991, petitioner filed a motion to intervene in the enforcement proceeding.  On September 17, 1992, the Government filed a notice to dismiss, and, on September 18, 1992, the court canceled a show cause hearing and dismissed the summons enforcement proceeding.  On April 18, 1991, respondent served a summons on petitioner.  Petitioner failed to comply with the summons, and the Government filed a petition to enforce the summons in the U.S. District Court for the Middle District of Florida, Orlando Division.

On June 12, 1997, an information was filed in the U.S. District Court for the Middle District of Florida alleging that

petitioner violated section 7206(4) in regard to his unpaid income tax liabilities for 1977-82. On November 13, 1997, pursuant to petitioner's plea of guilty, the District Court entered a judgment convicting petitioner of a violation of section 7206(4) and sentenced petitioner to imprisonment. The offense to which petitioner pleaded guilty occurred on August 9, 1990. In the plea agreement, petitioner admitted:

> WALTER L. MEDLIN, in an attempt to avoid the collection of a previously assessed income tax liability for which levy was authorized under 26 U.S.C. § 6331, placed three of his automobiles in a storage facility, located on Michigan Avenue in Kissimmee, Florida, in the Middle District of Florida, which facility leased to an entity called Central Florida Transportation Museum, Inc.
>
> Specifically, the defendant MEDLIN, after consenting to a United States Tax Court judgment against him in the approximate amount of $400,000.00 for liabilities stemming from tax years 1977-1982, misrepresented the nature and extent of his assets to an IRS Revenue Officer. Further, after issuance of the levy, defendant MEDLIN stored the automobiles in the above-referenced storage facility and, when asked about the case by and [sic] IRS Revenue Officer, stated that he no longer owned the vehicles. MEDLIN knew this statement to be false.

On November 14, 1997, respondent issued a notice of deficiency to petitioner for 1985, 1986, 1987, and 1988. On February 11, 1998, petitioner filed his petition.

Petitioner testified on his own behalf at trial. We find that, generally, his testimony was self-serving, was not credible, was at times inconsistent, and was at other times confusing. Petitioner did not satisfactorily answer many of the

questions that he was asked, and the questions that he did answer he did not answer with any degree of specificity.  With respect to the real estate transactions, he was evasive and did not recall specific transactions.  Petitioner could not testify whether his financial statements were accurate.

## General Legal Principles

Respondent's determinations of unreported income for the tax years at issue are presumed correct, and petitioner bears the burden of proving those determinations incorrect, arbitrary, or erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Parks v. Commissioner, 94 T.C. 654, 658-659 (1990).  On the other hand, respondent has the burden of proving by clear and convincing evidence that some portion of an underpayment of taxes by petitioner is due to fraud.  Sec. 7454(a); Rule 142(b).

Section 6001 requires taxpayers to keep adequate records. The regulations promulgated under that section provide:

> Records.  (a) In general. * * * any person subject
> to tax under subtitle A of the Code * * * or any person
> required to file a return of information with respect
> to income, shall keep such permanent books of account
> or records, including inventories, as are sufficient to
> establish the amount of gross income, deductions,
> credits, or other matters required to be shown by such
> person in any return of such tax or information.  [Sec.
> 1.6001-1(a), Income Tax Regs.]

In Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), we stated:

> The rule is well established that the failure of a
> party to introduce evidence within his possession and

which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable.  This is especially true where * * * the party failing to produce the evidence has the burden of proof or the other party to the proceeding has established a prima facie case. * * *

Also, the failure to present the testimony of available witnesses, who purportedly possess knowledge about certain relevant facts, provides sufficient basis to infer that the testimony of those witnesses would not have been favorable. Petzoldt v. Commissioner, 92 T.C. 661, 691 (1989); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968).

We are not required to accept incredible, implausible, or biased testimony.  Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. T.C. Memo. 1967-85; Parks v. Commissioner, supra at 659; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

I.    Items of Income Determined by Respondent

Respondent prepared on brief a reconciliation of items which are "in dispute" and concessions as to the adjustments in the statutory notice of deficiency.  Appendix C of this opinion reflects the reconciliation schedules that respondent prepared and which petitioner stipulated in his answering brief.  We discuss below those items of income that the parties represented were still in dispute.  However, we point out that petitioner does not contest on brief many of those items.  Instead, he

states "In addition, any issues not raised in Petitioner's Brief are also conceded by Petitioner."

A.  Rents Received From Island Living, Inc. in 1988

FINDINGS OF FACT

In 1985, petitioner through Mr. Miles, as trustee, purchased property located in Osceola County, Florida, the "Osceola County Property" (OS-19).  On July 22, 1985, petitioner leased that property to petitioner's corporation, Island Living, Inc., for $3,000 per month.  Petitioner concedes that he received rents of $6,000 in 1985, $24,000 in 1986, $24,000 in 1987, and $12,000 in 1988 from Island Living, Inc.

OPINION

Petitioner did not address on brief whether he received the additional amount of $12,000 that respondent determined as rent in 1988.  We find that petitioner has conceded this matter.  We find that he received $24,000 of rental income in 1988 and that he is taxable on that amount.  See sec. 61(a)(5).

B.  Schedule C Gains From Property Sales

1.  Florida Fruit Belt Subdivision (OS-06)

FINDINGS OF FACT

On April 11, 1985, petitioner through Mr. Miles, as trustee, sold three lots from the "Florida Fruit Belt Subdivision" located in Osceola County, Florida, to Burl and Louise Mynhier for $69,000.  Mr. and Mrs. Mynhier paid cash of $33,000 and issued to

petitioner, through Ms. Allen, a promissory note and mortgage for $36,000. Petitioner's basis in the three lots was $9,316, and he incurred selling costs of $412.

On May 20, 1985, petitioner through Ms. Allen, as trustee, assigned the mortgage that the Mynhiers issued to his father, Charles Medlin, for $36,000. Petitioner instructed the mortgagor to send the mortgage payments directly to Charles Medlin. An assignment of mortgage dated May 20, 1985, and signed by Ms. Allen, was filed with the County of Osceola, Florida; it provides:

> That I, Donna L. Allen part[y] of the first part, in consideration of the sum of Thirty-Six Thousand and no/100 dollars, and other valuable considerations, received from or on behalf of Charles B. Medlin party of the second part, at or before the ensealing and delivery of those presents, the receipt whereof is hereby acknowledged, do hereby grant, bargain, sell, assign, transfer and set over unto the said part[y] of the second part a certain mortgage bearing date the 12th day of April A.D. 1985 made by Burl R. Mynhier and Louise Mynhier, his wife in favor of Donna L. Allen and recorded in Official Records Book 772; page 782, public records of Osceola County, Florida, upon the following described piece or parcel of land, situate and being in said County and State, to wit:

> [Description of OS-06]

> * * * * * * *

> Together with the note or obligation described in said mortgage, and the moneys due and to become due thereon, with interest from the 20th day of May 1985.

> To Have and to Hold the same unto the said party of the second part his heirs, legal representatives, successors and assigns forever.

Petitioner did not report any income from the sale to the Mynhiers on his Form 1040 for 1985.

## OPINION

An installment sale is a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. Sec. 453(b). Income from an installment sale shall be taken into account under the installment method. Sec. 453(a). Under the installment method, the income recognized for any taxable year from a disposition is that proportion of the payments received in that year which the gross profit bears to the total contract price. Sec. 453(c). Respondent determined that petitioner recognized $28,347 as income from the installment sale to the Mynhiers in 1985.[14] Petitioner did not address this issue on brief, and he conceded any arguments he might have made, but did not. We hold that petitioner recognized $28,347 as income from the installment sale in 1985.

Under section 453B(a), gain or loss shall be recognized on the sale or exchange of an installment obligation to the extent of the difference between the basis of the obligation and the amount realized. The basis of an installment obligation shall be

_____

[14]Respondent computed the installment gain in 1985 as follows: Gross profit ($59,272) = sales price ($69,000) minus selling expenses ($412) minus basis ($9,316); gross profit percentage (0.859014) = gross profit ($59,272)/contract price ($69,000); income from installment sale ($28,347) = payments in 1985 ($33,000) x gross profit percentage (0.859014).

the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. Sec. 453B(b). Any gain or loss recognized shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. Sec. 453B(a) (flush language).

Respondent determined that the assignment by petitioner to Charles Medlin was a sale of an installment obligation under section 453B(a) and that petitioner recognized a gain of $30,925 in 1985.[15] Petitioner argues that the assignment of the mortgage to his father was not a sale but that it was pledged as collateral for a loan.

At trial, petitioner testified as follows:

Q    All right. Would you explain what transpired in relation to this mortgage and how you dealt with the mortgage in relation to your father?

A    From the sale of the property, there was down payment for cash. And then the mortgage, we took out the mortgage. And the guy would make payments; I believe they were annual payments, or maybe monthly; I'm not sure. Anyway, he was going to make payments, but I needed some money.

And my father, again, he was mainly a go-put-his-money-in-the-bank; he wasn't interested in real estate deals or anything, and I was probably sitting around moaning to him about the interest I was paying to other people like Mr. Margolis and things like that; he expressed an interest in--why didn't I give him some of

---

[15]Respondent computed the gain from the purported sale of the installment obligation as follows: Gain from sale of installment obligation ($30,925) = face value of the obligation sold ($36,000) x gross profit percentage (0.859014).

that?  And I was reluctant.  He lived in Jacksonville
and didn't know anything about my business or anything
else, so--but, anyway, this was something he could
relate to.  It was a mortgage on a piece of property
and there were payments coming in and I went to him and
borrowed--I'd borrowed from him before, just smaller
amounts of money--some money from him against the
mortgage, and signed a note to him as collateral, and
proceeded to continue to collect the payments.  Again,
trying to make him feel warm and fuzzy, instructed the
mortgagor to send the mortgage payments directly to my
dad.  We stayed on top of it and if they were a day
late, he called, and we had to go round up the guy and
get it to him.

Basically, it was a loan from my dad and as I got
in my payments from the other guy, they were forwarded
either directly to him or I got the payments in and
forwarded them directly to my dad.  Unlike where you
sell a mortgage without recourse and it's gone, it's
the other person's mortgage and you get the money and
go home, I had to live with this.  And, if he had quit
paying, my father didn't want a piece of property in
Osceola County, at his age, his health, you know, I was
going to have to pay the mortgage.

Q    You were going--

A    Right.  I was going to have to pay the loan in
lieu of the mortgage payments?

Q    So your position in relation to the handling of
that mortgage is that you did not sell the mortgage to
your father?

A    Correct.  As collateral, though, it was assigned
to him.  And that's customary practice.  I've borrowed
against mortgages, mortgage payments, from like Finance
America, Chrysler Financial Corporation, and stuff and
generally what you do is assign them a mortgage,
usually you assign them the mortgage and a portion of
the note.  Say you only borrowed the next five
payments, say, you would assign them a portion of the
note.

Petitioner's testimony is self-serving, is less than credible,

and it is not supported by the testimony of other witnesses or

evidence of record. Indeed, on brief, petitioner states that "Mr. Medlin's testimony clouded by the passage of so many years was not precise." We cannot accept petitioner's unsubstantiated testimony.[16]

If we were to accept petitioner's unsubstantiated testimony at face value that an installment obligation was pledged as collateral for loan proceeds, section 453B would be largely ineffective. Where as here, no documentary proof has been introduced to show that petitioner remained personally liable for any failure of the mortgagor's payment, we cannot accept that the assignment was a pledge of collateral.

Certainly, the form of the assignment was a sale. The assignment of mortgage filed with Osceola County states that Ms. Allen assigned the mortgage to Charles Medlin "in consideration of the sum of" $36,000. Moreover, petitioner's instructions to the mortgagor were that direct payments were to be made to his father following the assignment. Further, although petitioner testified to his continued involvement in the collection of the mortgage, he could not testify definitively as to whether he or Charles Medlin received the mortgage payments. Nevertheless, petitioner claims that the assignment of the mortgage occurred

---

[16]Petitioner testified that he signed a promissory note to his father as collateral; however, he did not produce any such note for the record. Petitioner relies solely on his testimony and cites the fact that records and witnesses have been lost or are unavailable.

without an assignment of the promissory note and that this indicates the mortgage was assigned to Charles Medlin as collateral for a loan.[17]  However, the assignment of the mortgage states that the mortgage "Together with the note or obligation described in said mortgage, and the moneys due and to become due thereon" were transferred.  We hold that petitioner recognized gain of $30,925 from the sale of an installment obligation in 1985.

### 2.  Susan's Lakefront Estate (OS-03)

#### FINDINGS OF FACT

In 1970, Medlin Investment Co. purchased certain real property in Osceola County, Florida, for $59,005.  This property was subdivided as "Susan's Lakefront Estate" and consisted of 30 lots (Lot 1, Lot 2, * * *, Lot 30) and one tract (Tract A).

On July 2, 1985, petitioner through Ms. Allen, as trustee, sold Lot 1 for $22,000.  Petitioner did not report any income from this sale on his 1985 Form 1040.  On June 12, 1986, petitioner through Ms. Allen, as trustee, sold Tract A, for $23,000.  Petitioner did not report any income from this sale on his 1986 Form 1040.  On May 25, 1988, petitioner through Mr.

---

[17]We note that a mortgage generally secures payment of the underlying installment obligation and that an assignment of the mortgage without an assignment of the note creates no right in the assignee with respect to the note.  See Vance v. Fields, 172 So. 2d 613, 614 (Fla. Dist. Ct. App. 1965).

Miles, as trustee, sold Lots 6 through 30, for $540,000.[18]  The purchasers paid $89,077 in 1988 and issued a purchase money mortgage for the remainder.  We are unable to locate this payment on petitioner's spreadsheets for 1988, and it does not appear that he reported any amount of this payment as income on his return for 1988.

OPINION

In computing petitioner's gains from the sales in 1985, 1986, and 1988, respondent apportioned the cost basis of the entire property equally among Lots 1 through 30 and Tract A, and assigned a basis of $1,903 to each lot and tract.[19]  Respondent determined that petitioner realized a gain of $20,097 from the sale in 1985,[20] a gain of $21,097 from the sale to Mr. Dugger in 1986,[21] and installment gains of $77,298 from the sales in 1988.[22]

On brief, petitioner does not address the disputed gains

---

[18]Petitioner incurred selling expenses of $23,831 for this sale.

[19]Cost basis for each lot and tract ($1,903) = cost of the entire property ($59,005)/the number of lots and the tract (31).

[20]Gain realized ($20,097) = amount realized ($22,000) - adjusted basis ($1,903).

[21]Gain realized ($21,097) = amount realized ($23,000) - adjusted basis ($1,903).

[22]Gross Profit ($468,594) = sales price ($540,000) - selling expenses ($23,831) - total of the adjusted bases in lots 6-30 ($47,575); gross profit percentage (0.867767) = gross profit ($468,594)/ contract price ($540,000); installment gain from sale in 1988 ($77,298) = payments received in 1988 ($89,077) x gross profit percentage (0.867767).

from the sales of the lots and the tract.  We find that petitioner received the amounts determined by respondent as income for the years in issue and they are taxable as gains derived from dealings in property.  See sec. 61(a)(3).

3.  <u>High Plains Property (OS-35)</u>

FINDINGS OF FACT

On June 29, 1977, petitioner, as trustee, through Mr. Miles, as trustee, purchased real property in Osceola County, Florida, which we refer to as the "High Plains Property" (OS-35), from William F. Mitchell, for $448,000.  The High Plains Property was a large piece of property (a couple hundred acres) which was divided into 5-acre tracts.

On May 30, 1985, petitioner through Ms. Allen, as trustee, sold a lot (Lot 23) in the High Plains Property to Clarence L. Bass for $27,000.  A gain of $19,699 was realized from the sale of this lot in 1985.  Petitioner did not report any income from the sale on his Form 1040 for any tax year.

Wayne Schoolfield and petitioner each originally owned a 50-percent interest in the High Plains Property.  Indeed, a declaration of trust dated April 11, 1977, provides:

> MADE this 11th day of April 1977 by and between D. L. Allen, hereinafter referred to as Allen and C. Wayne Schoolfield and W. L. Medlin, Trustee as Beneficiaries.
>
> NOW, THEREFORE, Allen, in consideration of $1.00 and other valuable considerations, hereby declares that she as Trustee holds in trust (for the beneficiaries herein named) that certain Offer to Purchase Contract

on property in Osceola County, Florida, presently owned by William F. Mitchell, Trustee.

WHEREAS, the beneficiaries of this Trust and their interest are as follows:  C. Wayne Schoolfield - 50% and W. L. Medlin, Trustee - 50%.

WHEREAS, Allen further declares she as Trustee will own, possess and administer the same only in keeping with the interest of the beneficiaries thereto and they shall have sole discretion and authority to sell, assign, transfer, and convey or otherwise dispose of the aforesaid Offer to Purchase Contract and that she will execute any and all necessary forms to consummate a sale upon receiving notice from the beneficiares [sic].  Allen shall account to and pay over to the beneficiarie [sic] herein the proceeds derived from their stated interest in that Receipt for Deposit and Offer to Purchase contract dated April 7, 1977 and attached hereto.

AND WHEREAS:  Allen shall not sell, convey or exchange the property conveyed to her as Trustee with herself as an individual without written consent of the beneficiaries of this Trust Agreement and she shall keep an accurate set of records regarding the above property and render periodic accounting therefore to the beneficiaries.

Mr. Schoolfield and petitioner's joint ownership of the High Plains Property terminated at some point in time.

OPINION

Respondent determined that petitioner was the sole owner of Lot 23 and that he realized the entire $19,699 gain from the sale of Lot 23 in 1985.  Petitioner contends that he was a half-owner of the lot with Mr. Schoolfield when the property was sold and that he received only half of the gain that respondent determined.

At trial, petitioner testified that he was in a partnership with Mr. Schoolfield with respect to the High Plains Property; however, he could not testify definitively that he and Mr. Schoolfield were still 50-50 owners at the time of the sale:

Q    What was your ownership interest in * * * [the High Plains Lot]?

A    I was in a partnership.  This is one of the pieces I mentioned earlier that Wayne Schoolfield and I had purchased from Mr. Green and Mr. Mitchell and developed it, broke it up into these 5-acre tracts, and sold them.

Q    What percentage interest did you have when OS-35 was sold?

A    I'm sorry.  I don't--Wayne and I, when we did this development, were 50-50 and, I believe, that at this time, we were still 50-50 owners in the property.

*    *    *    *    *    *    *

Q    Did that partnership ultimately end?

A    Yes, sir.

Q    Do you recall whether it ended before or after the sale of the lots in OS-35?

A    I think we ultimately sold all the property out, and, then, basically, took our money and went home.

Mr. Schoolfield testified that he was involved in a joint venture with petitioner with respect to the High Plains Property. However, when Mr. Schoolfield was shown a copy of the warranty deed from Ms. Allen to Mr. Bass, he could not recall having ever owned any interest in Lot 23, and he did not recall having ever

received any sale proceeds from Ms. Allen for this property.[23]

Mr. Schoolfield further testified that the joint ownership of the

High Plains Property may have terminated sometime prior to the

sale of Lot 23 to Mr. Bass, perhaps as early as the 1970s:

> Q    Did you ever have any ownership interest in
> property known as High Plains?
>
> A    I had some--I ended up with some 5-acre tracts out
> of that.  Started off to joint venture, but ended up
> with some 5-acre tracts out of it, yes.
>
> Q    You say it was a joint venture with who?
>
> A    Mr. Medlin.
>
> Q    With Mr. Medlin?
> And when did that joint venture break up?
>
> A    I'm not sure I can give you a date there, it's so
> long.  It's in--back in the 70's.
>
> Q    It broke up sometime in the 70's?
>
> A    I think it occurred probably then, but you got to
> remember, this stuff is going back so far.  My hair was
> black and I didn't have a bald spot in the back of my
> head.

---

[23]And with respect to the declaration of trust, Mr.
Schoolfield testified:

> Q    What property did this Declaration of Trust
> pertain to?
>
> A    There's nothing attached to it.  I--it could have
> been this property or another piece, but--
>
> Q    Okay.  Did this Declaration of Trust pertain
> specifically to this Lot 23?
>
> A    I--I don't know.  That's--I don't think so, but I
> don't know.  It's been too long for me.  I don't recall
> ever owning this piece.

You know, it's a long time. But I think it was in the early stages, but I can't, you know, I--my memory is not that good.

Q Did it occur before the date of this warranty deed, which is May of 1985?

A I certainly thought it would have.

Ms. Allen testified that petitioner and Mr. Schoolfield were partners with respect to the High Plains Property and that they had split up at some point in time. She could not testify as to when specifically they split up.

The evidence of record shows that at one point, Mr. Schoolfield and petitioner held joint interests in the High Plains Property, which may or may not have included Lot 23. Neither petitioner's, Mr. Schoolfield's, nor Ms. Allen's testimony establishes that Mr. Schoolfield still possessed his joint interest at the time of the sale of Lot 23 in 1985, or, for that matter, whether he ever possessed any interest in Lot 23. The testimony suggests that it was just as likely, if not more probable, that Mr. Schoolfield and petitioner split up the various tracts amongst themselves before 1985, that petitioner was left as the sole owner of Lot 23, and that petitioner proceeded to sell that lot in 1985 and collect the sales proceeds therefrom.[24]

---

[24]On recross-examination by petitioner's counsel, Mr. Schoolfield testified:

Q Ultimately at some point in time, these various 5-
(continued...)

Petitioner relies on Mr. Schoolfield's testimony that he could not say for certain that he did not have a 50-percent interest in Lot 23 at the time of its sale to Mr. Bass and that he could not say for certain when the "ultimate division" of the respective interests in the High Plains Property had occurred.

---

[24](...continued)
acre tracts, of which you and Walter were 50 percent beneficial owner interest in, were sold and then also you and he ultimately divided up what was left; is that right?

A    I don't know that that's correct.  What was left, we--somewhere in there I said, "Here, look, let me have X tracts and this is--and you take the rest of it.  You take it all."

Q    And as you sit here today, you're not sure when that happened, what the date of that was.

A    That's correct.  I don't know that I can give you a date.  I don't think I could.

Q    So, am I correct in your testimony that if that date happened, if you split up, and the document, the deed on page 1 is one of the 5-acre tracts that Walter got, then you would not have had any interest in it if it went to Walter after you and he split up.

A    Yeah.

Q    And if it happened before the split-up, then you would have had an interest in it.

A    I think that probably is correct.

Q    And as you sit here today, because of the number of years that have gone by, in fact you don't have your tax returns anymore, you can't specifically tell us for sure when that happened in relation to this sale; is that right?

A    Not sitting here today, I can't.

We reemphasize that respondent's determination of a deficiency is presumed correct, and it is petitioner who bears the burden of proving that determination incorrect. Since petitioner bears the burden of proof, he must also bear the onus of failed recollection and the lack of documentary evidence. Further, petitioner has created the situation in which he now finds himself by failing to document properly his various real estate transactions, in failing to maintain and keep adequate records, and by unnecessarily complicating those transactions. We hold that petitioner is responsible for 100 percent of the gain realized on the sale of Lot 23 in 1985.

### 4. Silver Lake (OS-01.4)

#### FINDINGS OF FACT

On September 30, 1975, petitioner, as trustee, purchased property in Osceola County, Florida, which we refer to as "Silver Lake" (OS-01.4). In November 1978, petitioner, as trustee, sold Silver Lake to L.R. Donnell, Jr., as trustee, for $70,000. On February 5, 1979, Mr. Donnell, as trustee, conveyed Silver Lake to Mr. Miles, as trustee, for no consideration.

On October 31, 1980, Mr. Miles, as trustee, sold Silver Lake to Don Prewitt, as trustee, for $220,600. Mr. Prewitt issued a purchase money mortgage for $180,000 to Mr. Miles and paid the balance. Mr. Miles, as trustee, received the following principal and interest payments in 1985, 1986, and 1987:

| Year | Principal | Interest |
|------|-----------|----------|
| 1985 | $18,000 | $13,545 |
| 1986 | 36,000 | 11,610 |
| 1987 | 72,000 | 10,976 |

Petitioner owned a 50-percent interest in Silver Lake at the time of its sale in 1980, and his basis was $70,000.

OPINION

Respondent argues that petitioner realized installment gains of $6,144, $12,288, and $24,577 in 1985, 1986, and 1987, respectively, for the principal amounts paid to Mr. Miles.[25] Petitioner, on brief, does not address the matter. We find that petitioner realized installment gains of $6,144, $12,288, and $24,577 in 1985, 1986, and 1987, respectively. Sec. 453(a).

Respondent originally determined that petitioner realized interest income for the full amount of the interest payments made to Mr. Miles. Respondent now concedes that petitioner realized only 50 percent of the original amounts determined. Petitioner does not address on brief his liability for half of the interest income. We hold that petitioner realized interest income of $6,773, $5,805, and $5,488 in 1985, 1986, and 1987, respectively.

---

[25]Respondent computed petitioner's gross profit percentage as follows: Gross profit ($150,600) = sales price ($220,600) minus basis ($70,000); gross profit percentage (0.682684) = gross profit ($150,600)/contract price ($220,600). Respondent then applied the gross profit percentage to each of the principal payments in 1985, 1986, and 1987, respectively, and divided the result in half to account for petitioner's 50-percent interest.

5. <u>East Lake Vista (OS-47)</u>

FINDINGS OF FACT

On May 1, 1984, Mr. Miles, as trustee, purchased real property consisting of approximately 156.65 acres in Osceola County, Florida, which we refer to as "East Lake Vista" (OS-47), from Reba Smith, for $500,000. Part of the purchase price, $125,000, was paid in cash, and Mr. Miles issued a purchase money mortgage of $375,000 for the remainder.[26]

In May 1986, Mr. Miles sold approximately 31 acres of East Lake Vista to Nicholas Pope, for $205,000. On December 16, 1986, Mr. Miles sold an additional 31.50 acres of East Lake Vista to Mr. Pope for $215,181. Petitioner did not report any income from those transactions on a Form 1040 for any tax year.

On December 16, 1986, at the same time as the second sale, petitioner and Dr. George Gant entered into a "Continuing and Unconditional Guaranty of Performance and Payment" in favor of Mr. Pope. That document shows petitioner and Dr. Gant as "Guarantors", Mr. Miles, trustee, as "Seller", and Mr. Pope as "Buyer":

> WHEREAS, R. Stephen Miles, Jr., Trustee, as Seller, and Nicholas A. Pope, as Trustee under that certain unrecorded Trust Agreement dated December 16,

_____

[26]The mortgage provides for interest of 10 percent, per annum, and requires "Three equal annual payments of $150,793.05 including principal and interest commencing one year from the date hereof and continuing each year thereafter until the entire balance plus interest is paid in full." A satisfaction of mortgage was issued by Reba Smith and was filed on Dec. 18, 1986.

1986, and/or Assigns, as Buyer, entered into that certain Contract and Sale and Purchase dated May 2, 1986 (the "Contract") with respect to the purchase of approximately 31.50 acres, more or less, located in Osceola County, Florida (the "Property"); and

WHEREAS, the terms of the Contract provide for Seller's obligation to complete construction of a road to be known as "Dan Smith Road" adjacent to the Property at Seller's expense within one (1) year after the date of closing, and further provide for Buyer's right to complete said construction and be reimbursed by Seller in the event of Seller's failure to complete said construction in accordance with the Contract; and

WHEREAS, the Contract further calls for the personal guaranty of Seller's performance of said road construction and payment for said road construction by the undersigned;

NOW THEREFORE, as an inducement to the Buyer to purchase the Property, and for good and valuable consideration not herein recited but the receipt and sufficiency of which is hereby acknowledged, the undersigned, jointly and severally, give to Buyer, and its successors and assigns, their continuing and unconditional guaranty of performance and payment by the Seller of the following described obligation, to the same extent as if Guarantors were the named parties identified as the Seller under the Contract:

* * * * * * *

The Guarantors hereunder also agree to pay all costs (including attorneys' fees whether incurred in connection with collection, trail [sic], appeal or otherwise) of collection against the Guarantors under this Guaranty. The liability of Guarantors hereunder is binding upon Guarantors and Guarantors' successors and assigns.

Petitioner and Dr. Gant signed the guaranty.

In August 1988, Mr. Miles, as trustee, sold approximately 10 acres of East Lake Vista for $80,000. Petitioner, for Mr. Miles,

signed the sales contract.  Petitioner did not report any income from this sale on his Form 1040 for 1988.

The record contains two personal financial statements for petitioner.  The first is dated November 15, 1985, and lists as an asset, East Lake Vista;[27] a "160 acre parcel located on East Lake North of Narcoossee being subdivied [sic] into 5 ac. tracts and is encumbered by 2 mortgages totaling $386,000.00".  The listing states:  "I own 1/2 interest", and values that interest at $560,000, subject to liabilities of $193,000.  The second financial statement is dated June 1, 1988, and lists as an asset, East Lake Vista; a "100 acre parcel located on East Lake North of Narcoossee being subdivided into 5 ac. tracts".  That property is listed under "Miscellaneous Lots & Acreage (Unencumbered)" and is valued at $400,000.

Mr. Miles's law firm maintained certain ledger cards, numbers 70006 through 70008, which are entitled "Walter Medlin/Reba Smith", "Medlin  Re:  Smith, Reba", and "Medlin, Walter from Reba L. Smith", respectively.  Those ledger cards contain the following relevant entries:

---

[27]Petitioner testified that East Lake Vista is also known as the "Narcoossee property" and the "Dan Smith Road property".  The parties also agree that the property was sometimes called the "Reba Smith property".

| Ledger Card Number/Line | Date | Name | Memo | Trust Funds Received | Disbursed |
|---|---|---|---|---|---|
| 70008/1 | 5-1-84 | Reba Louise Smith | Medlin | ---- | $95,551.82 |
| 70008/2 | 5-1-84 | H.R. Thornton | Medlin | ---- | 1,250.00 |
| 70008/3 | 5-1-84 | Allen's Osceola Realty, Inc. | Medlin | ---- | 25,000.00 |
| 70008/4 | 5-1-84 | Clerk of Circuit Court | Medlin | ---- | 3,588.95 |
| 70008/5 | 5-2-84 | Transferred from Medlin/Gant | | $62,873.61 | ---- |
| 70008/6 | 5-2-84 | George Gant | Medlin/ Smith R. | 62,867.16 | ---- |
| 70008/9 | 5-14-85 | Moved from Medlin/Tai | ---- | 61,646.52 | ---- |
| 70008/10 | ---- | Moved from Medlin/Tai | ---- | 1,950.00 | ---- |
| 70008/11 | ---- | Johnston's Eng. | Medlin/Smith | ---- | 1,950.00 |
| 70008/12 | 5-14-85 | Moved from Medlin/Tai | ---- | 61,646.52 | ---- |
| 70008/13 | 5-14-85 | Reba Smith | Medlin/Smith | ---- | 123,293.04 |
| 70008/16 | 5-2-86 | Webb | Medlin/Smith | 189,922.60 | ---- |
| 70008/21 | 5-2-86 | Lowndes, Drosdick et al | Medlin/Smith | 20,000.00 | ---- |
| 70007/4 | 5-2-86 | H.R. Thornton, Jr., Trustee | Medlin | ---- | 150,793.05 |
| 70007/9 | 5-14-86 | Transfer to Medlin/Gant card | ---- | ---- | 14,740.92 |
| 70007/11 | 5-14-86 | Walter L. Medlin | Medlin/Smith | ---- | 3,768.93 |
| 70007/12 | 5-19-86 | Freedom Financial Center | Medlin | ---- | 6,602.74 |
| 70007/13 | 5-19-86 | Walter L. Medlin Trustee | ---- | ---- | 1,897.26 |
| 70007/15 | 12-16-86 | Wire-Transfer | Medlin/Smith | 218,268.00 | ---- |
| 70007/16 | 12-16-86 | Reba Louise Smith | Medlin/Smith | ---- | 145,722.80 |
| 70006/5 | 12-24-86 | Transferred to Medlin/Gant | ---- | ---- | 55,094.55 |
| 70006/6 | 8-8-88 | Walter T. Rose, Jr | Medlin/Smith | 40,000.00 | ---- |
| 70006/7 | 8-8-88 | Beverly L. Rose | '' | 39,000.00 | ---- |
| 70006/8 | 8-8-88 | ERA-Horacio Toledo, Inc. | '' | 1,000.00 | ---- |
| 70006/14 | 8-8-88 | Moved to Medlin Mefford | ---- | ---- | 528.52 |
| 70006/15 | 8-8-88 | Moved to Medlin/ Gant 1/2 proceeds | ---- | ---- | 35,083.53 |
| 70006/16 | 8-8-88 | Moved to Medlin/ Gant 1/2 proceeds | ---- | ---- | 35,083.52 |
| 70006/22 | ?-27-89 | Moved to Medlin/ General | ---- | ---- | 100.00 |
| 70006/22 | 10-4-89 | Moved to Medlin/ General | ---- | ---- | 128.64 |

For each of the various sales transactions in 1986 and 1988, the parties executed a closing statement. The amounts listed in

those statements as deposits in escrow and as amounts due from the buyer to the seller match amounts listed as deposits in the ledger cards above, ledger card No. 70008 (lines 16 and 21), No. 70007 (line 15), and No. 70006 (lines 6-8).

Dr. Gant and petitioner each owned a 50-percent interest in the "Mefford Property" (OS-22), which was sold on October 7, 1988, for $250,000. A gain of $110,328 was realized from this sale. Respondent originally determined that petitioner was responsible for the entire gain realized from this sale, but he now concedes that petitioner is responsible for only half of that amount ($55,164).

Dr. Gant and petitioner also each owned a 50-percent interest in a piece of property which we refer to as the "Tai Property". The Tai Property was sold in 1984 for $457,900, and petitioner concedes that he is liable for 50 percent of the installment gain ($50,863) from payments received in 1985. See appendix C.

OPINION

It is well established that income must be taxed to him who earns it, United States v. Basye, 410 U.S. 441, 449 (1973), and that income includes gains derived from dealings in property. Sec. 61(a)(3). Respondent determined that petitioner owned a 50-percent interest in the portions of East Lake Vista sold in 1986 and 1988 and that he was responsible for 50 percent of the gain

realized from those transactions.[28]  Petitioner contends that Dr.
Gant owned 100 percent of East Lake Vista at the time of the
sales in 1986 and 1988.  Petitioner argues that he and Dr. Gant
originally agreed to be 50-50 partners with respect to East Lake
Vista, but that Dr. Gant contributed the entire purchase price
and thus acquired a 100-percent ownership interest in the
property.

At trial, petitioner testified that, initially, he was to
receive a 50-percent interest in East Lake Vista, but because Dr.
Gant "put up all the money and wanted all the interest in the
property", Dr. Gant "essentially owned all of it".  However,
petitioner's testimony was not definitive and was indeed
speculative.  It was also self-serving, and we do not agree that
he owned no interest in East Lake Vista at the time of the 1986
and 1988 sales.  The documentary evidence of record shows that

---

[28]Respondent allocated basis of $3,191.83 to each acre in
East Lake Vista:  Basis per acre ($3,191.83) = purchase price
($500,000)/acres purchased (156.65).  Respondent determined
$41,775 as petitioner's gain from the May 1986 sale:  Gain
realized ($83,550) = sales price ($205,000) - selling costs
($22,503) - basis ($98,947 = 31 acres x $3,191.83); petitioner's
gain ($41,775) = gain realized ($83,550) x petitioner's ownership
interest (50 percent).  Respondent determined $50,726 as
petitioner's gain on the Dec. 16, 1986, sale:  Gain realized
($101,452) = sales price ($215,181) - selling costs ($13,187) -
basis ($100,542 = 31.5 acres x $3,191.83); petitioner's gain
($50,726) = gain realized ($101,452) x petitioner's ownership
interest (50 percent).  Respondent determined $19,522 as
petitioner's gain on the 1988 sale:  Gain realized ($39,045) =
sales price ($80,000) - selling costs ($9,005) - basis ($31,950 =
10.01 acres x $3,191.83); petitioner's gain ($19,522) = gain
realized ($39,045) x petitioner's ownership interest (50
percent).

petitioner held an ownership interest in East Lake Vista at the time of the sales in 1986 and 1988.

First, petitioner's financial statements dated November 15, 1985, and June 1, 1988, show that he owned at least a 50-percent interest in East Lake Vista at some point before the sales that occurred in 1986 and 1988.  Petitioner contends that the November 15, 1985, financial statement is not inconsistent with his testimony and Dr. Gant's testimony that he was to originally own a 50-percent interest in East Lake Vista, which subsequently changed to no interest.  Petitioner has not presented any evidence to establish when his and Dr. Gant's original understanding supposedly changed; however, if it did change, we assume the change would have occurred either before or shortly after May 1, 1984, when Dr. Gant purportedly "put up all the money", the $125,000 cash portion of the purchase price.[29]  The financial statement is dated November 15, 1985, a full year and a half after the purchase of East Lake Vista.  Petitioner offers no explanation why he continued to represent himself as owning a 50-percent interest in November 1985, if, in fact, he owned no interest after Dr. Gant put up all the cash in May 1984.

Petitioner also contends that the June 1, 1988, financial statement cannot be relied upon since it incorrectly shows that

[29]Dr. Gant testified that he could not recall when the parties original understanding changed, but he suggested that it might have been in 1984.

he owned 100 percent of East Lake Vista and that the property consisted of 100 acres when, in fact, it consisted of 84 acres. We do not agree that these purported inaccuracies cause the June 1, 1988, financial statement to lose its persuasive value. The financial statement was prepared by or for petitioner, and petitioner does not explain why those inaccuracies were reflected on his financial statement, and why they invariably suggest that he held no interest in East Lake Vista in 1988. At the very least, the June 1, 1988, financial statement shows that petitioner perceived himself to own at least some interest in East Lake Vista in 1988 and that he intended other persons who might rely on the financial statement to recognize that ownership.

The road construction guaranty also indicates that petitioner had an ownership interest in East Lake Vista. Petitioner, Mr. Miles, and Dr. Gant executed the guaranty on December 16, 1986, the same date as the sale of the 31.50 acres of East Lake Vista to Mr. Pope. And, it specifically refers to a contract for the sale of 31.50 acres that Mr. Miles and Mr. Pope entered into on May 2, 1986. Petitioner argues that this guaranty originated in petitioner's "working relationship" with Dr. Gant and did not arise from any ownership interest in the property. However, petitioner did not present any evidence or testimony to suggest that he was compensated for his real estate

services.  Also, we cannot accept that he was performing those services for free.  Petitioner does not suggest that amounts he received following the sales in 1986 and 1988 were, in fact, compensation, and, indeed, petitioner claims those amounts were loans.  It is more plausible that petitioner's performance of services and his guarantee for the road construction arose from his ownership interest in East Lake Vista.

Under petitioner's argument, we must assume that any services that petitioner performed were for the benefit of Dr. Gant, the purported 100-percent owner of East Lake Vista.  But, Dr. Gant did not testify that petitioner performed services for his benefit and that he compensated petitioner.  Dr. Gant's testimony, as a whole, indicates that petitioner performed the real estate services for a 50-percent interest in East Lake Vista.  Dr. Gant testified that he and petitioner started out 50-50, with Dr. Gant putting up all the money[30] and petitioner doing all the work.  However, according to an "agreement" with Mr. Miles, ownership of the property was "posted as 100 percent on my part since I put up the money".  Dr. Gant also testified:

> Q    Did you pay anything for the additional 50 percent interest from Mr. Medlin?

---

[30]Dr. Gant testified that he gave petitioner $125,000 in 1984 for the purchase of East Lake Vista.  This amount represents the initial cash portion of the purchase price for the property.  Dr. Gant testified:  "I didn't pay any more.  We paid it out of operations at the time."

A    As I tried to explain to you earlier, the 50 percent was a 50/50 ownership in property and a 50 percent in participation.  I tried to explain that to you, and I thought you understood it.

Q    I must not have, sir.  I apologize.

A    He did not put any money up.  He didn't put a dime up to the best of my knowledge.  I put the money up.

Q    But now, he purchased the property.  Correct?

A    No.

Q    In terms of the expertise--he selected the property?  Excuse me.

A    He selected the property.

Q    He selected the property?

A    I paid for the property.

Q    Okay.  And so he just gifted his interest to you?  I mean, I understood the deal was 50/50 initially.

A    He didn't have any interest.  His interest was in the developing part of it.

        *    *    *    *    *    *    *

Q    * * *  On the Narcoossee property, if Mr. Medlin had a financial statement that showed that he was a 50 percent interest or owned half of the Narcoossee property, would you say that that was correct.

A    Sure.  That was our understanding--I tried to explain that--when we first started.

    But to protect my interest it was necessary for me to assume the 100 percent, as I had put the money in, 100 percent of the property.

Q    I understand, sir.

A    And all of the money he has taken out of it, the original investment has never been paid back.  I know

you haven't asked this question, but it's important for
you to know.

Dr. Gant's testimony, as a whole, shows considerable confusion
regarding petitioner's interest in East Lake Vista.  However, his
testimony indicates that he assumed 100-percent legal ownership
of East Lake Vista to protect his initial $125,000 contribution;
however, petitioner continued to possess an interest in the
property because of his contribution of services.  Dr. Gant did
not testify that the supposed agreement with Mr. Miles deprived
petitioner of a participation in any profits realized from the
property.

Petitioner's execution of the sales contract for the August
1988 sale also indicates that he had more than just a working
relationship with Dr. Gant with respect to East Lake Vista.  It
shows that he had the legal capacity to sell the property.  This
denotes ownership.  In addition, the ledger cards maintained by
Mr. Miles's law firm are essentially a record of the transactions
associated with East Lake Vista.  Those ledger cards show the
initial disbursement of approximately $125,000 to Reba Smith, the
annual payments on the mortgage issued to Ms. Smith, and the
amounts received from the sales in 1986 and 1988.  The ledger
cards each list petitioner's name with respect to transactions
which occurred from 1984 to 1989.  The ledger cards contradict a
significant portion of Dr. Gant's testimony and are certainly
inconsistent with petitioner's contention that he owned no

interest in East Lake Vista.  Although Dr. Gant testified that he did not put up any additional cash after his initial $125,000, the ledger cards show that $62,867.16 was received from "George Gant" on May 2, 1984.  Further, Dr. Gant testified that he was the only cash person in the deal; however, the ledger cards show that $62,873.61 was received on May 2, 1984, from the Medlin/Gant ledger card.[31]  Also, the ledger cards show that matching deposits of $61,646.52 were received on May 14, 1985, from the Medlin/Tai card.  Since petitioner and Dr. Gant each owned a 50-percent interest in the Tai Property, we assume that petitioner contributed at least $61,646.52 with respect to East Lake Vista.

The ledger cards also show disbursements to petitioner's general ledger card.  Moreover, the pattern of duplicate disbursements shortly after the 1986 and 1988 sales to ledger cards in which petitioner and Dr. Gant presumably held equal interests certainly supports respondent's position that petitioner and Dr. Gant each owned a 50-percent interest in East Lake Vista.  Petitioner, on the other hand, argues that his and Dr. Gant's testimony shows that any amounts he received from the 1986 and 1988 sales were received as loans from Dr. Gant.  We disagree.

---

[31]According to petitioner, the Medlin/Gant ledger card represents "an account in which both Medlin and Gant have an interest."

Dr. Gant testified that he did not have any records showing loans to petitioner, that he did not receive a note from petitioner, and that all records were maintained by Mr. Miles. Petitioner did not submit any records to substantiate his and Dr. Gant's testimony that loans were made, and none of the records from Mr. Miles's law firm, including the ledger cards, show any loans or their amounts.

At trial, petitioner and Dr. Gant testified that proceeds from the sales of East Lake Vista were deposited into Mr. Miles's law firm's trust account and that petitioner would then "borrow" those proceeds for his own purposes. However, it is not at all clear from Dr. Gant's testimony what he considers to be a "loan".[32]  It appears to us that Dr. Gant understood that upon the receipt of any sale proceeds from East Lake Vista, and after debt service on the note to Reba Smith, that he was to be repaid his initial $125,000, but that petitioner instead borrowed those proceeds, and that Dr. Gant has never been paid back his $125,000.  However, those facts do not establish a loan, and, in any event, they are not inconsistent with petitioner owning a 50-percent interest in East Lake Vista.  There is no evidence in this case that petitioner had an obligation to repay the amounts

_____

[32]The "hallmarks" of a loan are:  (1) Consensual recognition between the borrower and the lender of the existence of the loan, i.e., the obligation to repay; and (2) bona fide intent on the part of the borrower to repay the funds advanced.  Inv. Research Associates, Ltd. v. Commissioner, T.C. Memo. 1999-407.

"borrowed", and there is no evidence that those amounts were treated as a bona fide obligation or that Dr. Gant attempted to collect the amounts supposedly borrowed. At best, Dr. Gant's testimony indicates that petitioner made draws from Mr. Miles's trust account on the sale proceeds received from East Lake Vista and that those draws caused Dr. Gant to fail to realize the full extent of what he initially invested. However, those facts do not establish a loan or otherwise permit petitioner to escape taxation on his share of the gains from East Lake Vista.

Petitioner also points to respondent's concession that petitioner owned only a 50-percent interest in the Mefford Property, and he argues that this concession supports the credibility of petitioner's and Dr. Gant's testimony with respect to East Lake Vista. We disagree. The record contains numerous concessions by both petitioner and respondent, and we are not inclined to speculate as to the basis for those concessions. In any event, respondent notes that he conceded one-half of the deficiency with respect to the Mefford Property, because there was contemporaneous documentary evidence to support Dr. Gant's testimony. Respondent contends, and we agree, that Dr. Gant's testimony lacks such support with respect to East Lake Vista. Further, respondent's position after concession with respect to the Mefford Property would now appear consistent with the position he has taken with respect to East Lake Vista, that

petitioner and Dr. Gant each owned a 50-percent interest.  It is also consistent with their respective interests in another piece of property, the Tai Property.

We hold that petitioner owned a 50-percent interest in East Lake Vista, and we sustain respondent's determination that petitioner realized 50 percent of the gains from the sales in 1986 and 1988.

6.  <u>Grissom Parcels (OS 1.3)</u>

FINDINGS OF FACT

On April 15, 1985, petitioner purchased three parcels (parcels 1, 2, 3) of real property in Osceola County, Florida, which we refer to as the "Grissom Parcels", for $47,000.  Parcel 1 is fronted by U.S. Highway 192, and it borders another road, Rivers Road, on one side.  Parcels 2 and 3 do not border U.S. Highway 192, are separated from parcel 1 by Rivers Road and several smaller tracts of property, and border a road referred to as "County Road".  The relative sizes of the parcels are similar, although the dimensions differ.

On November 5, 1985, petitioner transferred the parcels to Ms. Allen, as trustee, for no consideration.  Petitioner was the sole beneficiary of the parcels conveyed to Ms. Allen.  On October 22, 1986, petitioner, through Ms. Allen, sold parcel 1 for $40,000.

For 1987, Osceola County assessed the values of the Grissom Parcels as follows:

| Parcel Number | Assessed Value |
|---|---|
| Parcel 1 | $12,500 |
| Parcel 2 | 14,955 |
| Parcel 3 | 11,228 |
| Total Assessed Value | 38,683 |

### OPINION

The parties agree that $40,000 was realized on the sale of parcel 1 in 1986, and that petitioner is responsible for any gain from that sale. The issue that remains for decision is petitioner's basis in parcel 1. The adjusted basis for determining gain from the sale of property, whenever acquired, shall be the basis determined under section 1012 and adjusted as provided in section 1016. Sec. 1011(a). Under section 1012, the basis of property shall be the cost of such property. Under section 1016(a)(1), the basis of property shall be adjusted for expenditures, receipts, losses, or other items, properly chargeable to capital account.

When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to that part. Fasken v. Commissioner, 71 T.C. 650, 655 (1979); sec. 1.61-6(a), Income Tax Regs. An equitable apportionment of cost basis may

reflect the relative fair market values of the portions of the larger property at the time of their purchase. Sec. 1.61-6(a), Example (2), Income Tax Regs. Our determination of the allocation of basis is a question of fact. Sleiman v. Commissioner, 187 F.3d 1352, 1360 (11th Cir. 1999), affg. T.C. Memo. 1997-530.

Respondent relies upon the assessed values of the Grissom Parcels in 1987 to determine the relative values of those parcels when they were purchased in 1985. Respondent allocated the purchase price of $47,000 in 1985 to the parcels as follows:

| Parcel Number | Assessed Value | Percentage of Total Assessed Value | Basis Allocated[1] |
|---|---|---|---|
| Parcel 1 | $12,500 | 32% | $15,040 |
| Parcel 2 | 14,955 | 39 | 18,330 |
| Parcel 3 | 11,228 | 29 | 13,630 |
| Totals | 38,683 | 100 | 47,000 |

[1]The basis allocated equals the purchase price multiplied by the percentage of the total assessed value of the parcels.

After accounting for selling expenses of $4,458, respondent determined that petitioner realized a gain of $20,502.[33] Petitioner contends that the methodology used by respondent to allocate cost basis to the Grissom Parcels is arbitrary. Petitioner argues that the cost basis should have been allocated according to the relative fair market values of the parcels in

[33]Gain ($20,502) = sales price ($40,000) - selling expenses ($4,458) - basis ($15,040).

1985 and that several factors show that parcel 1 was the most valuable of the three parcels when they were purchased.

Generally, "We do not consider that the amount for which the property was assessed for purposes of local taxation is necessarily a reliable criterion to be used in estimating its fair market value."[34]  Frazee v. Commissioner, 98 T.C. 554, 563 (1992).  However, in appropriate circumstances tax-assessed values can be useful as a guideline or as corroboration of other evidence of fair market value.  Kellahan v. Commissioner, T.C. Memo. 1999-210.  And, in the case that we are concerned with the relative values of several parts of a larger piece of property, local tax assessments may be relied upon to provide the correct value of a particular parcel of real estate.  2554-58 Creston Corp. v. Commissioner, 40 T.C. 932, 940 n.5 (1963).[35]  We are not willing to conclude as a matter of law that because respondent's determination is based on local tax assessments, it is arbitrary.  And, indeed, respondent's determination appears reasonable and consistent with the relative sizes of the three parcels.  See

---

[34]This is especially true when there is nothing in the record indicating that the tax-assessed value was intended to represent fair market value.  Kellahan v. Commissioner, T.C. Memo. 1999-210; Estate of Dowlin v. Commissioner, T.C. Memo. 1994-183; see also sec. 20.2031-1(b), Estate Tax Regs.

[35]In 2554-58 Creston Corp. v. Commissioner, 40 T.C. 932, 940 n.5 (1963), we stated:  "Although valuations for real estate taxes may often be too low to be relied upon as furnishing the correct value of a particular parcel of real estate as a whole, we have no reason to reject the use of such valuations in determining the relative value of land and buildings."

Clayton v. Commissioner, T.C. Memo. 1956-21, affd. 245 F.2d 138 (6th Cir. 1957).

"When, as in this case, the Commissioner has determined an allocation of basis, a taxpayer bringing a deficiency proceeding bears the burden of proving by a preponderance of the evidence that the Commissioner's determination is erroneous."  Sleiman v. Commissioner, supra at 1359; see also Byram v. Commissioner, 555 F.2d 1234, 1236 (5th Cir. 1977), affg. T.C. Memo. 1975-135. Petitioner argues that parcel 1 is fronted by U.S. Highway 192, the main road through Osceola County to Walt Disney World, whereas parcels 2 and 3 are on a dirt road, and that parcel 1 was zoned commercial, whereas parcels 2 and 3 were zoned residential. He also testified that parcels 2 and 3, at the time of their purchase, were "in a real undesirable neighborhood.  As you get down here, a lot of drug users and stuff.  There's sort of a shack here."  Petitioner claims, on the sole basis of his testimony, that one-half of the original $47,000 purchase price,

$23,500,[36] should be allocated to the parcel sold in 1986 and that he is responsible for $12,042 of gain.[37]

Petitioner is not a disinterested witness. Further, his opinion regarding the value of the Grissom Parcels is based on his own subjective viewpoint about the desirability of those individual parcels. Petitioner presents no objective analysis to support his valuation of parcel 1 to be "at least half of the entire purchase". Petitioner presented no records that were prepared at the time of the purchase or sale that reflected the allocation in his testimony, and he completely failed to report the sale on his income tax return. We cannot accept petitioner's testimony to establish the relative values of the Grissom Parcels, and he has failed to overcome the presumption of correctness that attaches to respondent's determination. We hold that petitioner's basis in parcel 1 was $15,040 and that his gain from its sale in 1986 was $20,502.

---

[36]Petitioner testified:

Q    And what value do you place as to the basis when you bought it--of the total purchase price, what value do you attribute to the value of parcel 1?

A    I had figured that it was worth at least half of the entire purchase, which would mean that it was equivalent to the other two parcels put together.

[37]Gain realized ($12,042) = amount realized ($40,000) - selling expenses ($4,458) - basis ($23,500).

7. Arrowhead Lakes Subdivision (OR-2), Angel-Royse Property (OS-39)

FINDINGS OF FACT

In 1974, Roger McLaughlin, as trustee, purchased Lots 26, 27, and 28 in the Arrowhead Lakes Subdivision (OR-2), which was located in Orange County, Florida. In 1977, Mr. McLaughlin conveyed those lots to Ms. Allen, as trustee, for no consideration. In 1979, Ms. Allen conveyed those same lots to Mr. Miles, as trustee, for no consideration. Petitioner owned Lots 26, 27, and 28 in the Arrowhead Lakes Subdivision; petitioner was the 100-percent beneficiary of the lots held in trust by Mr. Miles.

In 1983, Mr. Miles, as trustee, purchased 40 acres of a certain real property in Osceola County, Florida. On January 31, 1983, Mr. Miles, as trustee, issued a mortgage deed (purchase money note and first mortgage) of $70,200 with respect to this purchase. On February 24, 1983, Mr. Miles, as trustee, issued to Mr. McLaughlin a mortgage deed (purchase money note and second mortgage) of $30,500, which related to the 40-acre purchase. On March 25, 1983, petitioner entered into a contract to purchase an additional 34 acres for $102,000. Mr. Miles, as trustee, issued a mortgage deed of $73,000 for part of the purchase price. The 34 acres were conveyed to Mr. Miles, as trustee, on October 26, 1983. Petitioner and Mr. McLaughlin were equal beneficiaries in

the 74 acres held in trust; we refer to the property held in trust as the "Angel-Royse Property" (OS-39).

Petitioner's financial statement dated November 15, 1985, lists as an asset, "Angel-Royce Development";[38] a "74 Acre parcel located on North side of Boggy Creek Road west of the Turnpike and valued at $8,000 per acre. There are several mortgages covering the various parcels totaling $212,000 payable over 15 years I own 50%". The statement values petitioner's interest in the property at $300,000, subject to liabilities of $106,000.

In 1986, petitioner exchanged his ownership interest in Lots 26, 27, and 28 of the Arrowhead Lakes Subdivision for Mr. McLaughlin's ownership interest in the Angel-Royse Property. In exchange for the subdivision lots, Mr. McLaughlin forgave the $30,500 of outstanding principal that petitioner owed to him from the February 24, 1983, mortgage deed. Mr. McLaughlin also assumed the liability for real estate taxes on Lots 26, 27, and 28, which totaled $1,251 at the time of the exchange. Petitioner assumed Mr. McLaughlin's share of the liabilities associated with the Angel-Royse Property. Those liabilities totaled $66,202 and $71,042, respectively, at the time of the exchange. Petitioner's basis in Lots 26, 27, and 28 was $40,300. On November 23, 1986, Mr. McLaughlin transferred his interest in the 74 acres of the

---

[38]Petitioner referred to the Angel-Royse Property as the "Angel-Royce [sic] Development", the "Angel and Royce [sic] Property" and the "pit piece". Mr. McLaughlin also referred to the Angel-Royse Property as the "Boggy Creek Road" property.

Angel-Royse Property to Michael D. Johnson, as trustee. Petitioner was the 100-percent beneficiary of the Angel-Royse Property held in trust. Petitioner did not report any income from the exchange on a Form 1040 for the tax years at issue.

On June 9, 1987, a final judgment was entered by the Circuit Court of the Ninth Judicial Circuit of Osceola County, Florida, in the case of South Fla. Water Mgmt. Dist. v. Walter Medlin, Steven Miles, Tr., and Robert Adkins, Case No. 85-943. The judgment was entered into pursuant to a stipulation for consent decree, which requires petitioner and Mr. Adkins to restore the Angel-Royse Property and to plant cypress trees. The consent decree enjoins petitioner and Mr. Adkins from further excavation or dumping activities on the property.

The record contains no partnership tax returns or Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., and there is no evidence that any such returns or schedules were filed or distributed.

OPINION

Respondent determined that the value of the 74 acres of the Angel-Royse Property was $312,600, the value which was assessed by Osceola County for the two parcels of acreage.[39] Respondent determined that Mr. McLaughlin's interest had a fair market value

_____

[39]Osceola County assessed a value of $180,000 for the 40 acres acquired in early 1983 and assessed a value of $132,600 for the 34 acres acquired on Oct. 26, 1983.

of $156,300[40] and that petitioner realized a gain of $60,709 from the exchange in 1986.[41]

Petitioner contends that he and Mr. McLaughlin were partners in a partnership with respect to the properties, that the Angel-Royse Property was distributed to him from the partnership, and that this distribution did not result in the recognition of any gain under section 731(a)(1).[42]  Respondent argues that section 731(a)(1) does not apply because:  (1) There was no distribution from a partnership to a partner; petitioner simply exchanged his 100-percent interest in the Arrowhead Lakes Subdivision lots for Mr. McLaughlin's 50-percent interest in the Angel-Royse Property; and (2) no partnership existed.

In order for petitioner's partnership argument to work, that supposed partnership would have had to own both the Angel-Royse

---

[40]Value of Mr. McLaughlin's interest in the Angel-Royse Property ($156,300) = fair market value of the Angel-Royse Property ($312,600) x Mr. McLaughlin's interest (50 percent).

[41]Amount realized ($101,009) = value of Mr. McLaughlin's interest in the Angel-Royse Property ($156,300) + discharge by Mr. McLaughlin of petitioner's debt ($15,250) + assumption by Mr. McLaughlin of real estate taxes ($1,251) - petitioner's assumption of Mr. McLaughlin's share of the liabilities associated with the Angel-Royse Property ($68,622) - property taxes ($3,170).  Gain on exchange ($60,709) = amount realized ($101,009) - basis ($40,300).

[42]Sec. 731(a)(1) provides that in the case of a distribution by a partnership to a partner "gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution".

Property and the Arrowhead Lakes Subdivision lots.[43] However, the form of ownership of the Arrowhead Lakes Subdivision lots was clearly a trust and not a partnership. Moreover, petitioner stipulated that he was the 100-percent beneficiary of the Arrowhead lots held in trust by Mr. Miles, and he does not dispute, and in fact incorporates, respondent's requested finding of fact that "Petitioner owned Lots 26, 27 and 28 in OR-2 (a.k.a. Arrowhead Lakes Subdivision), which were held in trust by R. Stephen Miles, Jr., Trustee." Petitioner is bound by the form of ownership expressed in the stipulation and demonstrated by the record, and he cannot now argue that the Arrowhead lots were in fact held by a partnership. We agree with respondent's characterization that petitioner exchanged his 100-percent interest in the Arrowhead Lakes Subdivision lots for Mr. McLaughlin's 50-percent interest in the Angel-Royse Property and that there was no distribution of those properties from any partnership.[44] We also agree that petitioner and Mr. McLaughlin

_____

[43]Mr. McLaughlin and petitioner testified that their supposed partnership owned the Arrowhead Lakes Subdivision lots. They testified that they were equal partners with respect to both the Arrowhead Lakes Subdivision lots and the Angel-Royse Property. Petitioner contends that the partnership was terminated with the properties' being distributed equally. He claims that the properties exchanged were of equal value after accounting for the environmental liabilities associated with the Angel-Royse Property.

[44]This finding is supported by a letter from Mr. Miles to Mr. McLaughlin's attorney; he states:

(continued...)

were not engaged in a partnership with respect to the Angel-Royse Property.

A partnership is an organization for the production of income to which each partner contributes one or both of the ingredients of income, capital, or services. Commissioner v. Culbertson, 337 U.S. 733, 740 (1949). In determining whether there is a partnership, we consider the following factors:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. [Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964).]

In order for there to exist a partnership, the parties must conduct some business activity. Madison Gas & Elec. Co. v.

---

44(...continued)
I trust you will recall that Walter and Roger discussed with you and I a settlement of the existing dispute over the Royse-Angell property by an even exchange of Walter's interest in the Arrowhead Lakes property for Roger's interest in the Royse-Angell property. Walter apparently feels that he can salvage the Angell-Royse property and has directed me to proceed with the proposed settlement. * * *

Commissioner, 633 F.2d 512, 514-517 (7th Cir. 1980), affg. 72 T.C. 521 (1979); Frazell v. Commissioner, 88 T.C. 1405, 1412 (1987); Cusick v. Commissioner, T.C. Memo. 1998-286. And, mere coownership of property as tenants in common or otherwise does not result in a partnership. See Bergford v. Commissioner, 12 F.3d 166, 169 (9th Cir. 1993), affg. Alhouse v. Commissioner, T.C. Memo. 1991-652; Cusick v. Commissioner, supra. Petitioner testified that when he initially invested in the acreage in the Angel-Royse Property, it was "landlocked" and "it wasn't developable property." He also testified that Mr. McLaughlin held an adjoining tract of land that could provide access to the property and that Mr. McLaughlin's ownership of this tract prompted their entering into a "partnership". However, neither petitioner nor Mr. McLaughlin testified as to any development activity or plans for development on the Angel-Royse Property. Neither testified regarding whether they had any expectation of a profit from their activities and as to what kind of business activity their partnership was to engage in; i.e., subdivision, development, real estate sales, etc. There is substantial evidence of record that the property was not the subject of any business activity, and, indeed, the record indicates that petitioner and Mr. McLaughlin were allowing the property to waste.[45] There is no evidence of any partnership returns' having

---

[45]Petitioner testified that Mr. McLaughlin "let a guy come
(continued...)

been filed or any Schedules' K-1 having been issued to petitioner or Mr. McLaughlin. Petitioner has submitted no evidence of any partnership records, any partnership agreement, and he has not provided any discussion regarding the operations of this supposed partnership. The record shows that petitioner's and Mr. McLaughlin's relationship with respect to the Angel-Royse Property never rose above mere coownership. Petitioner has not established that he and Mr. McLaughlin formed a partnership with respect to the Angel-Royse Property, and we sustain respondent's determination that petitioner realized gain on the exchange of properties.

8. <u>Prather Ranch Property (OR-01)</u>

FINDINGS OF FACT

In 1978, petitioner and Wayne Schoolfield sought to acquire certain property owned by the Bank of Palm Beach and Trust Co., located in Orange County, Florida, which we refer to as the "Prather Ranch Property". Petitioner secured a contract with the bank for the purchase of the property, and he then located other

---

[45](...continued)
in and cut all the trees on the property and start digging out the dirt", and that these operations resulted in considerable environmental problems. The record also contains a letter from Mr. Miles, in which he complains to petitioner and Mr. McLaughlin that they had not paid their installments on the 1986 mortgages associated with the property and that the mortgagees were threatening foreclosure.

purchasers to facilitate its acquisition.[46]  On October 17, 1978, the bank sold the Prather Ranch Property to Investors Realty of Osceola, Inc., Agri-Land Corp., William L. Gibson, as trustee,[47] Mr. Prewitt, as trustee, William R. Wright (i.e., petitioner), as trustee,[48] and Marlborough Investors, Inc.  At the time of its purchase, the Prather Ranch Property consisted of 1500-1600 acres and was generally flat pasture with a creek running through the property; the property was zoned agricultural.

In 1981, Mr. Gibson sold a portion of the property that he held in trust to third parties.  On June 7, 1985, Mr. Gibson transferred the remaining property, which we refer to as "parcel 1", to Mr. Miles, as trustee, for no consideration.  Petitioner was the beneficiary of a 100-percent interest in parcel 1.

In March 1983, Mr. Schoolfield, Max Hagen, and petitioner entered into an agreement to trade and to purchase certain parcels of the Prather Ranch Property.[49]  Pursuant to this

---

[46]Mr. Schoolfield was interested in the front piece of the property, and petitioner was interested in the back piece.

[47]Petitioner was the beneficiary of the property interest held in trust by Mr. Gibson.

[48]Petitioner and Agri-Land Corp. were originally the beneficiaries of 50-percent interests, respectively, in the property held in trust by "Mr. Wright" (parcel 3).  Agri-Land's interest in this parcel subsequently terminated.

[49]According to petitioner, he ended up with a piece of the Prather Ranch Property in its southeast corner; Mr. Schoolfield owned a piece in front of petitioner's, which had "good access"; and Mr. Hagen owned a 400-acre piece south of Mr. Schoolfield's.
(continued...)

agreement, on April 22, 1982, Agri-Land conveyed its portion (parcel 2) of the Prather Ranch Property to its shareholder, Mr. Schoolfield, as trustee. On May 10, 1983, Mr. Schoolfield sold parcel 2 to Mr. Hagen, as trustee, and Mr. Hagen, in turn, sold it to Mr. Miles, as trustee, for $356,400. Petitioner was the sole beneficiary of parcel 2. On May 10, 1983, Mr. Wright, as trustee, conveyed parcel 3 to Mr. Miles, as trustee.

On September 5, 1986, Mr. Miles, as trustee, entered into a contract with Maury L. Carter to sell parcels 1, 2, and 3 for $1,731,000. Mr. Carter never saw an advertisement concerning the sale of this property, and Mr. Carter initiated the sale discussions with Mr. Miles. Pursuant to this contract, Mr.

------

[49](...continued)
Petitioner testified that Mr. Schoolfield was interested in purchasing Mr. Hagen's piece, and according to petitioner:

> And as part of an accommodation for him to buy the Hagen piece, I was going to buy his piece that was next to my portion of this 1,500 acres. So that would leave me with Wayne's piece and my piece, but to accomplish that--I didn't have the cash to give Wayne for it--so we went, both jointly, went and sat down and worked out a deal with Mr. Hagen.

> And the end result of the deal was that Mr. Hagen would, out of his 400 acres, would trade 240 acres, I believe it was, with Wayne. So he and Wayne did a trade of 240 acres. That meant that Hagen owned the 240 acres next to my piece and, at the same time, then Wayne purchased the remaining portion of the 400 acres from Mr. Hagen that was down in Osceola County. The 240 acres that Mr. Hagen now owns, up in Orange County, next to my piece, I purchased from him. I added to my holding by purchasing the property from Mr. Hagen, that he'd acquired from Wayne.

Miles, as trustee, sold parcel 1 for $120,000 on October 13, 1986. On May 13, 1987, Mr. Miles, as trustee, sold parcels 2 and 3 for $1,611,000.[50] Petitioner realized a gain of $72,039 from the sale of parcel 1 in 1986, and a gain of $823,079 from the sale of parcels 2 and 3 in 1987. Petitioner did not report those gains on his Forms 1040 for 1986 and 1987.

At the time of the sales of petitioner's interests in the Prather Ranch Property, the property was raw land with no improvements or site development.

OPINION

The only issue with respect to the Prather Ranch Property is whether petitioner realized capital gains on the sales of the parcels in 1986 and 1987, or ordinary income. Respondent determined that petitioner realized ordinary income.

In order for taxpayers to obtain preferential long-term capital gains tax rates, the gain must arise from "the sale or exchange of a capital asset". Sec. 1222(3). The term "capital asset" means "property held by the taxpayer (whether or not connected with his trade or business)", but does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". Sec. 1221(1).

---

[50]At the time of the sale, petitioner was the beneficiary of a 90.689-percent interest in parcels 2 and 3, which interest was held in trust by Mr. Miles.

In determining whether the gains that petitioner realized from the sales of the three parcels of the Prather Ranch Property were capital gains, we must ask three questions: (1) Was petitioner engaged in a trade or business, and, if so, what business?; (2) was petitioner holding the property primarily for sale in that business?; (3) were the sales contemplated by petitioner "ordinary" in the course of that business? Sanders v. United States, 740 F.2d 886, 888-889 (11th Cir. 1984); Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980).[51] The question whether property is held primarily for sale to customers in the ordinary course of one's business is "purely factual", Pritchett v. Commissioner, 63 T.C. 149, 162 (1974), and

---

[51]The following factors are considered in answering those questions:

> (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. [Sanders v. United States, 740 F.2d 886, 889 (11th Cir. 1984); United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969).]

The frequency and substantiality of sales is the most important factor of those listed. Suburban Realty Co. v. United States, 615 F.2d 171, 176 (5th Cir. 1980); Biedenharn Realty Co. v. United States, 526 F.2d 409, 416 (5th Cir. 1976); Hancock v. Commissioner, T.C. Memo. 1999-336.

petitioner bears the burden of showing that the property was held as a capital asset, <u>Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. 308, 316 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994). See also <u>Pritchett v. Commissioner</u>, <u>supra</u> at 164 ("Petitioner has the burden of proving that when he dealt with the parcels of land here involved he was wearing the hat of an investor rather than that of a dealer.").

Respondent argues that petitioner was in the business of buying and selling real estate at the time of the sales, that "petitioner agrees that he is not entitled to capital gain treatment for any of the numerous properties which he sold [in that business] during the years at issue", and that he has failed to meet his burden of demonstrating that he held the parcels as an investor, rather than a dealer. Petitioner, on the other hand, contends that he acquired the parcels with the intention of holding them as long-term investments, that he did not develop the parcels, did not advertise them for sale, did not attempt to change the zoning of the property, and that it was Mr. Carter, not petitioner, who initiated the discussions regarding the sales of the parcels.

Petitioner stipulated that "Since the mid 1970s through the present, the petitioner has been in the business of buying and selling real estate and real estate development." Nevertheless, petitioner contends that his ordinary course of business is "the

purchase, platting, subdividing, rezoning, and improvement of property", and since petitioner merely purchased and sold the parcels of the Prather Ranch Property, he cannot be said to have sold the property in the ordinary course of his trade or business. After examining the record, the stipulation provides the proper characterization of petitioner's business activity. Petitioner was involved in real estate sales without development, as well as real estate sales that involved varying degrees of development. Indeed, there are several examples of record wherein petitioner did not engage in development prior to sale and did not make an immediate sale following purchase, and those properties were sold as part of his real estate business. We cannot find that the purchase and the sale of the Prather Ranch Property were outside petitioner's ordinary course of business. However, we must decide whether the Prather Ranch Property was held primarily for sale in that business.

The U.S. Supreme Court has defined "primarily" as used in section 1221(1) to mean "principally" or "of first importance". Malat v. Riddell, 383 U.S. 569, 572 (1966). "It is, of course, well established that even though petitioner is a dealer in land, he still has the right to acquire land and hold it for investment purposes." Pritchett v. Commissioner, supra at 163; see also Maddux Constr. Co. v. Commissioner, 54 T.C. 1278, 1286 (1970). The taxpayer's primary holding purpose must be determined by

reference to his purpose "at some point before he decided to make the sale in dispute." Suburban Realty Co. v. United States, supra at 182; cf. Guardian Indus. Corp. & Subs., supra at 316.

At trial, petitioner testified that he viewed the Prather Ranch Property as a "long-term situation from a retirement standpoint". Keeping in mind that it is petitioner's burden to show his entitlement to capital gains treatment, we are not convinced that petitioner acquired the Prather Ranch Property as a long-term investment.[52] His purchase of this property was similar in many respects to his acquisition of other properties in his real estate business. Petitioner did not offer any evidence showing that this property, when acquired, was exceptional. The record reflects that like petitioner's acquisitions of other properties in the ordinary course of his

---

[52]Petitioner also testified:

Q    When you say--was that something--did you intend to deal with that property as you deal with most of your other properties?

A    You're meaning develop it and immediately sell it and stuff like that?

Q    Right.

A    No.

We cannot accept petitioner's testimony in and of itself that he did not intend to resell the property on its acquisition. Further, for reasons previously stated, we must reject petitioner's suggestion that his business was confined to the development and immediate sale of properties. The record suggests several properties were acquired, held for a considerable length of time, and then sold without development.

real estate business, he intended to resell the acquired property as soon as the circumstances permitted.[53]  We find, on the record, and in the absence of proof to the contrary, that petitioner acquired the property as part of his real estate business.  However, we must decide whether petitioner's motivation in holding the property for some time after its acquisition changed to an investment purpose.

At trial, petitioner testified that he became interested in putting cows on the Prather Ranch Property, that his "ultimate plan" was to move cattle to that property for grazing, and that he had a cattle guard[54] installed.  Petitioner's testimony was subjective and self-serving, and we cannot accept as true his testimony that he "got in the cow business, because of this piece of property".  Further, petitioner never moved any cattle to the Prather Ranch Property,[55] and, indeed, he testified that he had

---

[53]We also note that the 1982-1983 series of trades and purchases orchestrated by petitioner and Mr. Schoolfield are highly indicative of a business acquisition.  Through that series of maneuvers, petitioner was able to acquire a parcel of property with "good access" and we suspect a property with a higher probability of resale under favorable circumstances.

[54]A cattle guard is "a device consisting of a shallow ditch across which ties or rails are laid far enough apart to prevent livestock from crossing that is often used instead of a gate at a fence opening".  Webster's Third New International Dictionary 354 (1986).  Petitioner testified that the cattle guard he installed was a "huge concrete thing", which cost $1,600 and weighed about 5,000 pounds.

[55]Petitioner testified that as he was preparing to move cattle to the Prather Ranch Property, Mr. Carter "came along and
(continued...)

moved the cattle to another piece of property, which according to his testimony, was only 2 miles from his house.[56]  Other than the cattle guard, petitioner presented no evidence of any preparation of the property for cattle grazing or that the property was even suitable for grazing.  We cannot agree that petitioner's testimony alone establishes a change in his holding purpose to investment.  We hold that petitioner has not established his entitlement to capital gains treatment.

---

[55](...continued)
made me an offer I couldn't refuse."

[56]Petitioner testified in relevant part:

> Well, what I had done was I had, in the course of doing this, I had investigated with him -- I'd known Mike [Partin] for years -- getting into the cow business, with just the piece I had.  And then I get tied up with acquiring this other Hagen piece.

> Meanwhile, I had already started buying cows from Mike and we had a piece of property nearby that I moved the cows to and put them on.  Well, they, you know, same thing, you start buying too many cows and they start having babies and you're trying to keep them all as best you can and so I ended up kind of with too many.

> But just about the time I was getting ready to -- I felt like I had enough cows -- to move up to this piece of property, which was probably ten miles from my house, where the other piece was probably two miles from my house, that to get enough cows to put up there on this piece of property, Mr. Maury Carter came along and made me an offer I couldn't refuse.  And by then I was probably up to my eyeballs in something else and was over my head in the cow business -- had more cows that I could handle.

## 9. Citrus County Property

FINDINGS OF FACT

On September 7, 1977, petitioner through Ms. Allen, as trustee, purchased real property in Citrus County, Florida, which we refer to as the "Citrus County Property", for $1,837.54.  On August 10, 1981, petitioner through Ms. Allen, as trustee, transferred the Citrus County Property to Mr. Miles, as trustee. Petitioner was the sole beneficiary of this property.

On July 2, 1982, Combank, the predecessors in interest of Freedom Savings & Loan Association of Tampa, Inc. (Freedom), lent $120,000 to Cramer, Hoffman & Haber, P.A.  On July 2, 1982, petitioner guaranteed the $120,000 promissory note and pledged the Citrus County Property (sometimes referred to as property) as collateral.  In 1983, Freedom filed a mortgage foreclosure action in the Circuit Court of Citrus County, Florida, Case No. 83-917-CA (the foreclosure case) to foreclose its mortgage interest in the property.  On March 26, 1984, the parties in the foreclosure case, including petitioner as guarantor, filed a Joint Motion and Stipulation for Rendition of Final Judgment wherein they asked the court to render a final judgment of foreclosure regarding the property pursuant to certain conditions.  Those conditions included Freedom's forbearance of its right to foreclose in consideration for petitioner's unconditional promise to perform the terms of his guaranty and to make payments on the amounts due

Freedom. Petitioner also agreed that if those payments were not made as scheduled, then Freedom could proceed with the foreclosure. On October 11, 1985, Freedom filed a motion for final judgment of foreclosure against the property averring that the required payments had not been made in accordance with the parties' March 26, 1984, stipulation.[57] On October 25, 1985, pursuant to the stipulation, the court entered a Final Judgment of Foreclosure. Pursuant to the judgment, the property was sold and title was conveyed to the purchaser, Freedom, on November 25, 1985.

In 1983, Freedom filed a separate action in the Circuit Court for Orange County, Florida, Case No. 83-12119 (the judgment case), for judgment against petitioner and two other guarantors of the loan to Cramer, Hoffman & Haber, P.A. On September 16, 1986, Freedom filed a Motion for Final Judgment against petitioner seeking money judgment for the unpaid balance of the note that he guaranteed. In a pleading that petitioner filed on October 8, 1986, petitioner represented that the only issue in the judgment case that remained was the value of the property that had been sold pursuant to the prior foreclosure action in Citrus County. On December 22, 1986, the Circuit Court for Orange County rendered final judgment finding that petitioner

---

[57]The Court's final judgment recited that the outstanding debt to Freedom consisted of $96,872.18 principal, together with interest of $3,553.20 and attorney's fees of $4,000.

should be given credit for the fair market value of the Citrus County Property and found that the fair market value was $87,000. The Circuit Court's final judgment then determined that petitioner owed a remaining $20,834 on his guaranty obligation. On December 31, 1986, petitioner asked for rehearing claiming that at the time of the foreclosure sale in 1985, the Citrus County Property had a fair market value far in excess of $87,000. Petitioner alleged that the Citrus County appraiser's records indicated a fair market value of $133,000 and that petitioner's testimony was that the property value was, at an "absolute minimum", at least $114,000. Based on petitioner's averments, the Circuit Court for Orange County granted a rehearing as to the fair market value of the Citrus County Property. There is no evidence that a rehearing ever occurred. The parties eventually reached a settlement, and on October 28, 1987, Freedom filed a Satisfaction of Judgment stating that the $20,834 had been fully satisfied. Thus, petitioner's remaining personal liability on his guaranty was resolved approximately 2 years after the foreclosure sale had become final.

Petitioner's basis in the property at the time of the foreclosure sale was $1,844.

                              OPINION

Respondent has raised as a new matter in his amendment to answer an allegation that petitioner realized a gain of $112,156

from the foreclosure sale in 1985.[58]  Respondent agrees that he
bears the burden of proof on this issue under Rule 142(a).

The transfer of property in a foreclosure sale represents a
sale or exchange for tax purposes.  Helvering v. Hammel, 311 U.S.
504 (1941); 2925 Briarpark, Ltd. v. Commissioner, 163 F.3d 313,
318 (5th Cir. 1999), affg. T.C. Memo. 1997-298; Cox v.
Commissioner, 68 F.3d 128, 133 (5th Cir. 1995), affg. T.C. Memo.
1994-189; Yarbro v. Commissioner, 737 F.2d 479, 485 (5th Cir.
1984), affg. T.C. Memo. 1982-675; Aizawa v. Commissioner, 99 T.C.
197, 198 (1992), affd. without published opinion 29 F.3d 630 (9th
Cir. 1994).  Under section 1001(a), the amount of gain realized
from a sale or exchange is the excess of the amount realized over
the taxpayer's adjusted basis in the property.  In the case of
recourse debt, the amount realized from the transfer of property
in a foreclosure sale is the fair market value of the property on
the date of the sale.  Frazier v. Commissioner, 111 T.C. 243, 245
(1998); Marcaccio v. Commissioner, T.C. Memo. 1995-174.  The
amount realized from a sale or other disposition of property
includes the amount of liabilities from which the transferor is
discharged as a result of the sale or other disposition.  2925
Briarpark, Ltd. v. Commissioner, supra at 317; sec. 1.1001-
2(a)(1), Income Tax Regs.  Any unpaid portion of the recourse

_____

[58]Respondent originally determined that petitioner realized
cancellation of indebtedness income.  Respondent now concedes
this determination.

debt in excess of the fair market value of the property is not used to calculate the amount realized from a sale under section 1001(b). See 2925 Briarpark, Ltd. v. Commissioner, supra at 318 n.2; Marcaccio v. Commissioner, supra.

Respondent contends that petitioner realized at least $114,000 in the 1985 foreclosure sale of the Citrus County Property. He relies upon petitioner's position in the deficiency judgment proceedings that the fair market value of that property was at least $114,000 at the time of the foreclosure sale. We cannot agree that respondent has established that the fair market value of the Citrus County Property was at least $114,000 on the date of the foreclosure sale. The Orange County Circuit Court found that the Citrus County Property had a fair market value of $87,000 at the time of the foreclosure sale. The court gave petitioner credit for $87,000 and then entered a deficiency judgment of $20,834 against petitioner, which represented petitioner's remaining personal liability as guarantor. Although final judgment was stayed for the introduction of additional evidence as to fair market value, no such evidence appears to have been submitted, and, in any event, the parties settled the matter and Freedom filed a Satisfaction of Judgment stating that the $20,834 deficiency judgment had been satisfied. We find that the fair market value on the date of the foreclosure sale was $87,000, the amount determined by the Circuit Court.

We must also reject petitioner's argument that he is not required to recognize gain from the foreclosure sale, because he was not the borrower of the original loan proceeds and received no benefit therefrom. Petitioner argues:

> The law is clear that to realize gain based upon market value of property transferred, the transfer must be in consideration of the discharge or reduction of indebtedness. This gain is not realized when the indebtedness is based upon a guaranty and the taxpayer received none of the loan proceeds.

Petitioner cites Landreth v. Commissioner, 50 T.C. 803 (1968); Payne v. Commissioner, T.C. Memo. 1998-227, revd. on other grounds 224 F.2d 415 (5th Cir. 2000); and Whitmer v. Commissioner, T.C. Memo. 1996-83, in support of his position. We find those cases distinguishable in that they dealt with discharge of indebtedness income of a guarantor, not gain realized from the sale of the guarantor's property at a foreclosure sale.

In Frazier v. Commissioner, supra at 248, we achieved parity between the tax results to a party owning property sold in a foreclosure sale and the tax results to the willing seller who sells the property in an arm's-length transaction to a willing buyer, "neither being under compulsion to buy or sell and both having reasonable knowledge of relevant facts."[59]  Applying that

---

[59]A foreclosure, like a voluntary sale, is a disposition within the scope of the gain or loss provisions of sec. 1001. See Helvering v. Hammel, 311 U.S. 504 (1941); 2925 Briarpark, Ltd. v. Commissioner, 163 F.3d 313, 318 (5th Cir. 1999), affg.
(continued...)

approach in this case, if petitioner sold the Citrus County Property to a willing buyer for its fair market value of $87,000, and then transferred the sale proceeds in partial satisfaction of his personal liability as guarantor, he would have realized $85,156 ($87,000 amount realized minus $1,844 basis). On the facts presented, we hold that petitioner realized $85,156 on the foreclosure sale to Freedom.

C. Miscellaneous Items of Schedule C Income

FINDINGS OF FACT

On February 6, 1985, petitioner deposited $37,500 into his bank account with Freedom Savings & Loan Association. The record contains a check of $37,500 from Orange Valley Real Estate Exchange, Inc., to the order of Metro Realty Association. The spreadsheets that petitioner used to complete his tax returns list this amount under "Sales & Comm". Petitioner reported this amount as a part of his gross profit from his real estate business on Schedule C of his 1985 return.

Petitioner received net commission income of $598 from National Land Commissions in 1986.

On July 1, 1985, petitioner deposited checks from Crazy Commandos of $250 for rent from June 15 to 30, 1985, and $500 for rent from July 1 to 31, 1985. Petitioner also deposited $500 of rent from Crazy Commandos into his Freedom account on September

---

[59](...continued)
T.C. Memo. 1997-298; Rev. Rul. 90-16, 1990-1 C.B. at 13.

3, 1985. Petitioner received rents of $1,250 from Crazy Commandos in 1985.

Petitioner received $400 in 1985 from the sale of 100 wax myrtle trees.

## OPINION

Gross income means all income from whatever source derived, including compensation for services, commissions, gross income derived from business, gains derived from dealings in property, rents, etc. Sec. 61(a). Petitioner does not contest respondent's determinations in the notice of deficiency, his requested findings of fact, or his arguments on brief with respect to the amounts that petitioner received. Petitioner has abandoned any arguments he may have made with respect to those amounts. We hold that petitioner is taxable for the various amounts described above as determined by respondent.

D. Schedule E Income

## FINDINGS OF FACT

Petitioner owned stock in Frank's Corner, Inc., an S corporation. Frank's Corner filed a Schedule K-1 (Form 1120S), Shareholder's Share of Income, Credits, Deductions, etc., relating to petitioner for 1987. The Schedule K-1 reported ordinary income of $4,492 and a section 179 deduction of $604. Petitioner did not report any income from Frank's Corner on his 1987 return. Respondent determined that petitioner realized

income of $3,888 ($4,492 - $604) in 1987, which should have been reported on Schedule E, Supplemental Income and Loss (from rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.).  On his 1988 return, petitioner reported a loss of $4,702 from Frank's Corner, which matches the loss reported on the Schedule K-1 for that year.

OPINION

A shareholder in an S corporation must take into account, in determining his tax, the shareholder's pro rata share of the S corporation's "nonseparately computed income or loss".  Sec. 1366(a)(1)(B).  Nonseparately computed income or loss means gross income minus the deductions allowed to the corporation.  Sec. 1366(a)(2).  In other words, the taxpayer is responsible for his distributive share of income realized by an S corporation in which he is a shareholder.  See Ishler v. Commissioner, T.C. Memo. 2002-79.

Petitioner presents no challenge to respondent's determination, and he has therefore abandoned any arguments he might have presented.  We hold that petitioner realized Schedule E income as determined by respondent and that petitioner should have reported that amount on his 1987 return.

E.  Unidentified Deposits

Bank deposits are prima facie evidence of income.  DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir.

1992). "Where the petitioner has failed to maintain adequate records as to the amount and source of his income, and the Commissioner has determined that the deposits are income, the petitioner has the burden of showing that the determination is incorrect", Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), affd. 566 F.2d 2 (6th Cir. 1977), and he must prove by a preponderance of the evidence that the deposits came from a nontaxable source, Rule 142(a); Kudo v. Commissioner, T.C. Memo. 1998-404, affd. 11 Fed. Appx. 864 (2001). All money deposited into a taxpayer's bank account is presumed to represent taxable income, Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). Except where he bears the burden of proof, e.g., fraud, the Commissioner need not prove a likely source of the unreported income. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); Tokarski v. Commissioner, 87 T.C. at 77. Also, he is not required to prove that all deposits made by the taxpayer are income. Estate of Mason v. Commissioner, supra at 657; Gemma v. Commissioner, 46 T.C. 821, 833 (1966).

1. Deposit on March 12, 1985, of $59,000

FINDINGS OF FACT

On March 4, 1985, a $70,000 check from Washington International Bank & Trust Ltd. (Washington International), was deposited into petitioner's Freedom bank account (account No. 0110324809). Respondent did not determine that this deposit

represented unreported income. On March 11, 1985, a check (No. 601) for $63,212.50 was drawn on petitioner's Freedom account. This check was payable to the order of "Freedom Financial Center" and was endorsed by Ms. Allen. The account balance was reduced from $64,775.80 to $1,563.30 as a result of this check.

On March 11, 1985, petitioner purchased a cashier's check for $59,000 from Freedom. Petitioner was listed as both the remitter and the payee. On March 12, 1985, petitioner deposited the proceeds of this check into his Tucker State Bank account. Respondent determined that the $59,000 deposit was taxable as income to petitioner for 1985.

                            OPINION

Petitioner contends that the March 12, 1985, deposit of $59,000 was traceable to the $70,000 check from Washington International and that respondent did not determine that the proceeds of this check represented unreported income. Petitioner argues that after the $70,000 check was deposited to his Freedom account, Ms. Allen made a withdrawal of $63,212.50 in the form of check No. 601 and used the proceeds to purchase the $59,000 cashier's check payable to Mr. Medlin and deposited in his Tucker bank account.

Petitioner did not question Ms. Allen at trial regarding her endorsement on check No. 601 and whether she used that check to purchase the $59,000 cashier's check from Freedom. Petitioner

could not establish at trial, and has not established on brief, the appropriate link between the $59,000 deposit, the purchase of the $59,000 cashier's check, the $63,212.50 check signed by Ms. Allen, and the $70,000 check from Washington International. Petitioner has not explained why the cashier's check and the Tucker account deposit are for $59,000, while the check signed by Ms. Allen is for $63,212.50, and where the $4,212.50 excess ended up.  His explanation at trial was for the most part confusing.

Petitioner claims that since check No. 601 caused a decrease of $63,212.50 in his Freedom account and that since check No. 601 is payable to the order of "Freedom Financial Center", the proceeds of that check must have been used to purchase the $59,000 cashier's check from Freedom.  Petitioner assumes too much.  He assumes that he and Ms. Allen did not have other accounts with Freedom, that he and Ms. Allen did not engage in other transactions with Freedom, and, most importantly, that "Freedom Savings and Loan Association" is the same entity as "Freedom Financial Center".[60]  Petitioner assumes, but fails to establish, those matters.  In any event, petitioner's claim fails again to account for the $4,212.50 difference between the amount of the cashier's check and the amount of check No. 601.

_____

[60]At trial, petitioner cross-examined Revenue Agent Sherri Blackton, but he failed to establish through that witness that Freedom Savings & Loan Association was the same entity as Freedom Financial Center.  Indeed, Ms. Blackton testified that they might be separate entities.

Even if we were to assume that the deposit of $59,000 is traceable to the $70,000 received from Washington International, petitioner has not established that this is a nontaxable source of income. Petitioner relies on the fact that respondent failed to determine in the notice of deficiency that this amount represented unreported income. However, this alone does not establish an income source to be nontaxable. Respondent may have had a wide range of valid reasons for not targeting this particular item for an increased deficiency, including lack of information and records. Those reasons do not indicate that the source is a nontaxable one, especially given the particular circumstances of this case where moneys are being moved around through a variety of entities, individuals, transactions, and trust accounts.

Petitioner claims that the $70,000 check from Washington International was a loan, because "The evidence as to Washington International was that it loaned money secured by real estate (TR-412, 453)." At trial, John Kelly testified with respect to petitioner's Washington International account, i.e., the Cayman Island account, that "it was basically a loan account. He would pledge property as collateral, and they would advance him funds against his property. And subsequently he would repay the loan either from other funds or through sales of the property." Mr. Kelly also testified that "Mr. Medlin would transfer title to

pieces of property--or a security interest in pieces of property --not title--to the Cayman bank.  The Cayman bank would then advance him funds using the property as a security.  Mr. Medlin would then repay the loan in time."

At best, John Kelly's testimony provides a possible explanation for what the $70,000 check represented.  Petitioner has offered no additional evidence or testimony to establish his claim that the check was a loan.  Importantly, he does not argue, nor has he shown, that title to, or a security interest in, property was ever transferred to Washington International for what he purports to be $70,000 in loan proceeds.  Mr. Kelly's testimony that Washington International and Mr. Medlin were generally involved in loan transactions does not establish that this amount was a loan.  Indeed, his testimony was inconsistent with petitioner's testimony at trial that he used the Washington International trust account as a vehicle for deferring income from real estate sales.  Petitioner has not established a link between the unreported deposit and a nontaxable source of income. We sustain respondent's determination that the $59,000 deposit is taxable as income to petitioner.

2.  Deposit on September 16, 1986, of $84,521.63

FINDINGS OF FACT

On September 16, 1986, $84,521.63 was deposited into Mr. Miles's trust account.  Ledger card No. 70042 for that trust

account is entitled "Walter Medlin" and "Re $ Partin".[61]  Lines 3 through 6 of that ledger card contain the following notations:

| Date | Name | Memo | Received | Disbursed |
|------|------|------|----------|-----------|
| 9-16-86 | Michael Bast | Medlin/Partin | $84,521.63 | -- |
| 9-16-86 | Natl. Land & Inv. Inc | Medlin/Partin | 1,000.00 | -- |
| 9-18-86 | Transferred to Partin Sybil card | -- | -- | $84,521.63 |
| 9-18-86 | Transferred to Partin Sybil card | -- | -- | 1,000.00 |

Respondent determined that the deposit of $84,521.63 was taxable as income to petitioner for 1986.

### OPINION

Petitioner contends that he did not receive the benefit of the deposit of $84,521.63 on September 16, 1986, that the amount deposited related to a transaction between Michael Bast and Sybil Partin that did not involve petitioner, that the entry on the ledger card was a mistake, and that this mistake was corrected 2 days later with a transfer to the correct ledger card.

At trial, petitioner testified that he did not receive any of the proceeds of the $84,521.63 deposit and that he had no interest in the sale of property from Ms. Partin to Mr. Bast. Petitioner testified that the entry on the Medlin/Partin ledger card must have been a mistake:

> And because of my relationship with Mike and having a real estate license and being interested in real estate as well as his cattle business, I kind of

---

[61]This ledger card relates to ledger card No. 70043, which has its title line partially cut off.  The title line does show "Partin", "P.O. Box 521  Kissimmee, FL", and lists the "Adverse Party" as "Partin Property".

got first shot at buying a couple pieces of property. And one of them was a Breckenridge piece that is subject to this. I forget what the other piece was.

But because of my relationship with Mike, a couple people had come to me. One of them was Mr. Schoolfield. I believe he bought the parcel that Doc Partin had gotten. I wasn't interested in it.

And so Mike Bast had come to me and asked me if I was trying to buy Sybil's piece and/or if I could help him buy it. And, basically, I, you know, told him I wasn't interested in it. I couldn't--I had all I could afford at the time. And, so I took him to Mike Partin --they really knew each other--but I basically took him to Mike Partin and said, Mike and Mike, why don't you all get together on Sybil's behalf because Mike, Mr. Mike Partin who was here, and his wife had been handling his aunt's, who is Sybil, handling all her affairs and helping handle her cattle because she was a widow. And I think she was the only sister in the group, I believe, so she didn't have any help. Anyway, I kind of put the deal together for them, put the two of them together, and recommended that Mike take Aunt Sybil over to Steve Miles and have him do the closing and so forth.

And, I think, because of my PR position in the middle, dealmaker or whatever, it got put on one of my cards by Alana, I think. Then, it appears, that a couple days later, Mr. Miles--and again I'm guessing by looking at this--had said, Wait a minute. This is not Medlin's deal. Start a card that says Sybil Partin and transfer everything to Sybil Partin's card. I'm surmising this. I haven't discussed this with Mr. Miles. I've heard his testimony and Alana's testimony as to kind of how these things happen.

Mr. Miles referenced various checks accompanying ledger card No. 70042 and concluded that the references to "Partin" on that card must refer to "Edward L. Partin", known as "Geech Partin", and "Constance Partin". Mr. Miles testified that the property referred to in ledger card No. 70042 "was known or later

developed as Anorada Subdivision".  Mr. Miles then testified

about the entries at issue:

Q    Well, if you look at again 70042, you see this
Michael Bast payment of $84,521.

A    Yes.

Q    And then, the same amount, $84,521.63, was
transferred to, according to the notation there,
Partin, Sybil card.  Do you see that?

A    That's correct.

Q    And Partin, Sybil card is a card that you
apparently maintained for a Partin, Ms. Sybil Partin?

A    Yes.

Q    Was she also a client of yours that you performed
trustee activities for?

A    I don't know that we ever held anything in trust
for Sybil Partin.  We just represented her in
connection with the transaction with Mr. Bast, I
believe.

Q    Okay, So would it be fair to say that, from
looking at this, while Mr. Bast sent a check and it
originally got placed onto this card that relates to
Mr. Medlin, that the same amount of funds was then, two
days later, transferred over to the benefit of Sybil
Partin?

A    Yes.  And it looks like it was just a mistake in
putting it on this card to start with, because to my
knowledge Mr. Bast did not have anything to do with the
property that Mr. Medlin acquired from Geech and Connie
Partin.  Mr. Bast bought property from Sybil Partin.

      And there's a lot of Partins in Osceola County.
And when this check came in, it probably just said
Partin on it, and Alana put it on here.  I don't know.
Did you all ask her about it when she was here?

Q    No, I didn't.

A     Oh.  Okay.  She could probably tell you better than I could.

Q     But that kind of a mistake would have been corrected through the transfer that we see on there?

A     That's correct.

Q     And that's your memory of it now?

A     I don't have any memory of it.  Just looking at that and knowing the cast of characters, I think that's what happened.

Mike Partin, who was personally involved with the Sybil Partin/Michael Bast transaction, also testified that petitioner had no ownership interest in the property sold to Mr. Bast, that Sybil Partin was the owner of the property, and that Mr. Bast was the purchaser.

Although petitioner did not question Ms. Goodman regarding the deposit entry and the purported correction, Ms. Goodman was questioned generally about the ledger system she maintained.  She testified that the ledger system did not involve actual physical transfers but was "simply a bookkeeping trace".  Ms. Goodman testified that when a transfer was made to another ledger card, "I would write, Moved, on the card that it came from, and I would write either Received or Transferred from the card that it came from."

On the basis of the testimony offered at trial, we are satisfied that petitioner did not have an ownership or other interest in the property sold by Sybil Partin to Michael Bast and

that the payment from Michael Bast was mistakenly entered on the Medlin/Geech Partin ledger card, ledger card No. 70042. Although petitioner's testimony was, as a general matter, self-serving and less than credible at trial, his testimony regarding his involvement in the Sybil Partin/Michael Bast property transaction was detailed and supported by the testimony of Mr. Miles and Mike Partin. Given that petitioner lacked any discernible interest in that transaction, petitioner's contention that the entry on ledger card No. 70042 was a mistake is supported by the record. The ledger card shows a deposit of $84,521.63 followed 2 days later by a transfer in that same amount to the Sybil Partin ledger card. Mr. Miles confirmed that these entries were consistent with the procedures he and his bookkeeper followed with respect to a mistaken entry. Ms. Goodman's general testimony establishes that the initial deposit of $84,521.63 was indeed transferred to the Sybil Partin card given the notation "Transferred to Partin Sybil card". We hold that the $84,521.63 deposit is not income to petitioner.

### 3. Deposit on April 9, 1987, of $67,740

#### FINDINGS OF FACT

On April 9, 1987, petitioner deposited $67,740 into his Tucker bank account No. 00018066.[62] A memorandum dated October

---

[62]The record contains a Tucker State Bank signature card, which contains account information for account No. 00018066. That record contains the signatures of petitioner and Ms. Allen,
(continued...)

19, 1993, from Revenue Agent Sherri Blackton to Special Agent

Linda Ford states with respect to the source of this deposit:

> At 12:35 p.m. today, Mr. Larry Blackwater of Community First Bank of Winter Garden returned my call. I explained that I had a question regarding a deposit made to Mr. Medlin's account number 18066 on April 9, 1987 in the amount of $67,740.  The deposited item we received in response to the summons previously issued to the bank indicated the money was transferred from another account. (#1089234)  I explained that I needed to identify the originating account owner.  * * *

> *     *     *     *     *     *     *

> At 1:08 p.m. Mr. Blackwelder called to report that the originating account belonged to Mr. Medlin and that he thought we were provided with copies of the statements, etc. to that account.  He stated his research indicated that a $90,000 check from Orlando Land and Investment, less a $22,260 cashier's check, was deposited to account number 1089234.  The $67,740 was then immediately transferred to account number 18066.

A "Transfer of Funds" statement by Tucker State Bank states:  "On

the date indicated above [4/9/87], we made the following transfer

of funds between your accounts, according to your instructions

received by phone * * *.  We have charged your account for this

transfer From 1089234 to 00018066."  The statement is to "Walter

L. Medlin" and shows an amount of "$67,740.00".

Orlando Land & Investment Co. issued a check dated April 3,

1987, for $90,000, which is payable to the order of petitioner

and which contains the notation "FOR Loan".  A deposit ticket for

---

<sup>62</sup>(...continued)
shows the type of account as a trust with a "separate agreement", and states an initial deposit of $67,740 having been made on "4/8/87".

Mr. Medlin's Tucker bank account No. 1089234 dated April 8, 1987, shows the deposit of a check for $90,000 from "Orl. Land & Investment", "LESS CASHIERS CHECK in the amount of $22,260.00"; this resulted in a net deposit of $67,740 to account No. 1089234.

On April 6, 1987, petitioner executed a promissory note for the benefit of Don Henry and Sylvia Cohn, which provided:

<u>90,000.00</u>                                                    <u>4/6/1987</u>

<u>Ninty (90) days</u> after date, the undersigned, for value received jointly and severally promise to pay to the order of <u>Don Henry and/[illegible entry] Sylvia Cohn</u> at <u>Orlando Fla.</u>   <u>Ninty Thousand ($90,000) + Twenty Thousand ($20,000) dollars</u> with interest from date at the rate of <u>----</u>% per annum until fully paid.  Interest payable <u>----</u>.  This note shall bear interest from maturity at the rate of <u>----</u>% per annum until fully paid.

The promissory note is signed by petitioner.  Don Henry was the president of Orlando Land & Investment Co.

Respondent determined that the deposit of $67,740 was taxable as income to petitioner for 1987.

OPINION

Petitioner contends that the deposit of $67,740 on April 9, 1987, represents a portion of the loan proceeds received from Don Henry of the Orlando Land & Investment Co.

Respondent agrees that "The source for the deposit was a check for $90,000 from Orlando Land & Investment".  Accordingly, the April 9, 1987, deposit is not unidentified as respondent originally determined.  Nevertheless, respondent argues that this

check was not a loan from Don Henry and Sylvia Cohn. He argues that the promissory note that petitioner relies upon shows Don Henry and Sylvia Cohn as the obligees, not Orlando Land & Investment Co., and that the check from that entity was not a check from those obligees.

Since respondent has conceded the source of the formerly unidentified deposit, we are concerned only with whether that was a nontaxable source. We note that respondent did not determine an increased deficiency based on the $90,000 check, although his failure to do so is not conclusive, see supra. At trial, petitioner testified that the deposit was attributable to proceeds lent to him by Don Henry. Respondent concedes that Don Henry was the president of Orlando Land & Investment Co., and we have found that as fact. Although this fact alone does not establish a connection between the check of $90,000 and the promissory note of $90,000, we believe the evidence as a whole shows a sufficient connection beyond mere coincidence. We hold that the deposit of $67,740 is not taxable as income to petitioner.

### 4. Deposit on July 8, 1988, of $140,000

#### FINDINGS OF FACT

On July 8, 1988, $140,000 was deposited into Mr. Miles's law firm's trust account for petitioner. Ledger card No. 70269 for that trust account is entitled "Walter Medlin", "Prather Ranch

Property", and "see also Maury Carter". Line 21 of the ledger card contains the following information:

| Date | Name | Memo | Received |
|------|------|------|----------|
| 7-8-88 | Walter Medlin | Medlin/Prather | $140,000 |

Line 22 of this same ledger card contains the following entry:

| Date | Name | Memo | Disbursed |
|------|------|------|-----------|
| 7-12-88 | moved to Medlin/Partin | -- | $97,893.78 |
| 7-13-88 | moved to Medlin/Malfa | (24,529.00 + 342.72) | 24,871.72 |
| 7-13-88 | moved to Medlin/general | | 17,234.50 |

Ledger card No. 70042, entitled "Walter Medlin" and "Re $ Partin", contains the following entries on lines 10, 11, and 12, which were related to the transfer to the ledger card noted in line 13 below:

| Line | Date | Name | Memo | Received | Disbursed |
|------|------|------|------|----------|-----------|
| 10 | 7-12-88 | Edward L. and Constance A. Partin | Medlin/Partin | -- | $89,615.96 |
| 11 | 7-12-88 | Mike Partin | Medlin/Partin | -- | 5,094.04 |
| 12 | 7-12-88 | W.G. Boyd | Medlin/Partin | -- | 3,183.78 |
| 13 | 7-12-88 | Rec from Medlin/Prather | -- | $97,893.78 | -- |

The record contains a Dean, Witter, Reynolds, Inc. (Dean Witter), check (No. 69566) dated July 7, 1988, for $140,000, which is payable to the order of the "Stephen Miles Trust Account". The stub to that check is signed as "RECD BY Richard Margolis". A deposit statement for the "Miles & Cumbie P.A. Trust Account", dated July 8, 1988, lists check "1-23" for $140,000. This deposit statement was filled out by Alana Goodman. Ms. Goodman was Mr. Miles's bookkeeper, and she made the entries into the ledger cards. Ms. Goodman matched the

number "1-23" listed on the deposit statement to the bank tracing number "1-23" on the Dean Witter check.

Respondent determined that the deposit of $140,000 was taxable as income to petitioner for 1988.

## OPINION

Petitioner argues that the deposit on July 8, 1988, of $140,000, was traceable to a loan from Richard Margolis, that the loan proceeds were needed to make a mortgage payment on the Partin property, and that "The loan was secured by being structured as a sale and option to buy back from Margolis rather than a mortgage to Margolis." Respondent agrees that $97,893.78 was transferred from the Medlin/Prather Ranch ledger card to the Medlin/Partin ledger card and that checks were written for the Medlin/Partin property on that same date; however, respondent disagrees that the deposit for $140,000 and the subsequent transfers establish that a loan was made. We agree with respondent.

We find that petitioner has established that the source of the $140,000 deposit was the Dean Witter check of $140,000. That check was dated July 7, 1988, the day before the unidentified deposit to the Medlin/Prather Ranch Property card. Ms. Goodman testified that she always used the bank tracing number for checks when making deposits. As such, she was able to match the bank tracing number on the Dean Witter check to the bank tracing

number of a check listed on a deposit statement for the Miles & Cumbie P.A. Trust Account. The deposit statement is dated July 8, 1988, the check is in the amount of $140,000, and the deposit slip was filled out by Ms. Goodman. Petitioner has shown that the issuance of the $140,000 Dean Witter check on July 7, 1988, the deposit of $140,000 to Mr. Miles's law firm's trust account on July 8, 1988, and the deposit entry of $140,000 on the Medlin/Prather Ranch Property ledger card were more than mere coincidences and that the source of the deposit entry was the Dean Witter check. Nevertheless, petitioner has not shown that the Dean Witter check was a loan; i.e., that the check was a nontaxable source of income. See Polidori v. Commissioner, T.C. Memo. 1996-514.

At trial, petitioner testified that he needed to make a mortgage payment on what petitioner refers to as the Partin property, that he called Richard Margolis up and told him he needed some money, and that Mr. Margolis lent him the $140,000 at issue. Petitioner testified that Mr. Margolis's representative recommended:

> rather than do a mortgage, have me deed them the property, or deed or convey them the beneficial interest in the property, if I only held the beneficial interest, and then give me an option to buy it back at this continually accelerating price, which was reflective of the interest rate. And that's what happened here.

Petitioner claims that this recommendation was followed and that the property he put up as collateral was the Partin property. Petitioner also testified that he used some of the proceeds from the Margolis "loan" to make his mortgage payment, and he also described the various ledger entries:

Q    Okay.  And did you use some of the proceeds of the $140,000 loan, after you had conveyed the property to Mr. Margolis, to make a payment on that very property, on the mortgage already existing on that very property?

A    Yes, sir.

Q    And is that reflected in 70042 ledger card of 93-R?

A    Yes, sir, but you sort of have to go back to 70501.  And you can see where a portion on the next line from the entry of the $140,000--you can see on line 22, it says, 7/12/88, moved to Medlin/Partin, $97,893.78.

And then you go to the--as Mrs. Goodman explained, that was her way of getting the money out of, in this case off the Prather Ranch card onto the Partin card. So, I guess kind of an attempt to, all this gets very confusing and we probably should have, somebody should have done better--I didn't keep these cards.  They may have been in worse shape.  But just trying to keep track of this stuff.  But in this case, she moved it.

The $140,000 probably should have been put on the Partin card to begin with.  And it had nothing to do with the Prather Ranch.  But she put it there and we've seen it before, and we'll probably see it again, where she put stuff on the wrong card.  But it's not the end of the world.  It's correctable.  She makes an entry and says, I'm moving this over to the Partin card.  It was moved to the Partin card on line 13, same date 7/12/88, and it says, Received from Medlin/Prather 97,893.78.

Q    And did you then use that to make a payment out?

A    Yes, sir.

Q    Does that show there?

A    Yes, sir.  Those are reflected in the columns above, 10, 11, and 12.

Q    So then the source of this $140,000 unknown deposit on ledger card 70501, on 93-R, is the loan from Mr. Margolis?

A    Yes, sir.

Unlike petitioner's testimony with respect to the deposit of $84,521.63 on September 16, 1986, petitioner's testimony with respect to this deposit cannot be substantiated with the testimony of other witnesses or with evidence of record. Petitioner did not call Richard Margolis to testify, and he did not submit any evidence or documentation to show that the $140,000 Dean Witter check was a <u>loan</u> from Mr. Margolis.[63] Accordingly, we find petitioner's testimony to be self-serving and of no assistance to him.

Petitioner expends considerable effort to establish that on July 12, 1988, $97,893.78 was transferred from the Medlin/Prather Ranch Property ledger card (no. 70501) to the Medlin/Partin ledger card (no. 70042), and that on that same date, $97,893.78 was disbursed to Edward L. and Constance Partin, Mike Partin, and

---

[63]Petitioner cites the testimony of Revenue Agent Sherri Blackton that petitioner would at times borrow funds which were secured by giving a deed to the property with an option to buy the property back.  However, this does not establish that petitioner engaged in this type of transaction with Richard Margolis on this particular occasion.

W.G. Boyd from the Medlin/Partin ledger card.  However, this has little relevance in determining whether the $140,000 Dean Witter check was a nontaxable source of income; i.e., a loan.  Moreover, the considerable difference between the amount of the Dean Witter check, $140,000, and the total amount of the disbursements, $97,893.78, contradicts petitioner's testimony that the purpose of the loan was to make a mortgage payment.[64]

Also, we are not inclined to accept petitioner's testimony that the entries on the Medlin/Prather Ranch Property ledger card were mistaken entries by Ms. Goodman that were subsequently corrected.  Unlike the deposit in 1986, which we held was attributable to a mistaken entry, the entry on the ledger card at issue here was not simply corrected with a transfer in an equivalent amount to another card.  Instead, there were three offsetting entries:  (1) A transfer to the Medlin/Partin ledger card on July 12, 1988, of $97,893.78; (2) a transfer to the Medlin/Malfa card on July 13, 1988, of $24,871.72; and (3) a transfer to the Medlin/general ledger card on July 13, 1988, of $17,234.50.  We cannot conclude that the deposit entry on the Medlin/Prather Ranch Property was necessarily a mistake and that the $140,000 should have been transferred to the Medlin/Partin

---

[64]And, indeed, it could indicate that the transaction was in fact a sale of the property.  Proceeds from a sale of property would not be a nontaxable source of income.

ledger card.  We sustain respondent's determination that the $140,000 deposit represents taxable income to petitioner.

### 5.  Other Deposits

#### FINDINGS OF FACT

On May 6, 1986, petitioner deposited $300 into his Freedom account.  On August 1, 1986, a deposit of $9,038.47 was made to Mr. Miles's law firm's trust account.  On October 10, 1986, $300 was deposited into Mr. Miles's law firm's trust account for petitioner.  Respondent determined that those deposits were taxable as income to petitioner.

#### OPINION

Petitioner does not discuss on brief the deposit of $300 on May 6, 1986.  We find that he received that item as income.

In respondent's reply brief, he concedes that the deposit of $9,038.47 on August 1, 1986, to Mr. Miles's law firm's trust account was not income to petitioner.

Petitioner does not discuss on brief the deposit of $300 on October 10, 1986.  We find that he received that item as income.

### F.  Deductions Claimed by Petitioner

#### 1.  Schedule C Real Estate Business Deductions

#### FINDINGS OF FACT

Petitioner claimed deductions on the Schedules C for his real estate business on his returns for 1985 through 1988.  Those deductions were claimed on the basis of the spreadsheets that

petitioner prepared for the deposits and disbursements from his personal bank accounts. Petitioner's spreadsheets classified the various disbursements as expenditures for automobiles, dues and subscriptions, office, telephone, utilities, interest, maintenance and repair, travel and entertainment, licenses and taxes, commissions paid, insurance, and miscellaneous. Those disbursements were then claimed on the Schedules C as deductions from the gross income he reported for his real estate business. Respondent reconstructed petitioner's expenses from buying and selling real estate for 1985 through 1988. See appendix A. In reconstructing petitioner's expenses, respondent disallowed many of the deductions petitioner claimed for a failure to substantiate or a failure to show an ordinary and necessary business expense for purposes of section 162. Respondent allowed deductions for petitioner's real estate business in much larger amounts than petitioner originally claimed on his returns.[65]

OPINION

Petitioner did not present any evidence that respondent erred in reconstructing his Schedules C real estate expenses. Petitioner does not present any arguments on brief relating to his Schedules C real estate expenses or respondent's

---

[65]Of course, it is likely that many of these expenses were related to properties that petitioner sold but failed to report. We point out that the largest items of additional expense deductions are interest and taxes which appear to be linked to properties which petitioner sold as part of his real estate business.

reconstruction of those expenses. Petitioner's only argument relates to certain deductions he claims for alleged expenses from his orange grove, cattle, and Ferrari automobile collection activities. We hold that petitioner has conceded any arguments relating to respondent's reconstruction of the allowable expenses for his real estate business.

## 2. Personal Residence Interest

### FINDINGS OF FACT

On August 31, 1981, petitioner purchased his personal residence in Osceola County, Kissimmee, Florida, from Walter E. and Maxine J. Melitshka.[66] Petitioner borrowed certain amounts from the Melitshkas for the purchase of this residence. The amount of the loan, the interest rate, the repayment terms for the loan, and the actual amount of interest petitioner paid during tax years 1985, 1986, 1987, and 1988 were not established on the record.

### OPINION

Respondent determined that petitioner was entitled to deductions for mortgage interest paid on his personal residence of $24,957, $0, $41,759, and $16,249 for 1985, 1986, 1987, and 1988, respectively. Petitioner does not challenge those determinations on brief, and, accordingly, he has conceded the

---

[66]The residence was originally titled in the name of Mr. Miles, as trustee; however, on Aug. 10, 1990, Mr. Miles conveyed title to the residence to petitioner.

matter.  We sustain respondent's determination of the allowable mortgage interest expenses.

3.  <u>Orange Grove, Cattle, and Ferrari Activities</u>

FINDINGS OF FACT

Petitioner had an orange grove of approximately 800 trees near his personal residence, which covered approximately 17 to 18 acres.  When petitioner moved to his personal residence in or about 1981, the orange grove was old with at least a portion of it having been planted in the 1920s.  Petitioner was not in the growing business, and he allowed the orange grove to deteriorate.

After a bad freeze in 1985, petitioner let the orange grove go for a year without spraying it (without putting any herbicide or fertilizer on the trees).  Petitioner replaced a considerable number of old trees and dead trees with 690 new trees.  The orange grove had an irrigation system which needed repairs, and the orange grove required fertilizer and herbicide treatment. Petitioner paid $10,000 on June 22, 1987, and $6,371.53 on June 1, 1988, to Irrigation Engineers for certain irrigation work done on petitioner's orange grove.  Petitioner did not maintain any books or records for the orange grove, except for his checkbook. Petitioner has never made a profit from selling oranges.

Petitioner also owned cattle during the tax years at issue. Petitioner was advised by Michael Partin, a rancher, that the

cattle business could be profitable.[67]  Petitioner purchased a herd of purebred Brahman cattle from Mr. Partin in or about 1982 or 1983.  Most of the cattle were midage to older-age cattle, and a few were 1-2 year-old heifers.  Petitioner joined the American Brahman Beef Association and registered a brand.

In 1989, petitioner returned the cattle back to Mr. Partin. The market for cattle at this time was not good.  When Mr. Partin took the cattle back in 1989, the cattle were in good condition. Mr. Partin sold the cattle off over time.

Petitioner owned approximately 25 Ferrari automobiles in 1985 to 1988.  He did not sell any of the Ferraris in 1985 through 1988.  The Ferraris were damaged by vandals, and petitioner went to a dealer to get the damages repaired. Petitioner also had alternators replaced, carburetors cleaned out, and timing belts changed, etc.  Petitioner was a member of the Ferrari Club of America.

Petitioner did not maintain separate bank accounts for the orange grove, the cattle, or the Ferraris.  Petitioner did not report any business activities relating to the orange grove, the cattle, or the Ferraris on any income tax returns for the relevant tax years.  To the extent petitioner did report any

---

[67]Mr. Partin testified that "the Brahman business was really good.  We had good foreign sales, good domestic sales.  And I just told him that I thought it would be a good business for him to get into.  He had some land he could put some cattle on."  He also testified that "we were selling our yearling bulls for $1,500 apiece and our heifers for about the same price."

expenses with respect to those activities, he reported them on the Schedules C for his real estate business.

## OPINION

Petitioner claims that he is entitled to deductions for 1985 through 1988, which relate to expenses incurred with respect to his orange grove, his cattle, and his collection of Ferrari automobiles.[68]  Respondent argues that petitioner was not engaged in a trade or business with respect to those activities and that petitioner has failed to substantiate the expenses he claims.

It is well established that "'an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer.'" INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992) (quoting Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943)).  It is also the taxpayer's burden to show that the particular expense is currently deductible and is not a capital

---

[68]Petitioner claims that he reported the expenses relating to his orange grove, cattle, and Ferrari activities on his returns for 1985 through 1988.  The civil report that respondent prepared indicates that petitioner claimed expenses for those activities.  However, we are unable to determine from the spreadsheets and petitioner's returns to what extent he claimed expenses for those activities, since the expenses are intermingled with expenses for other activities.  Further, we are unable to determine whether any expenses, if identifiable, were in fact incurred in the activities that petitioner claims.  Also, it appears from petitioner's supplement to petition that he is claiming expenses in greater amounts than the expenses claimed on his returns.

expenditure which is amortized or depreciated over time.  See id. at 83-84.

Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  Conversely, section 262(a) disallows any deduction, except as otherwise expressly provided in the Code, for personal, living, or family expenses.  And, section 263(a) disallows a current deduction for any capital expenditure; i.e., an amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.  See id.  To qualify for a deduction under section 162(a), an item must:  (1) Be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense.  Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971).  We are primarily concerned here with the second requirement; i.e., whether petitioner incurred the expenses while carrying on a trade or business.

"[T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.  A sporadic activity, a hobby, or an amusement diversion does not qualify."  Commissioner v.

Groetzinger, 480 U.S. 23, 35 (1987).  The taxpayer's expectation

of profit need not be reasonable; however, a good faith

expectation of profit is required.  Burger v. Commissioner, 809

F.2d 355, 358 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Golanty

v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without

published opinion 647 F.2d 170 (9th Cir. 1981).  All the facts

and circumstances must be considered, and more weight is given to

objective facts than to the taxpayer's statement of his intent.

Engdahl v. Commissioner, 72 T.C. 659, 666 (1979).

In determining whether petitioner possessed the requisite

profit motive under section 162(a), we look to the factors set

forth in section 183.  Osteen v. Commissioner, 62 F.3d 356, 358

(11th Cir. 1995), affg. in part and revg. in part T.C. Memo.

1993-519.  The regulations promulgated under section 183, section

1.183-2(b), Income Tax Regs., set forth a nonexclusive list of

factors, which include:  (1) The manner in which the taxpayer

carried on the activity; (2) the expertise of the taxpayer or his

advisers; (3) the time and effort expended by the taxpayer in

carrying on the activity; (4) the expectation that assets used in

the activity may appreciate in value; (5) the success of the

taxpayer in carrying on similar or dissimilar activities; (6) the

taxpayer's history of income or losses with respect to the

activity; (7) the amount of occasional profits, if any, which are

earned; (8) the financial status of the taxpayer; and (9) the

presence of elements of personal pleasure or recreation.  See
Nichols v. Commissioner, T.C. Memo. 1990-546.  None of these
factors alone is necessarily controlling, nor is any mathematical
preponderance of factors determinative.  Osteen v. Commissioner,
supra at 358.  Petitioner bears the burden of proving the
requisite profit motive.  Allen v. Commissioner, 72 T.C. 28, 34
(1979).

During the tax years at issue petitioner did not realize a
profit on the orange grove, and he did not receive any income
attributable to that activity.[69]  At trial, petitioner did not
know how many crates of oranges he produced from the orange grove
during the years at issue, and he could only testify that it
"seems like '87, I sold a few oranges."  Petitioner did not know
how much fruit he had picked.  Petitioner also testified:

Q     Did you do it hoping you would make money
eventually?

A     Oh, yes.  And I eventually will.  I've been hit a
couple of hard times by the freeze.  And, particularly,
the time that we have in question, the irrigation
system was a mess and I had to bring in Mrs. Ray's
husband and they came in and straightened it out.
There was a problem with the pump.  I had to replace
the pump just to get it up and going.

But, unfortunately, what happens though, is I kind
of get it up and going and either a freeze came along,
like in '85, and just about killing everything.  That
set me back for a couple years.

[69]A history of unexplained losses over an extended period is
persuasive evidence of the absence of a profit motivation,
especially where the taxpayer has substantial independent sources
of income.  Allen v. Commissioner, 72 T.C. 28, 34 (1979).

On the basis of petitioner's testimony, we cannot agree that petitioner incurred his expenses while <u>carrying on a trade or business</u>. At best, petitioner in 1985-1988 had an aspiration that one day the orange grove would be capable of producing fruit and that the fruit could be sold as part of an ongoing trade or business.[70] Indeed, from petitioner's testimony, it is clear that his aspirations have not changed at the time of the trial in this case, some 13 years later.

The fact that an activity has recreational aspects is an important factor in determining whether petitioner has the requisite profit motivation. See <u>Nichols v. Commissioner</u>, <u>supra</u>; sec. 1.183-2(b)(9), Income Tax Regs. Although cattle, unlike horses, and an orange grove are not activities which one might think of as providing the type of personal pleasure or gratification that might supplant a profit motivation, see <u>Allen v. Commissioner</u>, <u>supra</u> at 36, at trial, petitioner testified:

> The grove really went downhill. I bought it and I'm not in the growing business--I was out there chasing cows--and gradually I figured out, similar to the cow situation, you can't afford to be in the cow business unless you own the land. And I owned a large piece of land that I was already buying and talked to Mike Partin and he said if you can't make enough out of the cows to pay for the land--but cows can be a good investment and <u>I enjoy the animals</u>.

---

[70]Similarly, petitioner testified with respect to his claimed cattle business that "Basically, I never got up to the point that I was really producing stock, and so forth, that I would be selling into it and know myself."

> *Same way with the orange grove*.  I was setting
> there with the orange grove, paying for my house
> anyway, and so it was suggested to me, Why are you
> letting the grove go to hell.  And so then I started
> fixing it up which--probably, very little fruit came
> off in the beginning because, like I say, I wasn't
> paying any attention to it.  I just thought, well, gee,
> nobody makes money off groves, but if you already own
> the grove and you can buy a tractor and buy a sprayer
> and stuff like this--I always bought used equipment,
> and you can see in all the repair things, I had to fix
> up old tractors and discs and sprayers and stuff--
> [Emphasis added.]

Mr. Partin also testified that, prior to petitioner's purchase of the cattle; "He loved the cattle.  He'd come--he'd be at my place off and on, and you know, he just loved the cattle.  And we thought, you know, with his love of the cattle, that's what it takes to be in the cattle business."  And, certainly, it is beyond doubt that the Ferrari automobile has an inherent pleasure quality, and petitioner has not presented any evidence to suggest otherwise.  Elements of personal pleasure do not alone negate a profit motivation, see Burger v. Commissioner, supra at 360; McCarthy v. Commissioner, T.C. Memo. 2000-135; however, on the record before us we find considerable evidence that the activities were engaged in for hobby and as a personal diversion.

Petitioner did not maintain any books or records for any of these purported businesses, and his only method of bookkeeping with respect to the orange grove and cattle business was his "checkbook".  The lack of a bookkeeping system such that the taxpayer could not monitor expenses or losses and could not make

informed business decisions is persuasive evidence that the business activity was not engaged in for profit. Burger v. Commissioner, 809 F.2d at 359. Further, with respect to the cattle and the orange grove, the record and petitioner's testimony show that he had a very primitive expertise in those activities. For example, even though petitioner noted the importance of the age of cattle as an "economic factor" in their "economic production", he could not testify from personal knowledge regarding the age of the cattle he acquired from Mr. Partin. This indicates to us a lack of a bona fide profit motivation.

Petitioner did not provide evidence of the amount of time that he devoted to the particular activities during the tax years at issue, or any evidence that he was required to withdraw from his real estate business to devote more time to any of those activities. See McCarthy v. Commissioner, supra; sec. 1.183-2(b)(3), Income Tax Regs. On the record before us, we find that petitioner was not engaged in a trade or business with respect to the orange grove, cattle, and Ferrari activities.

Taxpayers must substantiate any expenses which they claim as deductions. See Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. 540 F.2d 821 (5th Cir. 1976); Tarakci v. Commissioner, T.C. Memo. 2000-358.[71] Further, to be an

---

[71]Sec. 274(d) provides for more stringent substantiation

(continued...)

"ordinary" expense under section 162, the expense must arise from a transaction that is "of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940); Tarakci v. Commissioner, supra.

There is no dispute in this case that petitioner was engaged in orange grove, cattle, and Ferrari activities. There is also no dispute, we think, that those activities are such that expenses arise in their normal course.[72] As petitioner states with respect to his cattle, "he's got to eat". However, to substantiate his expenses for those activities, petitioner has simply provided a bundle of receipts and a listing of expenses. Most of those receipts and the listing do not show for what purpose the expenses were made. Those items do not foreclose that the expenses incurred were personal expenses unrelated to the activities that petitioner claims deductions for or that the

---

[71](...continued)
requirements with respect to "any traveling expense (including meals and lodging while away from home)", "for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity", and for any expenses relating to passenger automobiles or any other property used as a means of transportation. See secs. 274(d)(4), 280F(d)(4). We note that several of the expenses that petitioner claims as a deduction, he categorizes as "Automobiles" and "Meals & Entertainment". Also, he claims expenses relating to his collection of Ferraris.

[72]At trial, petitioner testified with respect to his cattle activity that he incurred expenses for 50-pound mineral blocks, hay, and health supplies such as injections, insect sprays, "and stuff". Petitioner's testimony regarding those expenses was general and not specific.

expenses are such that they are required to be capitalized.
Petitioner has not provided further substantiation of those
items, and he has not provided evidence which would permit us to
conclude that those particular expenses were of frequent and
common occurrence in the petitioner's purported business
activity. With that being said, petitioner has not met his
burden of substantiation or proved his entitlement to current
deductions under section 162(a). We hold that the claimed
expenses are not allowable as ordinary and necessary business
deductions.

G.  Self-employment Tax

FINDINGS OF FACT

Petitioner reported self-employment tax of $930, $509,
$5,387, and $2,371, on his Forms 1040 for 1985, 1986, 1987, and
1988, respectively. Those amounts were computed on the basis of
petitioner's net profits, which he reported from his real estate
business: Net profits of $7,882, $4,138, $44,219, and $18,208,
for 1985, 1986, 1987, and 1988, respectively.

OPINION

Section 1401 imposes a percentage tax on self-employment
income of every individual. See Baker v. Commissioner, T.C.
Memo. 2001-283. Self-employment income is defined as "the net
earnings from self-employment derived by an individual  * * *
during any taxable year". Sec. 1402(b). The term "net earnings

from self-employment" is defined as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions * * * which are attributable to such trade or business". Sec. 1402(a).

Respondent determined self-employment taxes on the basis of petitioner's income from his real estate business. The applicable percentage for each of the tax years at issue was applied to the maximum amount of self-employment earnings subject to self-employment tax: $39,600 in 1985, $42,000 in 1986, $43,800 in 1987, and $45,000 in 1988. See sec. 1402(b)(1). Respondent determined petitioner's self-employment tax liability to be $4,673[73] for 1985, $5,166[74] for 1986, $5,387[75] for 1987, and $5,859[76] for 1988.

Petitioner was engaged in the trade or business of buying and selling real estate during the years at issue. He does not contest on brief that his earnings from that business are subject to self-employment taxes. Therefore, we sustain respondent's

---

[73]Self-employment tax ($4,673) = Maximum amount subject to self-employment tax ($39,600) x Applicable percentage (.118).

[74]Self-employment tax ($5,166) = Maximum amount subject to self-employment tax ($42,000) x Applicable percentage (.123).

[75]Self-employment tax ($5,387) = Maximum amount subject to self-employment tax ($43,800) x Applicable percentage (.123).

[76]Self-employment tax ($5,859) = Maximum amount subject to self-employment tax ($45,000) x Applicable percentage (.1302).

determination regarding the application of the self-employment

tax to petitioner's net earnings and the amounts he determined.

II.  Additions to Tax for Fraud

Respondent determined additions to tax under section 6653(b)

for petitioner's 1985, 1986, 1987, and 1988 tax years.  Section

6653(b), in effect for the tax years at issue, provided for

additions to tax for underpayments of tax which are attributable

to fraud.  Section 6653(b)(1) and (2), in effect for petitioner's

1985 tax year provided:

> SEC. 6653(b).  Fraud.--
>
> (1)  In general.--If any part of any underpayment
> * * * of tax required to be shown on a return is due to
> fraud, there shall be added to the tax an amount equal
> to 50 percent of the underpayment.
>
> (2)  Additional amount for portion attributable to
> fraud.--There shall be added to the tax (in addition to
> the amount determined under paragraph (1)) an amount
> equal to 50 percent of the interest payable under
> section 6601--
>
> > (A) with respect to the portion of the
> > underpayment described in paragraph (1) which is
> > attributable to fraud, and
> >
> > (B) for the period beginning on the last day
> > prescribed by law for payment of such underpayment
> > (determined without regard to any extension) and
> > ending on the date of the assessment of the tax
> > (or, if earlier, the date of the payment of the
> > tax).

Section 6653(b)(1) and (2), in effect for 1986 and 1987,

provided:

SEC. 6653(b). Fraud.--

(1) In general.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of--

(A) 75 percent of the portion of the underpayment which is attributable to fraud, and

(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the payment of the tax.

(2) Determination of portion attributable to fraud.--If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer established is not attributable to fraud.

Section 6653(b)(1) and (2), in effect for 1988, provided:

SEC. 6653(b). Fraud.--

(1) In general.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

(2) Determination of portion attributable to fraud.--If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer established is not attributable to fraud.

Respondent has the burden of proof, sec. 7454(a); Rule 142(b), and he must show by clear and convincing evidence: (1)

Petitioner has underpaid his taxes for each year, and (2) at least some part of the underpayment is due to fraud. DiLeo v. Commissioner, 96 T.C. at 873; Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

With respect to the 1985 tax year, the 50-percent addition to tax for fraud under section 6653(b)(1) is imposed on the total underpayment, where any portion of the underpayment is attributable to fraud. See H. Conf. Rept. 99-841 at II-780 (1986), 1986-4 C.B. 1, 780. With respect to the section 6653(b)(2) addition to tax for 1985, it is respondent's burden to establish, by clear and convincing evidence, the specific portion of the underpayment attributable to fraud. Hughes v. Commissioner, T.C. Memo. 1994-139.

With respect to the 1986, 1987, and 1988 tax years, once respondent has shown by clear and convincing evidence an underpayment of tax and that at least some portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subject to the section 6653(b)(1) addition to tax. Sec. 6653(b)(2); Kalo v. Commissioner, T.C. Memo. 1996-482, affd. without published opinion 149 F.3d 1183 (6th Cir. 1998). The normal presumption of correctness then attaches to the Commissioner's determination, DiLeo v. Commissioner, supra at 873, and the taxpayer bears the

burden of showing how much of the underpayment is not due to fraud. Ishler v. Commissioner, T.C. Memo. 2002-79.[77]

A. Underpayment of Tax Required To Be Shown on a Return[78]

Under section 6653(c)(1), in effect for each of the tax years at issue, an "underpayment" is defined as follows:

> SEC. 6653(c). Definition of Underpayment.–For purposes of this section, the term "underpayment" means--
>
> (1) Income, estate, gift, and certain excise taxes.--In the case of a tax to which section 6211 (relating to income, estate, gift, and certain excise taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *

The Commissioner cannot rely upon the taxpayer's failure to meet the burden of proof on the issue of the existence of a deficiency to sustain his burden of proving an underpayment by clear and convincing evidence. Parks v. Commissioner, 94 T.C. at 660-661; Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).[79] However, the

---

[77]See also Hughes v. Commissioner, T.C. Memo. 1994-139 (describing sec. 6653(b)(2) as a burden-shifting provision). Sec. 6653(b)(2) was added to the Code by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(b), 100 Stat. 2742, and is effective for return due dates after Dec. 31, 1986.

[78]Our discussions in subs. A and B do not address fraudulent underpayments under sec. 6653(b)(2) for the 1985 tax year. That addition is discussed separately in subs. C, infra.

[79]See appendix D for the items of income that respondent
                                              (continued...)

Commissioner need only show that there is "some underpayment" for each of the tax years at issue.  Langworthy v. Commissioner, T.C. Memo. 1998-218.

Since petitioner's returns for 1985, 1986, and 1988 were not filed timely, respondent computed the fraud penalty on the basis of petitioner's total tax liability for each year without reduction for amounts shown on petitioner's untimely returns. See sec. 6653(c)(1) (parenthetical).  On the record before us, we hold that respondent has met his burden of proving by clear and convincing evidence an underpayment for each of the tax years 1985, 1986, 1987, and 1988.

1.  Underpayment for 1985

For 1985, petitioner has specifically conceded the following amounts as income, see appendix C:

| Income item | Amount |
| --- | --- |
| Schedule C miscellaneous income | $12,357 |
| Gains from property sales | 185,661 |
| Schedule C interest income | 40,479 |
| Commission income | 30,249 |
| Unidentified deposits | 1,700 |
| Total | 270,446 |

In addition, petitioner did not address on brief the following items of income:

---

79(...continued)
relies upon as clear and convincing evidence of an underpayment.

| Income item | Amount |
|---|---|
| Gain from sale of Lot 1 in Susan's Lakefront Estate | $20,097 |
| Installment gain from sale of 3 lots in Florida Fruit Belt Subdivision | 28,347 |
| Installment gain from Silver Lake sale | 6,144 |
| Gain from sale of Wax Myrtle trees | 400 |
| Interest income from Silver Lake mortgage | 6,773 |
| Commission income | 37,500 |
| Rental income | 1,250 |
| Total | 100,511 |

Those items are conceded by petitioner's own statement on brief that "any issues not raised in Petitioner's Brief are also conceded by Petitioner".[80] Respondent has produced affirmative evidence for each of the items conceded, and he has proven those items of income by clear and convincing evidence.

Respondent's determination that petitioner realized $30,925 in 1985 from the sale of an installment obligation to his father is supported by clear and convincing evidence in the record: (1) An assignment of mortgage relates that the mortgage along with the "note or obligation" and "the moneys due and to become due thereon" were being transferred "in consideration of the sum of" $36,000 received from Charles Medlin; (2) the form of the transaction was a sale of an installment note, which is evidenced by petitioner's instructions to the mortgagor to make direct payments to his father.

---

[80]See Brodsky v. Commissioner, T.C. Memo. 2001-240 (taxpayer's failure to contest certain amounts of undisputed income determined by respondent establishes underpayment by clear and convincing evidence).

Respondent also relies on his determination that petitioner realized 100 percent of the gain realized on the sale of Lot 23 in the High Plains Property in 1985. The record is clear that, at one point in time, petitioner and Mr. Schoolfield were 50-50 owners of the High Plains Property. However, it is not clear from the record whether this 50-50 interest extended to Lot 23, and, if so, whether petitioner and Mr. Schoolfield split up before or after the sale in 1985. In our general discussion relating to the deficiency determination, we have relied on petitioner's failure to overcome the presumption of correctness which attaches to respondent's determination. See supra. We decided that petitioner did not establish that Mr. Schoolfield owned 50 percent of that lot at the time of its sale, and we decided that petitioner was responsible for 100 percent of the gain realized. However, with respect to the fraud addition to tax, we find that respondent has not proven by clear and convincing evidence that petitioner was responsible for 100 percent of the gain from this sale. Petitioner agrees on brief that he is responsible for half of the gain from this sale.

There is clear and convincing evidence that the fair market value of the Citrus County Property at the time of the foreclosure sale in 1985 was at least $87,000 and that petitioner realized $85,156[81] on the foreclosure sale in 1985.

---

[81]Gain realized ($85,156) = Amount realized ($87,000) -
(continued...)

Respondent determined that the deposit of a $59,000 cashier's check into petitioner's Tucker bank account on March 12, 1985, was income to petitioner. Bank deposits are prima facie evidence of income. United States v. Price, 335 F.2d at 677; DiLeo v. Commissioner, 96 T.C. at 868. Where respondent bears the burden of proof, he must show a likely taxable source for the deposits. Armes v. Commissioner, 448 F.2d 972, 975 (5th Cir. 1971), affg. in part, revg. in part, and remanding T.C. Memo. 1969-181. Alternatively, where the taxpayer alleges a nontaxable source, the Commissioner may satisfy his burden by disproving the nontaxable source so alleged. United States v. Massei, 355 U.S. 595 (1958); Parks v. Commissioner, 94 T.C. at 661. Respondent claims that the Tucker bank account is an account to which petitioner deposited, generally, taxable income from his business. Also, respondent relies upon petitioner's "business of buying and selling real estate and real estate development" as the likely source of the $59,000 deposit.

The record shows that there were a number of deposits into petitioner's Tucker bank account from his real estate business and that those deposits represented taxable income. Indeed, the spreadsheets provided to Mr. Kelly, which list deposits to and expenditures from the Tucker bank account, show items such as commissions and interest received in petitioner's real estate

---

[81](...continued)
Basis ($1,844).

business.  Respondent has shown by clear and convincing evidence the likely source of the $59,000; i.e., petitioner's real estate business.  Petitioner was regularly engaged in the real estate business during 1985, and he received a substantial amount of unreported income during that period from that business.[82] Petitioner did not maintain adequate records for his real estate transactions or development activities, and there is substantial evidence of an intent to conceal income received in that business.  Given those circumstances, we find that the real estate business provides a likely source for the $59,000 cashier's check.

Petitioner argues, on the other hand, that the $59,000 cashier's check is traceable to a $70,000 check from Washington International, and that check represents a loan.  Petitioner contends that respondent has not proven this source to be a taxable source and that, indeed, he was aware of this $70,000 check during the examination, but he did not classify it as income.  First, we note that respondent, having shown a likely taxable source for the $59,000 deposit, does not bear the burden of negating nontaxable sources alleged by petitioner.  Holland v.

---

[82]Petitioner's financial statement dated Nov. 15, 1985, also reveals certain items of income receivable in petitioner's real estate business that could provide a likely source of the deposit.  For example, the financial statement shows notes and mortgages receivable of $329,210, annual income from rentals of $40,000, and "Projected annual income from Monarch Realty" of $40,000.

United States, 348 U.S. 121 (1954). Second, we find that respondent has nevertheless negated the Washington International check as a nontaxable source of the deposit. Petitioner, in this case, relies upon Mr. Kelly's testimony that Washington International, generally, "loaned money secured by real estate" and that petitioner's account was "basically a loan account". However, this position is inconsistent with petitioner's testimony at trial that the Washington International trust account was used as a vehicle for deferring income from real estate sales. We cannot agree, on the basis of the record before us, that the Washington International trust account was a loan account or that the $70,000 check represents a loan. There is evidence that this check did not represent a nontaxable source, and we do not draw any adverse conclusion from respondent's failure to classify it as taxable income in his examination. We hold that respondent has shown by clear and convincing evidence that the $59,000 deposit represents income to petitioner.

Respondent has proven by clear and convincing evidence the following items of income for 1985:

| Item | Amount |
| --- | --- |
| Income conceded or stipulated | $270,446 |
| Disputed income conceded on brief | 100,511 |
| Gain from sale of installment obligation | 30,925 |
| One-half gain from sale of High Plains Property | 9,850 |
| Gain from foreclosure of Citrus County Prop. | 85,156 |
| Unidentified deposit--Mar. 12, 1985 | 59,000 |
| Total | 555,888 |

Respondent allowed the following deductions for 1985:

| Type of deduction | Amount |
|---|---|
| Schedule C expenses | $225,301 |
| Itemized deductions | 22,567 |
| Exemptions | 2,080 |
| Total | 249,948 |

Respondent has proven by clear and convincing evidence that petitioner received taxable income of $305,940[83] in 1985. Respondent has also proven that petitioner is liable for self-employment taxes of $4,673 for 1985. Respondent has proven an underpayment for 1985 by clear and convincing evidence.

2. Underpayment for 1986

For 1986, petitioner has specifically conceded the following amounts as income; see appendix C:

| Income item | Amount |
|---|---|
| Schedule C miscellaneous income | $27,019 |
| Gains from property sales | 154,924 |
| Schedule C interest income | 10,614 |
| Schedule C commission income | 32,357 |
| Schedule C unidentified deposit | 24,186 |
| Total | 249,100 |

In addition, petitioner did not address on brief the following items of income:

| Income item | Amount |
|---|---|
| Gain from sale of Tract A in Susan's Lakefront Estate | $21,097 |
| Installment gain from Silver Lake sale | 12,288 |
| Interest from Silver Lake | 5,805 |
| Deposit on May 6, 1986 | 300 |
| Deposit on Oct. 10, 1986 | 300 |
| Total | 39,790 |

---

[83]Total income proven of $555,888 less allowable deductions of $249,948 equals $305,940 in taxable income.

Petitioner has conceded those items. Respondent has produced affirmative evidence for each of the items conceded, and he has proven those items of income by clear and convincing evidence.

Respondent relies upon the gain from the sale of one of the Grissom Parcels in 1986 as evidence of an underpayment. Petitioner agrees that he is responsible for $12,042 of gain from that sale. Respondent has proven that amount by clear and convincing evidence.

Respondent also relies on the gain from the exchange of petitioner's ownership interest in Lots 26, 27, and 28 of the Arrowhead Lakes Subdivision for Mr. McLaughlin's ownership interest in the Angel-Royse Property. In our discussion relating to whether a deficiency existed with respect to this item, the record reflected that petitioner was the 100-percent owner of the lots in the Arrowhead Lakes Subdivision and that he exchanged those lots for Mr. McLaughlin's 50-percent interest in the Angel-Royse Property. There is clear and convincing evidence that petitioner and Mr. McLaughlin were not involved in a partnership with respect to both the Arrowhead Lakes Subdivision and the Angel-Royse Property. We hold that respondent has proven by clear and convincing evidence that petitioner realized $60,709 of gain from the exchange of the properties in 1986.

Respondent also relies upon the gain of $92,502 from the sales of 31 and 31.5 acres of East Lake Vista in 1986. There is

clear and convincing evidence that petitioner owned at least a 50-percent interest in the East Lake Vista properties at the time of their sales in 1986, including petitioner's financial statements, a guaranty that petitioner entered into with the buyer at the time of the sale of the 31.5 acres, and the ledger cards that Mr. Miles's law firm maintained with respect to East Lake Vista. We hold that respondent has proven by clear and convincing evidence that petitioner realized half of the gain from the sales of 31 and 31.5 acres from East Lake Vista in 1986.

Respondent has proven by clear and convincing evidence the following items of income for 1986:

| Item | Amount |
|------|--------|
| Income conceded or stipulated | $249,100 |
| Disputed income conceded on brief | 39,790 |
| Gain from sale of Grissom Parcels | 12,042 |
| Gain from exchange of Arrowhead Lakes Subdivision lots | 60,706 |
| Gain from sales in East Lake Vista | 92,502 |
| Total | 454,140 |

Respondent allowed the following deductions for 1986:

| Type of deduction | Amount |
|-------------------|--------|
| Schedule C expenses | $298,656 |
| Nonitemized contributions | 48 |
| Exemptions | 2,160 |
| Total | 300,864 |

Respondent has proven by clear and convincing evidence that petitioner received taxable income of $153,276[84] in 1986.

---

[84]Total income proven of $454,140 less allowable deductions of $300,864 equals $153,276 in taxable income.

Respondent has also proven that petitioner is liable for self-employment taxes of $5,166 for 1986. Respondent has proven an underpayment for 1986 by clear and convincing evidence.

### 3. Underpayment for 1987

For 1987, petitioner has specifically conceded the following amounts as income; see appendix C:

| Income item | Amount |
|---|---|
| Schedule C miscellaneous income | $24,000 |
| Gains from property sales | 946,649 |
| Schedule C interest income | 9,084 |
| Total | 979,733 |

In addition, petitioner did not address on brief the following items of income:

| Income item | Amount |
|---|---|
| Gain from sale of Silver Lake | $24,577 |
| Interest income | 5,488 |
| Total | 30,065 |

Petitioner has conceded those items. Respondent has produced affirmative evidence for each of the items conceded, and he has proven those items of income by clear and convincing evidence. Thus, respondent has proven by clear and convincing evidence that petitioner received income of $1,009,798 ($979,733 + $30,065) in 1987.

Respondent allowed the following deductions for 1987:

| Type of deduction | Amount |
|---|---|
| Schedule C expenses | $265,076 |
| Itemized deductions | 43,561 |
| Exemptions | 3,800 |
| Total | 312,437 |

Respondent has proven by clear and convincing evidence that petitioner received taxable income of $697,361[85] in 1987.

Respondent has proven by clear and convincing evidence that petitioner is liable for self-employment tax of $5,387.

Petitioner reported taxable income of $37,879, a tax of $7,515 on that amount, and self-employment tax of $5,387. Respondent has proven an underpayment for 1987 by clear and convincing evidence.

### 4. Underpayment for 1988

For 1988, petitioner has specifically conceded the following amounts as income; see appendix C:

| Income item | Amount |
| --- | --- |
| Schedule C miscellaneous income | $12,000 |
| Gains from property sales | 167,120 |
| Unidentified deposits | 4,400 |
| Total | 183,520 |

In addition, petitioner did not dispute on brief the following items of income:

| Income item | Amount |
| --- | --- |
| Gain from sale of Lots 6-30 in Susan's Lakefront Estate | $77,298 |
| Gain from sale of Mefford property | 55,164 |
| Rents received from Island Living, Inc. | 12,000 |
| Total | 144,462 |

Petitioner has conceded those items. Respondent has produced affirmative evidence for each of the items conceded, and he has proven those items of income by clear and convincing evidence.

---

[85]Total income proven of $1,009,798 less allowable deductions of $312,437 equals $697,361 in taxable income.

Respondent relies on the sale of 10 acres in East Lake Vista as evidence of an underpayment for 1988. Considering our discussion above with respect to the sales of acres from East Lake Vista in 1986, we hold that respondent has proven by clear and convincing evidence that petitioner owned a 50-percent interest in East Lake Vista at the time of the sale in 1988 and that he realized gain of $19,522 in 1988 from the sale of his 50-percent interest.

Respondent also relies on the $140,000 that was deposited into Mr. Miles's law firm's trust account for petitioner on July 8, 1988. Petitioner established that the $140,000 was traceable to a $140,000 check from Dean Witter and that the check stub was signed "RECD BY Richard Margolis". Respondent has demonstrated by clear and convincing evidence that petitioner was involved in the business of buying and selling real estate; he received substantial amounts of income from numerous property transactions in this business; those property transactions were carried out using trustees, including Mr. Miles; proceeds from those transactions were deposited into Mr. Miles's law firm's trust account; and those proceeds represented income taxable to petitioner but which he failed to report. By petitioner's own account, the $140,000 check from Dean Witter and allegedly from Mr. Margolis was attributable to a transaction which was in form a sale of petitioner's property. We hold that respondent has

established that petitioner's business of buying and selling real estate was a likely taxable source of this deposit.

Petitioner alleges that the source of the deposit of $140,000 was a loan from Mr. Margolis. Petitioner did not call Mr. Margolis as a witness, and he did not provide any documentary evidence to support his claim that this amount was a loan. Petitioner's claim that this item represents a loan is based solely on his testimony, which was uncorroborated, inconsistent, and not credible. Given these circumstances, petitioner's use of Mr. Miles's law firm's trust account to transact his real estate deals, the substantial evidence of concealment of petitioner's real estate sales and gains therefrom, and the form of the transaction that petitioner relies upon as a source of nontaxable income, we are convinced that the $140,000 was not a loan.

Respondent has proven by clear and convincing evidence the following items of income for 1988:

| Item | Amount |
|------|--------|
| Income conceded or stipulated | $183,520 |
| Disputed income conceded on brief | 144,462 |
| Sale of 10 acres from East Lake Vista | 19,522 |
| Deposit of $140,000 on July 8, 1988 | 140,000 |
| Total | 487,504 |

Respondent allowed the following deductions for 1988:

| Type of deduction | Amount |
|-------------------|--------|
| Schedule C expenses | $301,910 |
| Itemized deductions | 44,651 |
| Exemptions | 3,900 |
| Total | 350,461 |

Respondent has proven by clear and convincing evidence that petitioner received taxable income of $137,043[86] in 1988. Respondent has also proven that petitioner is liable for self-employment taxes of $5,859 for 1988. Respondent has proven an underpayment for 1988 by clear and convincing evidence.

### 5. Conclusion

Respondent has proven underpayments by clear and convincing evidence for 1985, 1986, 1987, and 1988.

### B. Fraudulent Intent

### 1. Clear and Convincing Evidence of Fraud

Respondent must show that a portion of the underpayment is attributable to fraud. Fraud is established where the Commissioner shows that "the taxpayer intended to evade taxes that he knew or believed to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes." Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; see also Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Clark v. Commissioner, T.C. Memo. 2001-205. Suspicion of fraudulent conduct is not sufficient. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 517 (1992). The issue of fraudulent intent is a question of fact shown by surveying the

---

[86]Total income proven of $487,504 less allowable deductions of $350,461 equals $137,043 in taxable income.

taxpayer's entire course of conduct and drawing reasonable inferences therefrom. Korecky v. Commissioner, supra at 1568.

Fraud is rarely provable by direct evidence but may be provable by circumstantial evidence. Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Such evidence includes, but is not limited to the following "badges of fraud": (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing income or assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) an intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash. See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Kalo v. Commissioner, T.C. Memo. 1996-482. No single factor is necessarily dispositive, but a combination of several factors is persuasive circumstantial evidence of fraud. Petzoldt v. Commissioner, 92 T.C. at 699. We find substantial evidence of fraud in this case.

The record shows a consistent pattern of understating income by petitioner. For the years in issue, petitioner received substantial amounts of income from his real estate business,

which he did not report as income. Petitioner reported income only to the extent that deposits were made into his personal checking accounts and which he did not classify as "loans". However, the income that petitioner reported was substantially offset by deductions that petitioner claimed for each disbursement that he made from his personal bank accounts.[87] The items of income that respondent determined, and which he proved by clear and convincing evidence, greatly exceed the amounts which petitioner reported as gross income on his returns for 1985 through 1988. We find that the understatements for the years at issue were substantial and are evidence of fraud.

Petitioner has previously understated his income in considerable amounts and with respect to items of income substantially similar to those items involved herein.[88] On April 17, 1988, we entered a stipulated decision for deficiencies of $1,082 for 1977, $22,213 for 1978, $63,533 for 1979, $7,110 for 1981, and $37,921 for 1982. Petitioner also understated his income for the 1983 and 1984 tax years, and he eventually agreed to deficiencies of $10,550 for those years. We find the

[87]Petitioner reported gross income from his real estate business of $160,363 for 1985, $119,772 for 1986, $138,653 for 1987, and $61,921 for 1988. He claimed deductions for expenses of $152,481 for 1985, $115,634 for 1986, $94,434 for 1987, and $43,713 for 1988.

[88]Evidence of tax evasion for tax years which occur before and after the filing of the return for the particular tax year at issue is relevant on the issue of willfulness for that return. United States v. Dixon, 698 F.2d 445, 447 (11th Cir. 1983).

stipulated decision constitutes substantial evidence of fraud for the years at issue in the instant case since: (1) The decision involved similar items as those involved herein; i.e., the use of nominee accounts to hold real estate sale proceeds; and (2) it was entered before petitioner's filing of each of his returns for the 1985 through 1988 tax years. Further, in the course of the previous years' examinations, petitioner was apprised that the use of trustees to hold real estate sale proceeds did not insulate him from tax liability, and he agreed that those transactions were taxable. Petitioner's consistent understatement of large amounts of such income over a period of years is evidence of willful intent to evade tax. Otsuki v. Commissioner, 53 T.C. at 108.

Petitioner filed Forms 2688 for each of the years at issue in which he requested an extension of time for filing his returns. In the Form 2688 for the 1985 tax year, he states as his need for an extension: "Client derived substantially all his income from a bulk land transaction, which was extremely complex. Additional time is needed to analyze the transaction." Petitioner did not report income on his Form 1040 for 1985 from any bulk land transaction, and he accepts on brief that he did not provide any information to Mr. Kelly regarding any bulk land sale transaction. We find his statement on the Form 2688, which essentially admits having received income from a land sale, as

substantial evidence that petitioner knew he was taxable for such a transaction before the filing of his return.

In his Forms 2688 for the 1986, 1987, and 1988, tax years, petitioner requested an extension because "Taxpayer has not received all needed K-1's for 1065 & 1120 tax returns that represent a substantial portion of his income.  Without these items a complete and accurate return cannot be prepared." However, petitioner never provided any Schedules K-1 to Mr. Kelly.  Moreover, in the examination of his 1983 and 1984 Forms 1040 filed on January 30, 1986, and March 7, 1986, respectively, petitioner informed the revenue agent that he was not involved in any corporations, partnerships, or trusts, i.e., entities from which Schedules K-1 might be issued.  We have found as fact that petitioner was involved in several business entities, and petitioner accepts that he owned properties held in trust by Mr. Miles and other trustees under his control.  We also note that petitioner informed the revenue agent examining his 1983 and 1984 returns that his Cayman Islands trust account was closed in 1983. However, petitioner subsequently received five checks totaling $135,000 from the Cayman Islands trust in 1985.  We find that this record of inconsistent statements and claims by petitioner is yet another indication of fraud.[89]

---

[89]The making of false and inconsistent statements to the Commissioner's revenue agents during the course of their investigation indicates fraudulent intent.  Solomon v.

(continued...)

Petitioner did not provide to his return preparer, Mr. Kelly, any checks or other documents relating to his real estate transactions, and he did not disclose to Mr. Kelly the existence or nature of his use of Mr. Miles's law firm's trust account. Petitioner provided to Mr. Kelly only spreadsheets reflecting his deposits into and expenditures from his bank accounts.[90] Concealing evidence from one's tax return preparer is indicative of fraud. Ishler v. Commissioner, T.C. Memo. 2002-79.

Petitioner's reliance on spreadsheets of his bank deposits and disbursements to compute his income tax liability was surely misplaced, and there is considerable evidence that he knew this to be the case. Indeed, he was told during the examination of his 1983 and 1984 returns, which occurred prior to filing the returns for the years in issue, that this method of computing taxable income was not acceptable. The duty of filing accurate returns cannot be avoided by placing responsibility upon an agent, especially where the taxpayer has withheld books, records, and other information regarding sources of income, see Bacon v.

_____

[89](...continued)
Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984) ("concealment of bank accounts from Internal Revenue agents is yet another sign indicating fraud), affg. T.C. Memo. 1982-603; Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); Kalo v. Commissioner, T.C. Memo. 1996-482 (taxpayer's failure to mention foreign bank accounts), affd. without published opinion 149 F.3d 1183 (6th Cir. 1998).

[90]This same lack of disclosure was apparent in the preparation of petitioner's 1977-1982 spreadsheets and tax returns involving Mr. Kelly and Mr. Brooks.

Commissioner, T.C. Memo. 2000-257, affd. without published opinion 275 F.3d 33 (3d Cir. 2001), and where the taxpayer has taken an active and controlling role in the process of preparing the tax returns and the information used for their preparation.

During the examination of petitioner's returns, respondent served a third-party recordkeeper summons on Mr. Miles and a summons on petitioner, both of which requested information for petitioner's 1985 through 1988 tax years. Petitioner did not comply with the summons issued to him, and, at petitioner's behest, Mr. Miles did not provide any requested information. Respondent was forced to pursue enforcement in court of those summonses. Petitioner's refusal to cooperate with respondent in determining his correct income tax liability is indicia of fraud. See Rowlee v. Commissioner, 80 T.C. at 1125.

We also consider petitioner's testimony at trial to be evidence of his fraudulent intent for the years at issue. We find that petitioner's testimony at trial was evasive and inconsistent, and we do not find it credible:

> Although mere refusal to believe the taxpayer's testimony does not discharge the Commissioner's burden, the lack of credibility of the taxpayer's testimony, the inconsistencies in his testimony and his evasiveness on the stand are heavily weighted factors in considering the fraud issue." [Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; citations omitted.]

Petitioner was unable to explain credibly his failure to report the amounts of income from his real estate sales transactions.

There is considerable evidence of the concealment of assets and of income for the tax years at issue, and we find that this concealment is due in large part to an intent to mislead tax authorities and to evade taxation on income.[91]  For the years 1981 through 1990, petitioner had his personal residence titled in the name of Mr. Miles, as trustee.[92]  Also, in 1987, petitioner purchased a Ferrari and had the bill of sale and the application for a temporary tag put in the name of Mr. Miles's law firm.  Petitioner regularly used Mr. Miles, Ms. Allen, and other trustees to hold and sell his various properties, and he then used Mr. Miles's law firm's trust account to hold the proceeds from the sales.  The trustees had no functions other than holding title to the properties, and petitioner was firmly in control of the proceeds that passed into the law firm's trust account.  Indeed, as trustee of that account, Mr. Miles did whatever petitioner instructed him to do, and petitioner requested on several occasions that Mr. Miles or Ms. Goodman pay his personal expenses with his trust funds.  The use of nominee accounts; i.e., the use of bank accounts fashioned as trust

---

[91]Petitioner's concealment of the various real estate transactions was so prevalent that respondent's revenue agent was able to discover those transactions only by a search of various courthouse records in seven different counties.

[92]We also note that on petitioner's Forms 1040 for 1985-1988, he lists his address as "P.O. Box 383, Lake Lure, NC 28746".  However, petitioner resided in Osceola County, Kissimmee, Florida, during the tax years at issue and at the time of filing his returns.

accounts, to conceal assets is evidence of fraud where petitioner has unfettered control over those accounts.[93] Temple v. Commissioner, T.C. Memo. 2000-337, affd. 62 Fed. Appx. 605 (6th Cir. 2003); Friedman v. Commissioner, T.C. Memo. 1968-145, affd. 421 F.2d 658 (6th Cir. 1970).

Petitioner used fictitious names in some of his real estate dealings for the years in issue. Indeed, petitioner signed various documents relating to real estate documents in the name of "William R. Wright", and he also notarized several documents in that name. Petitioner also used the name "D.W. Davis" and opened a bank account in that name. When asked about his use of fictitious names, petitioner testified with respect to the name "John Waltin" that it was not fictitious since "there's probably a John Waltin somewhere". We find petitioner's testimony not credible, and we find that he used those fictitious names for the purpose of concealing income and property transactions. See Milito v. Commissioner, T.C. Memo. 1989-145 ("The use of aliases

_____

[93]Petitioner argues that his use of trusts is not evidence of fraud, since "the practice of owning property through nominees and trustees was widespread and common." We might agree that the use of trusts alone does not establish fraudulent intent; however, the use of trusts in combination with evidence of the concealment of assets and sale proceeds provides persuasive evidence of fraud. Further, it does not follow from the frequent use of the trust vehicle to hold property in Florida that petitioner's use of the trust vehicle was not fraudulent. Indeed, the use of trusts does not necessarily involve the same circumstances that exist with respect to petitioner's use, notably the failure to report income and the failure to file appropriate returns.

or fictitious names to conceal income is also evidence of fraud."); see also Cooperstein v. Commissioner, T.C. Memo. 1984-290; Yu v. Commissioner, T.C. Memo. 1973-188; Staff v. Commissioner, T.C. Memo. 1954-59.

As we have noted throughout this opinion, petitioner has consistently failed to maintain adequate records of his real estate and other transactions. In some cases, the only record petitioner admits to have maintained is his checkbook. Clearly, a checkbook is an insufficient record for purposes of computing his gross income, especially where the transactions involved are complex real estate transactions which include installment sales and subdividing. Such a gross failure to maintain adequate records (or to provide such records) is certainly indicative of fraud. See Clayton v. Commissioner, 102 T.C. at 647.

We hold that there is clear and convincing evidence of fraudulent intent to evade income taxes by petitioner and that the circumstances which lead us to that holding were apparent with respect to at least some part of the underpayments for each of the tax years in issue. Thus, with respect to the 1985 tax year, respondent has satisfied his burden, and the addition to tax under section 6653(b)(1) applies to the entire underpayment; with respect to the 1986, 1987, and 1988, tax years respondent has satisfied his initial burden, and the additions to tax for fraud for those tax years apply to the entire underpayment unless

petitioner can show the specific portion of the underpayment that is not due to fraud.

2.  Portion of Underpayment Not Attributable to Fraud

Petitioner contends, generally, that he understood that, in dealings in real estate (and exotic cars), receipts from sales or mortgage payments related to the real estate business "were not taxable, but were a tax free exception", but that "Payments taken for living and personal expenses were taxable."  Petitioner is correct that the fraud penalty cannot be imposed on the basis of an "honest mistake" regarding taxability.  Indeed, the "due to fraud" language in section 6653(b) requires a specific intent to evade a tax owing, and "a good-faith misunderstanding of the tax laws could negate fraud".  Niedringhaus v. Commissioner, 99 T.C. 202, 217 (1992).  However, considering all the facts and circumstances on the record, we find petitioner's alleged misunderstanding of the law on tax free exchanges incredible.[94]

Petitioner was an experienced real estate developer and dealer for many years.  He was involved in a considerable number of real estate transactions during the years at issue and in prior years.  Mr. Kelly testified that petitioner appeared

---

[94]It appears that petitioner raised this explanation of his failure to report income from his real estate transactions for the first time at trial.  The record shows that he did not present this purported "misunderstanding" of tax free exchanges to respondent's revenue agent during the examination of his 1985-1988 returns, and his petition does not provide any allegation of a misunderstanding of the tax laws.

knowledgeable on the subject of like-kind exchanges.  See sec.
1031; <u>Kalo v. Commissioner</u>, T.C. Memo. 1996-482 (A taxpayer's
intelligence, education, and tax expertise are also relevant for
purposes of determining fraudulent intent).

At trial, petitioner testified:

Q    Now, in relation to mortgage payments--the receipt
of mortgage payments--if those payments went to Mr.
Miles as trustee, you related how they might not--
might or might not have appeared on your tax return.

A    Yes, sir.

Q    Would you explain to the Court why they might or
might not appear on your tax return if a payment went
to Miles?

A    Well, I mean, we were discussing before that as
long as I was leaving in there to either pay--I mean,
some of it went for legal fees or taxes--real estate
taxes, mortgage payments, interest payments, to
purchase another piece of property that--and
occasionally I would go, you know, need money and say,
Write me a check.  I would put it in my account, go on
the spreadsheet; it would go on the return.

Q    Now, as far as payments that were received from
the sale of a property, if that went to Miles, how
would you consider it?  How did you consider it?

A    I'm sorry.  I thought that was the question you
had just previously asked me.

Q    No, I asked you specifically about receipt from
mortgage payments--if there was a mortgage payment that
Miles received.

A    Okay.  All right, well, I gave you the correct
answer.

Q    Now, if it was not a mortgage payment, but
actually a payment at a closing from the sale of
property--

A     Oh, like the downpayment at closing.

Q     Right.

A     Same thing.

Q     Did you use Miles--any of the money in Miles's trust account at times to attempt to make purchases of property?

A     Oh, yes.

Q     And did you think that that caused you to have to declare that as income when you made the purchase through Miles?

A     No, sir.

Q     Why not?

A     Again, I had this.  I thought, an understanding of what a tax-free exchange was, and I don't think in this game you have to be off very much.  But apparently I was off a little bit on this.

Q     Well, what was your understanding in the years at issue--1985, '-6, '-7, and '8, as to how this tax-free exchange worked in relation to your tax liability?

A     Okay.  It's hard to divorce myself from what I think today and what I thought today--is that, you could sell a piece of property, the money goes into escrow, and you take that money and buy another piece of property, and if you don't--again, I refer to it as, take it out and spend it on wine, women, and song--

Q     By that, you mean--

A     --that is reinvestment.

Q     By that phrase--wine, women, and song--you mean take it out for yourself, for living.

A     Yes, sir.

Q     And if you didn't take it out for living, what was your opinion at that time?

A    That it was like a tax-free--that was the way, and I'm not far off, but I think I'm off far enough.  I understand now that that was how you do a tax-free exchange.

Q    Now, you considered yourself to be in the business of buying and selling property.  Is that correct?

A    Yes, pretty much.  Yes, sir.

Q    Did you think that because you were in the business of buying and selling property, that that impacted your ability to engage in tax-free exchanges?

A    That was my business.

Q    Did you think that you could be in the business of buying and selling properties, and still engage in tax-free exchanges?

A    Oh, yes.

Q    I mean, as you sit here today, you know there's a --

A    Yes, now I understand your question, and yes, sir.

Q    So back in the years at issue, did you know that there was this distinction about, even if you do it correctly, it may--a tax-free exchange may not be available to a dealer in property?

A    Yes, sir.  I understand that now.

As we have stated previously in this opinion, we were not impressed with petitioner's testimony at trial, generally, and we were certainly not impressed with his supposed understanding of tax free exchanges of property.  During the examinations of petitioner's returns for 1985 through 1988, petitioner did not discuss with the revenue agent his beliefs regarding tax free exchanges, and the substantial evidence of concealment of the

trust holdings and the sales proceeds in Mr. Miles's law firm trust account indicates that petitioner's use of nominees was for a purpose other than tax-free exchanges.

Most importantly, petitioner's testimony and contentions regarding his failure to report income deposited in Mr. Miles's law firm's trust account are contradicted by other evidence of record. Petitioner's purported understanding was that he was not required to report income from his sales of real estate so long as the sale proceeds remained in the trust account and were not disbursed for personal expenses. Petitioner claims that he reported consistently with that understanding. Nevertheless, there were considerable amounts that were disbursed from Mr. Miles's law firm's trust account for personal expenses during the years in issue that were not reported as income. Petitioner does not explain this failure to report. We cannot accept that petitioner had a bona fide misunderstanding of tax free exchanges and that this purported misunderstanding explains his failure to report the substantial amounts of income from real estate transactions.

Petitioner argues that fraud penalties should not apply to the amounts which he reported as income on his returns for 1986 through 1988.[95] Petitioner suggests that to the extent those

---

[95]The addition to tax for fraud under sec. 6653(b)(1) applies to the entire underpayment for 1985, regardless of whether petitioner establishes that some portion of that
(continued...)

amounts gave rise to underpayments, the underpayments are not attributable to fraud. We disagree.

Petitioner's method of preparing his returns for 1985 through 1988 was erroneous, and petitioner was aware at the time he signed those returns that the method was erroneous. His returns for 1985 through 1988 were prepared on the basis of spreadsheets of the deposits to, and disbursements from, his personal bank accounts. Petitioner reported income only to the extent that deposits were made to his personal accounts and, then, only to the extent that the deposit was not classified as a "loan". However, petitioner's reported income from these spreadsheets was substantially offset by disbursements from his personal bank accounts, which he claimed as deductible expenses on his Schedules C.

Petitioner contends that the fraud penalties should not be applied to the tax liability which was increased due to the expenses that respondent disallowed. After reviewing the spreadsheets that petitioner used to prepare his returns, we are convinced that many of the expenses that petitioner claimed as deductions were personal in nature. For example, on Schedule C of petitioner's 1985 tax return, he claimed a deduction for commission expenses of $14,540, which represented the cost of a ring, earrings, and two necklaces that he purchased for Ms.

---

[95](...continued)
underpayment is not attributable to fraud.

Allen.  On Schedule C of petitioner's 1986 tax return, he
deducted the costs of his subscriptions to Playboy and Penthouse
magazines.[96]  Petitioner also claimed as deductible expenses on
his Schedules C:  (1) Subscription payments for Sesame Street and
Dr. Seuss books; and (2) travel and entertainment expenses for
credit card payments to Burdines, Neiman Marcus, Jordan Marsh,
Master Card, and Visa; and (3) expenses for gasoline and expenses
related to his 25 Ferrari automobiles.  These items are
inherently personal in nature, and petitioner's claiming those
deductions pursuant to his method of preparing his returns for
1985 through 1988 is evidence of fraud.

Petitioner also points to certain expenses which he claims
are related to his orange grove, cattle, and Ferrari collection
activities.  He claims that respondent disallowed all expenses
relating to those activities, which he claimed on his returns.
Petitioner contends that, although it might be appropriate to
disallow expense deductions for those activities when determining
his deficiencies, fraud penalties should not be imposed on the
tax liabilities resulting from their disallowance.  However, it

---

[96]Petitioner argues on brief that the Playboy magazine
"could be used by Mr. Medlin as reading material for his real
estate business", and although he concedes those are not
allowable expenses, he suggests that such deductions are not
indicative of fraud.  We disagree.  Those items are inherently
personal and are items which we find someone in petitioner's
position as a real estate businessman would have known were not
deductible.  In our view, claiming those deductions on a return
shows a willingness to evade tax.

is unclear to us the extent to which petitioner claimed those items as expenses on his returns, and, the amounts claimed and disallowed.[97]  Petitioner did not prepare separate Schedules C for the orange grove, cattle, and Ferrari collection activities for 1985 through 1988.  Instead, he claimed those expenses, along with other expenses including personal expenses, on the Schedules C relating to his real estate business.  We also point out that petitioner's method of preparing his returns considered only whether a disbursement was made from his personal bank accounts and not whether that disbursement related to a trade or business or was otherwise a deductible expense.

Given petitioner's faulty method of preparing his returns, and the inherently personal nature of many of the expenditures claimed on his returns, petitioner has not established that the portion of the underpayment arising from the disallowed expense deductions is not attributable to fraud.  Petitioner has not shown that any portion of the underpayment for each of the years 1986, 1987, and 1988, is not attributable to fraud, and, accordingly, the entire underpayment for each of those years is subject to the addition to tax for fraud.

[97]We note that the civil report that respondent prepared indicates that certain expenses were disallowed with respect to petitioner's Ferrari automobile collection and his orange grove and cattle activities.  However, since petitioner lumped the expenses relating to those activities into expenses relating to other activities, and reported them as car and truck and repair and maintenance expenses, we are unable to determine to what extent those items were claimed as deductions on his returns.

C.  Section 6653(b)(2) Addition to Tax for 1985

With respect to the section 6653(b)(2) addition to tax for 1985, it is respondent's burden to establish, by clear and convincing evidence, the specific portion of the underpayment which is attributable to fraud.  Hughes v. Commissioner, T.C. Memo. 1994-139; Franklin v. Commissioner, T.C. Memo. 1993-184.

Pursuant to our discussion above, respondent has proven by clear and convincing evidence that petitioner received taxable income of $305,940 and that petitioner is liable for self-employment tax of $4,763 for 1985.  For purposes of section 6653(b)(2), respondent has proven by clear and convincing evidence an underpayment for 1985, which the parties shall compute under Rule 155 on the basis of our findings and conclusions.

Respondent has proven by clear and convincing evidence that petitioner failed to report substantial gains and other income from his real estate transactions and that he did so with fraudulent intent.  Petitioner was an experienced real estate developer and businessman.  We are convinced that he knew those items were taxable as income when received.  Indeed, petitioner was informed during the examination of his 1983 and 1984 returns, which occurred prior to the time petitioner filed his 1985 through 1988 returns, that the sale proceeds deposited into the

law firm's trust account were taxable, and petitioner agreed.[98]
We cannot accept petitioner's explanation that he misunderstood
that if sales proceeds and other items were "reinvested" and held
in trust accounts, they would not be taxable until withdrawn for
"wine, women, and song".  Respondent has produced evidence
showing that substantial amounts of income were paid from the
trust account per petitioner's instructions for personal expenses
and that those withdrawals were not reported as income on his tax
returns.  Petitioner did not inform respondent's revenue agent,
who examined his returns for 1985-1988, that he held this belief
regarding tax deferred exchanges, and there is no credible
evidence of record showing that petitioner had this purported
misunderstanding.

Respondent has also proven by clear and convincing evidence
that petitioner's method of preparing his return for 1985 was
done with a fraudulent intent.  On the Schedule C for his real
estate business, petitioner reported income and expenses from
that business on the basis of spreadsheets of the deposits and
disbursements from his personal bank accounts.  He reported the
deposits, less amounts he classified as "loans", as gross income
from his business, and the disbursements, as deductible expenses
on the Schedule C.  Many of the disbursements were for inherently

---

[98]Also, the Tax Court's stipulated decision with respect to
petitioner's agreed deficiencies for 1977, 1978, 1979, 1981, and
1982, was entered before petitioner's filing of each of his
returns for the 1985 through 1988 tax years.

personal items, including jewelry for Ms. Allen and expenses for his 25 Ferrari automobiles.

Unlike most of the unreported items involving gain from real estate transactions that we find were due to fraud, the 1985 foreclosure sale of the Citrus County Property was not a typical sale of real estate. Respondent originally determined that petitioner realized $49,907 as cancellation of indebtedness income with respect to the Citrus County Property, in 1987. Respondent first raised the issue of gain from the foreclosure sale as a new matter in his amendment to answer. Respondent has not proven that the portion of the underpayment from the 1985 foreclosure sale of the Citrus County Property was attributable to petitioner's fraud. The addition to tax under section 6653(b)(2) shall not apply to that portion of the underpayment attributable to the gain realized from the foreclosure sale in 1985. Respondent has proven to our satisfaction that the remaining amount of the underpayment for 1985 is attributable to fraud. We hold that the addition to tax under section 6653(b)(2) applies to that amount of the underpayment.

III. Statute of Limitations for Assessment

Generally, the amount of any tax must be assessed within 3 years after the return required to be filed by the taxpayer was filed (whether such return was filed on or after the date prescribed therefor). Sec. 6501(a). However, in the case of a

false or fraudulent return with the intent to evade tax, the tax may be assessed <u>at any time</u>. Sec. 6501(c)(1). Respondent bears the burden of proving the applicability of this exception, and he must prove the same elements of fraud under section 6501(c)(1) as he is required to prove with respect to the additions to tax for fraud. <u>Estate of Johnson v. Commissioner</u>, T.C. Memo. 2001-182. In this case, respondent has shown by clear and convincing evidence that an underpayment of tax exists for each of the years 1985, 1986, 1987, and 1988, and he has shown that at least some part of that underpayment for each of those years is a result of fraud by petitioner. Therefore, we hold that the open period of limitations of section 6501(c)(1) applies, and section 6501(a) does not bar assessment of petitioner's deficiencies in taxes. See <u>DiLeo v. Commissioner</u>, 96 T.C. at 880.[99]

<u>Decision will be</u>

<u>entered under Rule 155</u>.

---

[99]Since we hold that each of the tax years at issue is open under sec. 6501(c)(1), we do not address respondent's alternative argument that the 1988 assessment is not barred under sec. 6501(a), because the period of limitations specified in sec. 6501(e)(1) applies and was extended by sec. 7609(e)(1).

Appendix A

INCOME AND DEDUCTIONS REPORTED BY PETITIONER ON RETURNS
RESPONDENT'S DETERMINATIONS OF INCOME AND DEDUCTIONS IN THE
STATUTORY NOTICE OF DEFICIENCY

<u>1985</u>:

<u>Schedule C Income</u>

| <u>Amount Reported</u> | <u>Amount Determined</u> | <u>Total Adjustment</u> |
|---|---|---|
| $160,363 | $448,498 | $288,135 |

| <u>Description of Deduction</u> | <u>Deduction Claimed</u> | <u>Deduction Allowed in Notice of Deficiency</u> |
|---|---|---|
| <u>Schedule C</u> | | |
| Car and truck expenses | $7,712 | - 0 - |
| Commissions | 26,840 | - 0 - |
| County recording fee expense | --- | $640 |
| Depreciation and sec. 179 deduction from Form 4562 | 2,300 | 3,575 |
| Development expense | --- | 437 |
| Dues and publications | 3,677 | - 0 - |
| Engineering expense | --- | 4,060 |
| Insurance | 1,277 | - 0 - |
| Legal and professional services | 9,282 | 3,609 |
| Office expense | 6,996 | 316 |
| Other interest | 43,291 | 178,435 |
| Repairs & maintenance | 23,157 | - 0 - |
| Taxes | 9,073 | 29,955 |
| Title insurance expense | --- | 8 |
| Travel and entertainment | 15,688 | - 0 - |
| Utilities and telephone | 3,188 | - 0 - |
| Total | 152,481 | 221,035 |

<u>Itemized Deductions</u>

| | |
|---|---|
| Reported by petitioner | --- |
| Determined by respondent | $22,567 |

<u>Personal Exemptions</u>

| | |
|---|---|
| Reported by petitioner (2) | $2,080 |
| Determined by respondent (2) | $2,080 |

<u>Taxable Income</u>

| | |
|---|---|
| Reported by petitioner | $5,802 |
| Determined by respondent | $202,816 |

Tax

| | |
|---|---|
| Reported by petitioner | $426 |
| Determined by respondent | $82,798 |

Self-employment Tax

| | |
|---|---|
| Reported by petitioner | $930 |
| Determined by respondent | $4,673 |

Earned Income Credit Recapture

| | |
|---|---|
| Determined by respondent | $382 |


1986:

Schedule C Income

| Amount Reported | Amount Determined | Total Adjustment |
|---|---|---|
| $119,772 | $659,361 | $539,589 |

| Description of Deduction | Deduction Claimed | Deduction Allowed in Notice of Deficiency |
|---|---|---|
| Car and truck expenses | $4,807 | - 0 - |
| Commissions | 6,922 | - 0 - |
| County recording fee expense | --- | $351 |
| Depreciation expense | --- | 8,579 |
| Dues and publications | 1,146 | - 0 - |
| Engineering expense | --- | 6,380 |
| Insurance | 112 | - 0 - |
| Interest: | | |
| Mortgage (paid to financial institutions) | --- | - 0 - |
| Other | 76,828 | 208,287 |
| Legal and professional services | 11,031 | 16,870 |
| Office expense | 3,935 | 268 |
| Repairs & maintenance | 4,510 | - 0 - |
| Taxes | --- | 63,588 |
| Title insurance expense | --- | 159 |
| Travel | 3,505 | - 0 - |
| Utilities and telephone | 2,838 | - 0 - |
| Total | 115,634 | 304,482 |

Itemized deductions

| | |
|---|---|
| Reported by petitioner | --- |
| Determined by respondent | $48 |

Personal Exemptions

| | |
|---|---|
| Reported by petitioner (2) | $2,080 |
| Determined by respondent (2) | $2,160 |

Taxable Income

| | |
|---|---|
| Reported by petitioner | $2,058 |
| Determined by respondent | $352,671 |

Tax

| | |
|---|---|
| Reported by petitioner | - 0 - |
| Determined by respondent | $160,671 |

Self-employment Tax

| | |
|---|---|
| Reported by petitioner | $509 |
| Determined by respondent | $5,166 |

Political Contribution Credit

| | |
|---|---|
| Reported by petitioner | --- |
| Determined by respondent | $50 |

Earned Income Credit Recapture

| | |
|---|---|
| Determined By Respondent | $454 |

1987:

Schedule C Income

| Amount Reported | Amount Determined | Total Adjustment |
|---|---|---|
| $138,653 | $1,157,509 | $1,018,856 |

| Description of Deduction | Deduction Claimed | Deduction Allowed in Notice of Deficiency |
|---|---|---|
| Appraisal expense | --- | $630 |
| Car and truck expenses | $5,152 | - 0 - |
| Commissions | 2,840 | 3,441 |
| County recording fee expenses | --- | 9 |
| Depreciation expense | --- | 8,579 |
| Development expense | --- | 106 |
| Dues and publications | 1,649 | 75 |
| Engineering expenses | --- | 2,272 |
| Interest: | | |
|   Mortgage (paid to financial institutions) | --- | - 0 - |
|   Other | 619 | 213,685 |
| Legal and professional expenses | --- | 8,115 |
| Office expense | 13,104 | 126 |
| Repairs | 41,554 | - 0 - |
| Taxes | 24,290 | 20,509 |
| Title insurance expense | --- | 10,979 |
| Travel | 2,325 | - 0 - |
| Utilities and telephone | 2,901 | - 0 - |
|   Total | 94,434 | 268,526 |

Itemized Deductions

|  |  |
|---|---|
| Reported by petitioner | --- |
| Determined by respondent | $41,021 |

Personal Exemptions

|  |  |
|---|---|
| Reported by petitioner (2) | $3,800 |
| Determined by respondent (2) | $3,800 |

Taxable Income

|  |  |
|---|---|
| Reported by petitioner | $37,879 |
| Determined by respondent | 845,510 |

Tax

|  |  |
|---|---|
| Reported by petitioner | $7,515 |
| Determined by respondent | $316,971 |

Self-employment Tax

|  |  |
|---|---|
| Reported by petitioner | $5,387 |
| Determined by respondent | $5,387 |

1988:

Schedule C Income

| Amount Reported | Amount Determined | Total Adjustment |
|---|---|---|
| $61,921 | $576,668 | $514,747 |

| Description of Deduction | Amount of Deduction | Deduction Allowed in Notice of Deficiency |
|---|---|---|
| Advertising expense | --- | $265 |
| Appraisal expense | --- | 1,500 |
| Car and truck expenses | $986 | - 0 - |
| Commissions | 3,750 | 3,467 |
| County recording fee expenses | --- | 146 |
| Depreciation expense | --- | 8,579 |
| Development expense | --- | 604 |
| Dues and publications | 555 | - 0 - |
| Engineering expenses | --- | 9,500 |
| Interest: |  |  |
|   Mortgage (paid to financial institutions) | --- | - 0 - |
|   Other | 19,272 | 222,133 |
| Legal and professional services | 3,986 | 5,885 |
| Office expense | 823 | 173 |
| Repairs | 10,182 | - 0 - |
| Taxes | 510 | 56,057 |
| Title insurance | 0 | (1,435) |

```
Travel, meals, ent.
  Travel                                  ---
  Meals & ent.               1,081
    20% of meals & ent.       (216)
  Meals & ent. minus 20%                  865          - 0 -
Utilities and telephone                 2,784          - 0 -
  Total                                43,713        306,874
```

S Corporation Loss

|  |  |
|---|---|
| Reported by petitioner | $4,702 |
| Determined by respondent | $4,702 |

Itemized Deductions

|  |  |
|---|---|
| Reported by petitioner | --- |
| Determined by respondent | $38,661 |

Personal Exemptions

|  |  |
|---|---|
| Reported by petitioner (2) | $3,900 |
| Determined by respondent (2) | $3,900 |

Taxable Income

|  |  |
|---|---|
| Reported by petitioner | $5,206 |
| Determined by respondent | $218,131 |

Tax

|  |  |
|---|---|
| Reported by petitioner | $784 |
| Determined by respondent | $62,169 |

Self-employment Tax

|  |  |
|---|---|
| Reported by petitioner | $2,371 |
| Determined by respondent | $5,859 |

Earned Income Credit Recapture

|  |  |
|---|---|
| Determined by respondent | $37 |

## Appendix B

### ADDITIONAL INCOME AND CLAIMED DEDUCTIONS
### RAISED IN PETITIONER'S SUPPLEMENT TO PETITION
### AND RESPONDENT'S AMENDMENT TO ANSWER

Petitioner's Supplement to Petition

Petitioner claims that respondent erred in disallowing expenses and in failing to allow expenses relating to his land development business, orange grove business, cattle business, and interest expense.

Petitioner claims to have incurred the following expenses as to part-time labor with grove, cattle, and general property maintenance and repair:

| Tax Year | Expenses |
|----------|----------|
| 1985 | $787 |
| 1987 | 4,782 |
| 1988 | 3,765 |

Petitioner claims to have incurred the following expenses as to orange grove agricultural dues and fees, supplies and equipment along with grove fertilizer, general maintenance and repairs, and development work:

| Tax Year | Expenses |
|----------|----------|
| 1985 | $15,628.42 |
| 1986 | 2,716.22 |
| 1987 | 27,409.61 |
| 1988 | 33,136.92 |

Petitioner claims to have incurred the following expenses as to the purchase of cattle, feed, supplies and equipment:

| Tax Year | Expenses |
|----------|----------|
| 1985 | $7,508.94 |
| 1986 | 1,656.61 |
| 1987 | 7,349.77 |
| 1988 | 125.00 |

Petitioner claims to have incurred the following expenses as to vintage automobiles:

| Tax Year | Expenses |
|----------|----------|
| 1985 | $16,125.77 |
| 1986 | 28,938.78 |
| 1987 | 72,951.91 |
| 1988 | 349.17 |

Respondent's Amendment to Answer

Citrus County Property:  Respondent originally determined that petitioner realized $49,907 as forgiveness of indebtedness income in 1987.  Respondent alternatively alleges that petitioner realized $112,156 of ordinary income from the sale of that property in 1985.


Tai Property:  Respondent alleges that petitioner realized additional income of $50,863 from the sale of real property in 1985.


As a result of those allegations, respondent asserts an additional deficiency of $80,523.  Thus, respondent claims a total revised income tax deficiency of $167,056 for 1985.

Respondent also alleges that those items of income were omitted with fraudulent intent to evade tax and asserts an increased sec. 6653(b)(1) addition to tax of $40,402 (revised addition to tax for fraud of $84,188 for 1985), and an increased sec. 6653(b)(2) addition to tax of 50 percent of the interest due on the revised underpayment of $167,056.


Total adjustments to Schedule C income:  $163,019
Taxable income from notice of deficiency:  $202,816
Corrected taxable income:  $365,835
Tax:  $163,321
Self-employment tax:  $4,673
Total corrected tax liability:  $167,994
Total tax shown on return or as previously adjusted:  $1,320
Adjustment to earned income credit:  ($382)
Deficiency - increase in tax:  $167,056

## Appendix C

### CONCESSIONS[100]

SCHEDULE C MISCELLANEOUS INCOME

|  | Taxable Year | | | |
|  | 1985 | 1986 | 1987 | 1988 |
| --- | --- | --- | --- | --- |
| Notice of deficiency | | | | |
| Miscellaneous income | $12,357 | $27,019 | $73,907 | $24,000 |
| | | | | |
| Amounts conceded by petitioner | | | | |
| Commission Income | $6,357 | $3,019 | – 0 – | – 0 – |
| Rent | 6,000 | 24,000 | $24,000 | $12,000 |
| Total | 12,357 | 27,019 | 24,000 | 12,000 |
| | | | | |
| Amounts conceded by respondent | | | | |
| Forgiveness of debt | – 0 – | – 0 – | $49,907* | $0 |
| | | | | |
| Amounts in dispute | | | | |
| Rent | – 0 – | – 0 – | – 0 – | $12,000 |

*Respondent concedes his forgiveness of debt determination for 1987. However, he raises as new matter that petitioner realized $112,156 of ordinary income from the sale by foreclosure of the Citrus County Property in 1985. See appendix B.

[100]Respondent prepared on brief a reconciliation of items which are "in dispute" and concessions as to the adjustments in the statutory notice of deficiency. Appendix C of this opinion reflects the reconciliation schedules that respondent prepared and which petitioner stipulated in his answering brief. However, there are a number of income items, as we discuss in the opinion, that the parties represented were still in dispute but which petitioner does not contest on brief. Instead, he states: "In addition, any issues not raised in Petitioner's Brief are also conceded by Petitioner".

SCHEDULE C GAINS FROM PROPERTY SALES

| | Taxable Year | | | |
|---|---|---|---|---|
| | 1985 | 1986 | 1987 | 1988 |
| **Notice of deficiency** | | | | |
| Gains on property sales | $247,154 | $417,788 | $995,801 | $375,268 |
| **Amendment to answer** | | | | |
| Tai Property | $50,863 | – 0 – | – 0 – | – 0 – |
| **Amounts conceded by petitioner** | | | | |
| OS-13 | $4,854 | – 0 – | – 0 – | – 0 – |
| OS-06 | 10,270 | $13,100 | – 0 – | $12,950 |
| OS-49 | 20,000 | – 0 – | $94,446 | – 0 – |
| OS-1.2 | 6,878 | – 0 – | 29,124 | – 0 – |
| OS-61 | 92,796 | – 0 – | 0 | – 0 – |
| OR-01 | – 0 – | 72,039 | 823,078 | – 0 – |
| OS-29 | – 0 – | 2,570 | – 0 – | – 0 – |
| OS-31 | – 0 – | 48,432 | – 0 – | – 0 – |
| OR-ABC | – 0 – | 18,783 | – 0 – | – 0 – |
| OS-23 | – 0 – | – 0 – | – 0 – | 154,170 |
| Total | 134,798 | 154,924 | 946,648 | 167,120 |
| **Concession relating to amendment to answer** | | | | |
| Tai Property | $50,863 | – 0 – | – 0 – | – 0 – |
| **Amounts conceded by respondent** | | | | |
| OS-06 | $1,000 | $1,000 | – 0 – | $1,000 |
| OS-1.4 | 6,144 | 12,289 | $24,577 | – 0 – |
| OS-29 | – 0 – | 42,480 | – 0 – | – 0 – |
| OS-22 | – 0 – | – 0 – | – 0 – | 55,164 |
| Total | 7,144 | 55,769 | 24,577 | 56,164 |
| **Amounts in dispute** | | | | |
| OS-03 | $20,097 | $21,097 | – 0 – | $77,298 |
| OS-06 | 59,272 | – 0 – | – 0 – | – 0 – |
| OS-35 | 19,699 | – 0 – | – 0 – | – 0 – |
| OS-1.4 | 6,144 | 12,289 | $24,577 | – 0 – |
| OS-47 | – 0 – | 41,776 | – 0 – | – 0 – |
| OS-47 | – 0 – | 50,726 | – 0 – | 19,522 |
| OS-1.3 | – 0 – | 20,502 | – 0 – | – 0 – |
| OS-39 | – 0 – | 60,706 | – 0 – | – 0 – |
| OS-22 | – 0 – | – 0 – | – 0 – | 55,164 |
| Total | 105,212 | 207,096 | 24,577 | 151,984 |

*Petitioner on brief concedes that his share of the gain from the sale of the Mefford Property (OS-22) was $55,164.

SCHEDULE C INTEREST INCOME

| | Taxable Year | | | |
|---|---|---|---|---|
| | 1985 | 1986 | 1987 | 1988 |
| **Notice of deficiency** | | | | |
| Interest income | $54,024 | $22,224 | $20,061 | - 0 - |
| **Amounts conceded by petitioner** | | | | |
| **Payee** | | | | |
| Botos | - 0 - | - 0 - | $400 | - 0 - |
| Horton | - 0 - | $10,614 | - 0 - | - 0 - |
| Tai | $27,718 | - 0 - | - 0 - | - 0 - |
| Commonwealth Int. | - 0 - | - 0 - | 8,305 | - 0 - |
| Muroff | 12,761 | - 0 - | - 0 - | - 0 - |
| Miles | - 0 - | - 0 - | 380 | - 0 - |
| Total | 40,479 | 10,614 | 9,085 | - 0 - |
| **Amounts conceded by respondent** | | | | |
| **Payee** | | | | |
| Bettner, et al. | $6,773 | $5,805 | $5,488 | - 0 - |
| **Amounts in dispute** | | | | |
| **Payee** | | | | |
| Bettner, et al. | $6,773 | $5,805 | $5,488 | - 0 - |

SCHEDULE C COMMISSION INCOME

Notice of deficiency

| | |
|---|---:|
| Commission income-1985 | $67,749 |
| Commission income-1986 | 32,383 |
| Commission income-1987 | - 0 - |
| Commission income-1988 | - 0 - |

Amounts conceded by petitioner

Commission income-1985
Account (Date of deposit)

| | |
|---|---:|
| Freedom (01/03/85) | $500 |
| Freedom (01/18/85) | 18,562 |
| Freedom (06/10/85) | 500 |
| Freedom (07/22/85) | 10,530 |
| Tucker  (03/01/85) | 157 |
| Total | 30,249 |

Commission income-1986*
Account (Date of deposit)

| | |
|---|---:|
| Freedom (01/08/86) | $1,817 |
| Freedom (01/17/86) | 1,600 |
| Freedom (04/10/86) | 4,680 |
| Freedom (06/20/86) | 5,215 |
| Freedom (07/24/86) | 1,588 |
| Freedom (08/01/86) | 13,558 |
| Freedom (08/25/86) | 3,000 |
| Freedom (10/03/86) | 600 |
| Freedom (12/12/86) | 300 |
| Total | 32,358 |

*The amounts of commission income for 1986 were not part of respondent's reconciliation of Schedule C commission income; however, petitioner agrees to respondent's requested finding that he received those amounts as income in 1986.

Amounts in dispute

Commission income-1985
Account (Date of deposit)

| | |
|---|---:|
| Freedom (02/06/85) | $37,500 |

Commission income-1986

| | |
|---|---:|
| None | - 0 - |

*The statutory notice of deficiency determined $32,383 as commission income for 1986.  However, on brief, respondent states $32,358 as the amount of commission income for 1986.  Respondent has apparently conceded the $25 difference between these two figures.

SCHEDULE C RENT FROM CRAZY COMMANDOS

<u>Notice of deficiency</u>
     Rent from Crazy Commandos-1985        $1,353

<u>Amounts conceded by respondent</u>
     Rent from Crazy Commandos-1985        $103

<u>Amounts in dispute</u>
     Rent from Crazy Commandos-1985        $1,250


SCHEDULE C UNIDENTIFIED DEPOSITS


<u>Notice of deficiency</u>

| | |
|---|---|
| Unidentified deposits-1985 | $60,854 |
| Unidentified deposits-1986 | 159,349 |
| Unidentified deposits-1987 | 67,740 |
| Unidentified deposits-1988 | 177,400 |

<u>Amounts conceded by petitioner</u>

<u>Unidentified deposits-1985</u>
<u>Account (Date of deposit)</u>
Tucker (08/01/85)          $1,700

<u>Unidentified deposits-1986</u>
<u>Account (Date of deposit)</u>

| | |
|---|---|
| Freedom (04/14/86) | $6,000 |
| Freedom (09/09/86) | 11,186 |
| Freedom (12/16/86) | <u>7,000</u> |
|   Total | 24,186 |

<u>Unidentified deposits-1987</u>
None          - 0 -

<u>Unidentified deposits-1988</u>
<u>Account (Date of deposit)</u>

| | |
|---|---|
| Freedom (03/21/88) | $2,200 |
| Tucker (09/07/88) | <u>2,200</u> |
|   Total | 4,400 |

<u>Amounts conceded by respondent</u>

<u>Unidentified deposits</u>
<u>Account (Date of deposit)</u>
Tucker (09/30/85)          $154

<u>Unidentified deposits-1986</u>
<u>Account (Date of deposit)</u>

| | |
|---|---|
| Ledger (08/01/86) | $9,038 |
| Ledger (08/15/86) | <u>41,003</u> |
|   Total | 50,041 |

<u>Unidentified deposits-1987</u>
None          - 0 -

Unidentified deposits-1988
Account (Date of deposit)
Freedom (03/24/88)                $33,000

Amounts in dispute

Unidentified deposits-1985
Account (Date of deposit)
Tucker (03/12/85)                 $59,000

Unidentified deposits-1986
Account (Date of deposit)
Freedom (05/06/86)                   $300
Ledger (09/16/86)                  84,522
Ledger (10/10/86)                     300
  Total                            85,122

Unidentified deposits-1987
Account (Date of deposit)
Tucker (04/09/87)                 $67,740

Unidentified deposits-1988
Account (Date of deposit)
Ledger (07/08/88)                $140,000


SCHEDULE C NATIONAL LAND COMMISSION INCOME


Notice of deficiency

Natl. Land Commissions-1985       $4,607
Natl. Land Commissions-1986          598

Amounts conceded by respondent

Natl. Land Commissions-1985       $4,607*

*According to respondent's concession, this is a net amount composed of commission income received from, and commission expenses paid to, National Land.  Respondent is actually conceding commission income of $8,873; which eliminates the $4,607 adjustment in the notice of deficiency and results in a negative adjustment of $4,266 ($4,607 - $8,873).

Amounts in dispute

Natl. Land Commissions-1985        - 0 -
Natl. Land Commissions-1986         $598

SCHEDULE C SALE WAX MYRTLE TREES

<u>Notice of deficiency</u>

     Sale Wax Myrtle Trees-1985          $400

<u>Amounts in dispute</u>

     Sale Wax Myrtle Trees-1985          $400


SCHEDULE E INCOME*

<u>Notice of deficiency</u>

     Schedule E income-1987          $3,888

<u>Amounts in dispute</u>

     Schedule E income-1987          $3,888


*This item was not reflected in respondent's reconciliation schedules.

## Appendix D

### ITEMS RESPONDENT RELIES UPON AS
### CLEAR AND CONVINCING EVIDENCE OF UNDERPAYMENT

1985:

Stipulated Income:

| Income Item | Amount |
|---|---|
| Miscellaneous Sch. C income | $12,357 |
| Gains from property sales | 185,661 |
| Interest income | 40,479 |
| Commission income | 30,249 |
| Unidentified deposits | 1,700 |
| Total stipulated income | 270,446 |

Disputed Income:

| Income Item | Amount |
|---|---|
| Gain from sale of Lot 1 in Susan's Lakefront Estate | $20,097 |
| Installment gain from sale of 3 lots in Florida Fruit Belt Subd. | 28,347 |
| Gain from sale of installment note | 30,925 |
| Gain from sale of Lot 23, High Plains | 19,699 |
| Installment gain from Silver Lake sale | 6,144 |
| Gain from foreclosure sale of Citrus County Property | 112,156 |
| Interest income from Silver Lake mortgage | 6,773 |
| Commission income | 37,500 |
| Rental income | 1,250 |
| Unidentified deposit | 59,000 |
| Total disputed income | 321,891 |

Total income relied upon by respondent (stipulated income + disputed income):  $592,337
Less reconstructed Schedule C expenses (after concessions on brief):  $225,301
Less itemized deductions:  $22,567
Less personal exemptions:  $2,080
Taxable income:  $342,389
Tax liability (based on head of household filing status):  $151,597
Plus self-employment tax:  $4,673

CLAIMED UNDERPAYMENT FOR 1985:  $156,270

1986:

Stipulated Income:

| Income Item | Amount |
|---|---|
| Miscellaneous Sch. C income | $27,019 |
| Gains from property sales | 154,924 |
| Interest income | 10,614 |
| Commission income | 32,357 |
| Unidentified deposits | 24,186 |
| Total stipulated income | 249,100 |

Disputed Income:

| Income Item | Amount |
|---|---|
| Gain from sale of Tract A in Susan's Lakefront Estate | $21,097 |
| Gain from sale of parcel in Grissom Parcels | 20,502 |
| Installment gain from Silver Lake sale | 12,288 |
| Gain from sale of 62.5 acres in East Lake Vista | 92,502 |
| Gain from exchange of Arrowhead Lakes Subd. for Angel-Royse Property | 60,706 |
| Interest income from Silver Lake mortgage | 5,805 |
| Unidentified deposits | 9,638 |
| Total disputed income | 222,538 |

Total income relied upon by respondent (stipulated income + disputed income):  $471,638
Less reconstructed Sch. C expenses (after concessions on brief):  $298,656
Less itemized deductions:  - 0 -
Less nonitemized contributions:  $48
Less personal exemptions:  $2,160
Taxable income:  $170,774
Tax liability (based on head of household filing status):  $69,723
Plus self-employment tax:  $5,166

CLAIMED UNDERPAYMENT FOR 1986:  $74,889

1987:

Stipulated Income:

| Income Item | Amount |
| --- | --- |
| Miscellaneous Sch. C income | $24,000 |
| Gains from property sales | 946,649 |
| Interest income | 9,084 |
| Total stipulated income | 979,733 |

Disputed Income:

| Income Item | Amount |
| --- | --- |
| Installment gain from Silver Lake sale | $24,577 |
| Interest income from Silver Lake mortgage | 5,488 |
| Total disputed income | 30,065 |

Total income relied upon by respondent (stipulated income + disputed income):  $1,009,798
Less reconstructed Sch. C expenses (after concessions on brief):  $265,076
Less itemized deductions:  $43,561
Less personal exemptions:  $3,800
Taxable income:  $697,361
Tax liability (based on head of household filing status): $259,934
Plus self-employment tax:  $5,387
Less tax per return:  $12,902

CLAIMED UNDERPAYMENT FOR 1987:  $252,419

1988:

Stipulated Income:

| Income Item | Amount |
|---|---|
| Miscellaneous Sch. C income | $12,000 |
| Gains from property sales | 167,120 |
| Unidentified deposits | 4,400 |
| Total stipulated income | 183,520 |

Disputed Income:

| Income Item | Amount |
|---|---|
| Gain from sale of Lots 6-30 in Susan's Lakefront Estate | $77,298 |
| Gain from sale of 10 acres in East Lake Vista | 19,522 |
| Gain from sale of Mefford Property | 55,164 |
| Rent received from Island Living, Inc. | 12,000 |
| Unidentified deposit | 140,000 |
| Total disputed income | 303,984 |

Total income relied upon by respondent (stipulated income + disputed income): $487,504
Less reconstructed Sch. C expenses (after concessions on brief): $301,910
Less itemized deductions: $44,651
Less personal exemptions: $3,900
Taxable income: $137,043
Tax liability (based on head of household filing status): $39,035
Plus self-employment tax: $5,859

CLAIMED UNDERPAYMENT FOR 1988: $44,894